UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MANY CULTURES, ONE MESSAGE, et al,

                         Plaintiffs,

      v.

JIM CLEMENTS, et al,

                         Defendants.

No. 3:10-cv-05253-KLS

ORDER DENYING PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT
AND GRANTING SUMMARY
JUDGMENT FOR DEFENDANTS

     This matter comes before the Court on plaintiffs' motion for summary judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56. The parties have consented to have this matter heard by the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(c), Fed. R. Civ. P. 73 and Local Rule MJR 13. After having reviewed plaintiffs' motion for summary judgment, defendants' response to that motion, plaintiffs' reply thereto and the remaining record – including the parties' supplemental briefing regarding standing – the Court finds that plaintiffs' motion for summary judgment should be denied, and that summary judgment should be granted in favor of defendants.

<u>FACTUAL AND PROCEDURAL BACKGROUND</u>

     Plaintiffs' have brought this civil rights action pursuant to 42 U.S.C. § 1983, alleging RCW 42.17.200 (the section of Washington's campaign finance, lobbying and public disclosure

laws, RCW Chapter 42.17, dealing with "grassroots lobbying") and RCW 42.17.160 (the section of RCW Chapter 42.17 setting forth certain exemptions from Washington's lobbying registration and reporting requirements) and regulations issued by the Washington State Public Disclosure Commission ("PDC") implementing and enforcing those provisions, are unconstitutional on their face and as applied to plaintiffs. Specifically, plaintiffs allege that the above statutory provisions and regulations: (1) violate the First Amendment right of anonymous political and free speech, the right of association, the right to petition the government, and the right against prior restraint; (2) that they are overbroad and void for vagueness; and (3) that they violate the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs seek relief in the form of a declaratory order, as well as both a preliminary and a permanent injunction.

I.      Washington's Public Disclosure Laws

Initiative 276 was "overwhelmingly approved" by Washington voters in 1972, receiving 72% of the vote. ECF #22, Exhibit 1, *The History and Intent of Initiative 276*, David Cuillier, David Dean and Dr. Susan Dente Ross (issued May 4, 2004, and updated August 24, 2004), pp. 1, 4. The Initiative also gathered "a far greater number of signatures than it needed to be placed on the ballot." ECF #25-2, Exhibit 1, Declaration of Jolene Unsold, p. 4. It "required disclosure of campaign contributions and expenditures, lobbying expenditures, and the personal affairs of various officials." ECF #25-2, Exhibit 1, p. 2; see also ECF #22, Exhibit 1, p. 1. Initiative 276 led to what eventually became RCW Chapter 42.17, Washington's campaign finance, lobbying and public disclosure laws. See ECF #22, Exhibit 1, p. 1. It also created the PDC to enforce those laws. ECF #25-2, Exhibit 1, p. 2; Voter's Education Committee v. Washington State Public Disclosure Commission, 161 Wn.2d 470, 479 (2007).

"[T]he genesis of Initiative 276 occurred not just because of concerns about disclosure of

ORDER - 2

money raised and spent on candidate campaigns and public records disclosure, but also a strong interest by the public in the disclosure of money raised and spent on legislative lobbying and ballot measure campaigns to enact legislation." ECF #25-2, Exhibit 1, p. 3. "The overall thrust" of Initiative 276 "was the people's right to know, and to enable citizens to 'follow the money' in all sorts of campaigns" in Washington. Id. The paragraph that began the statement for Initiative 276 read as follows:

> Our whole concept of democracy is based on an informed and involved citizenry. Trust and confidence in governmental institutions is at an all time low. High on the list of causes of this citizen distrust are secrecy in government and the influence of private money on governmental decision making. Initiative 276 brings all this out into the open for citizens and voters to judge for themselves.

ECF #22, Exhibit 1, p. 2.

The official declaration of policy contained in RCW Chapter 42.17 expressly states in relevant part as well that it is "the public policy of the State of Washington" that "lobbying contributions and expenditures be fully disclosed to the public and that secrecy is to be avoided," and that "the public's right to know of . . . lobbying . . . far outweighs any right that that these matters remain secret and private." RCW 42.17.010(1), (10). The declaration of policy goes on to state again in relevant part that:

> The provisions of [RCW Chapter 42.17] shall be liberally construed to promote complete disclosure of all information respecting . . . lobbying . . . and full access to public records as to assure continuing public confidence of fairness of elections and governmental processes, and so as to assure that the public interest will be fully protected. . . .

RCW 42.17.010. However, "[i]n promoting such complete disclosure," the declaration of policy further provides that RCW Chapter 42.17:

> . . . [S]hall be enforced so as to insure that the information disclosed will not be misused for arbitrary and capricious purposes and to insure that all persons reporting under [RCW Chapter 42.17] will be protected from harassment and

ORDER - 3

unfounded allegations based on information they have freely disclosed.

Id.

Specifically with respect to "grass roots lobbying," RCW 42.17.200 provides in relevant part that:

> Any person who has made expenditures, not reported by a registered lobbyist . . . or by a candidate or political committee . . . exceeding *five hundred dollars in the aggregate within any three-month period or exceeding *two hundred dollars in the aggregate within any one-month period[1] in presenting a program addressed to the public, a substantial portion of which is intended, designed, or calculated primarily to influence legislation shall be required to register and report, as provided in subsection (2) of this section, as a sponsor of a grass roots lobbying campaign.

RCW 42.17.200(1). The term "legislation" is defined to mean:

> . . . [B]ills, resolutions, motions, amendments, nominations, and other matters pending or proposed in either house of the state legislature, and includes any other matter that may be the subject of action by either house or any committee of the legislature and all bills and resolutions that, having passed both houses, are pending approval by the governor.

RCW 42.17.020(30). In regard to registration and reporting requirements, RCW 42.17.200(2)

---

[1]These are not the current expenditure amounts. As explained by Doug Ellis, the current Interim Executive Director of the PDC:

> The legislature amended [RCW 42.17.200] in 1985 and 1990, and recodified it in 2010. . . . The asterisks in the statute refer to the [PDC's] authority to adjust [the expenditure] amounts for inflation per RCW 42.17.370. The . . . current [expenditure amounts are $1,000 and $500 respectively, and] were established by the [PDC] and have been confirmed by the [Washington State L]egislature in the [2010] recodification. RCW 42.17.370(11) empowers, but does not require, the [PDC] to revise at least once every five years but no more often than every two years, the[se expenditure amounts] . . . The [PDC] itself last adjusted the[se amounts] in 1985. Then, in 2010, the legislature considered [RCW 42.17.200], recodified it at RCW 42.17A.640 effective January 1, 2012, and retained the current [expenditure amounts] as follows:
>
> > (1) Any person who has made expenditures, not reported by a registered lobbyist under RCW 42.17A.615 or by a candidate or political committee under RCW 42.17A.225 or 42.17A.235, exceeding *one thousand dollars in the aggregate within any three-month period or exceeding *five hundred dollars in the aggregate within any one-month period in presenting a program to the public, a substantial portion of which is intended, designed, or calculated primarily to influence legislation shall register and report, as provided in subsection (2) of this section, as a sponsor of a grass roots lobbying campaign.

ECF #25, Declaration of Doug Ellis, ¶ 35.

ORDER - 4

provides in relevant part:

> . . . Within thirty days after becoming a sponsor of a grass roots lobbying campaign, the sponsor shall register by filing with the commission a registration statement, in such detail as the commission shall prescribe, showing:
>
> (a) The sponsor's name, address, and business or occupation, and, if the sponsor is not an individual, the names, addresses, and titles of the controlling persons responsible for managing the sponsor's affairs;
>
> (b) The names, addresses, and business or occupation of all persons organizing and managing the campaign, or hired to assist the campaign, including any public relations or advertising firms participating in the campaign, and the terms of compensation for all such persons;
>
> (c) The names and addresses of each person contributing twenty-five dollars or more to the campaign, and the aggregate amount contributed;
>
> (d) The purpose of the campaign, including the specific legislation, rules, rates, standards, or proposals that are the subject matter of the campaign;
>
> (e) The totals of all expenditures made or incurred to date on behalf of the campaign, which totals shall be segregated according to financial category, including but not limited to the following: Advertising, segregated by media, and in the case of large expenditures (as provided by rule of the [PDC]), by outlet; contributions; entertainment, including food and refreshments; office expenses including rent and the salaries and wages paid for staff and secretarial assistance, or the proportionate amount thereof paid or incurred for lobbying campaign activities; consultants; and printing and mailing expenses.

Other reporting requirements apply as well:

> (3) Every sponsor who has registered under this section shall file monthly reports with the [PDC], which reports shall be filed by the tenth day of the month for the activity during the preceding month. The reports shall update the information contained in the sponsor's registration statement and in prior reports and shall show contributions received and totals of expenditures made during the month, in the same manner as provided for in the registration statement.
>
> (4) When the campaign has been terminated, the sponsor shall file a notice of termination with the final monthly report, which notice shall state the totals of all contributions and expenditures made on behalf of the campaign, in the same manner as provided for in the registration statement.

RCW 42.17.200. On the other hand, certain persons are made exempt from the registration and

ORDER - 5

reporting requirements of RCW 42.17.200.  These persons include – with certain exceptions not relevant here – the following:

(1) Persons who limit their lobbying activities to appearing before public sessions of committees of the legislature, or public hearings of state agencies;

(2) Activities by lobbyists or other persons whose participation has been solicited by an agency . . . ;

(3) News or feature reporting activities and editorial comment by working members of the press, radio, or television and the publication or dissemination thereof by a newspaper, book publisher, regularly published periodical, radio station, or television station;

(4) Persons who lobby without compensation or other consideration for acting as a lobbyist: PROVIDED, Such person makes no expenditure for or on behalf of any member of the legislature or elected official or public officer or employee of the state of Washington in connection with such lobbying. . . .[2];

(5) Persons who restrict their lobbying activities to no more than four days or parts thereof during any three-month period and whose total expenditures during such three-month period for or on behalf of any one or more members of the legislature or state elected officials or public officers or employees of the state of Washington in connection with such lobbying do not exceed twenty-five dollars . . .[3];

(6) The governor;

(7) The lieutenant governor;

(8) . . . members of the legislature;

(9) . . . persons employed by the legislature for the purpose of aiding in the preparation or enactment of legislation or the performance of legislative duties;

---

[2] This subsection further explains: "The exemption contained in this subsection is intended to permit and encourage citizens of this state to lobby any legislator, public official, or state agency without incurring any registration or reporting obligation provided they do not exceed the limits stated above.  Any person exempt under this subsection (4) may at his or her option register and report under [RCW Chapter 42.17]." RCW 42.17.160(4)

[3] This subsection continues: "PROVIDED, That the [PDC] shall promulgate regulations to require disclosure by persons exempt under this subsection or their employers or entities which sponsor or coordinate the lobbying activities of such persons if it determines that such regulations are necessary to prevent frustration of the purposes of [RCW Chapter 42.17].  Any person exempt under this subsection (5) may at his or her option register and report under [RCW Chapter 42.17]." RCW 42.17.160(5)

ORDER - 6

(10) Elected officials, and officers and employees of any agency reporting [with respect to legislative and lobbying activities].

RCW 42.17.160.

RCW Chapter 42.17 also contains penalties for failure to comply with the requisite registration and reporting requirements. For example, RCW 42.17.390 provides in relevant part that:

(2) If any lobbyist or sponsor of any grass roots lobbying campaign violates any of the provisions of [RCW Chapter 42.17], his or her registration may be revoked or suspended and he or she may be enjoined from receiving compensation or making expenditures for lobbying . . .

(3) Any person who violates any of the provisions of [RCW Chapter 42.17] may be subject to a civil penalty of not more than ten thousand dollars for each such violation. . . . .

(4) Any person who fails to file a properly completed statement or report within the time required by [RCW Chapter 42.17] may be subject to a civil penalty of ten dollars per day for each day each such delinquency continues.

(5) Any person who fails to report a contribution or expenditure as required by [RCW Chapter 42.17] may be subject to a civil penalty equivalent to the amount not reported as required.

(6) The court may enjoin any person to prevent the doing of any act herein prohibited, or to compel the performance of any act required herein.

The PDC itself may issue an order requiring any person who violates RCW Chapter 42.17 "to cease and desist from the activity that constitutes [the] violation and in addition, or alternatively, may impose one or more of the remedies provided in RCW 42.17.390(2) through (5)." RCW 42.17.395(4). On the other hand, "[n]o individual penalty assessed by the [PDC] may exceed" $1,700, and "in any case where multiple violations are involved in a single complaint . . . , the maximum aggregate penalty may not exceed" $4,200. Id.

Washington's Attorney General and other state "prosecuting authorities" also "may bring

ORDER - 7

civil actions in the name of the state for any appropriate civil remedy, including but not limited to the special remedies provided in RCW 42.17.390." RCW 42.17.400(1).  Under certain circumstances, a citizen of Washington may bring a private cause of action for failure to comply with RCW Chapter 42.17. <u>See</u> RCW 42.17.400(4).  Penalties for violations that may be assessed under this statutory provision include the following:

> In any action brought under this section, the court may award to the state all costs of investigation and trial, including a reasonable attorney's fee to be fixed by the court.  If the violation is found to have been intentional, the amount of the judgment, which shall for this purpose include the costs, may be trebled as punitive damages. . . .

RCW 42.17.400(5).

II.     <u>The Public Disclosure Commission</u>

As noted above, the PDC "was created through the passage of Initiative 276 in 1972," which was made "effective in 1973" and "codified in RCW Chapter 42.17," and which "the PDC implements and enforces." ECF #25, ¶ 5.  According to Doug Ellis, the PDC's current Interim Executive Director, "[p]roviding information to the public is a core mission of the PDC," as "it enables the public to 'follow the money' with respect to campaigns and lobbying." <u>Id.</u> at ¶ 10. "All reports filed with the PDC disclosing campaign, lobbying and other activities . . . are public records," and "[t]he PDC makes this information available to the public for inspection and copying." <u>Id.</u> at ¶¶ at 10-11; <u>see also</u> RCW 42.17.440 (providing that all statements and reports filed under RCW Chapter 42.17 are to be treated as public records, and are to be made available for public inspection and copying).  In addition, in regard to such public access:

> Before the mid-1990s, all reports were filed on paper.  Members of the public, and especially the media, would ask the PDC to provide them copies of the paper reports.  Today, thousands of campaign finance and lobbying reports are filed electronically and made available on the PDC's website . . .  In addition, paper reports filed by . . . lobbyists are scanned and typically made available on the website within four hours of receipt by PDC staff and within 15

ORDER - 8

minutes for electronically filed reports. . . .

. . . As a result, information from filed reports is quickly available online to the voters and to the public.  The public can then use these reports to "follow the money" in campaigns and lobbying and also conduct their own analysis.

ECF #25 at ¶¶ at 11-12.  Indeed, making such information available to the public electronically was mandated by the Washington State Legislature itself:

By February 1, 2000, the [PDC] shall operate a web site or contract for the operation of a web site that allows access to reports, copies of reports, or copies of data and information submitted in reports, filed with the [PDC] under RCW 42.17.040, 42.17.065, 42.17.080, 42.17.100, and 42.17.105.  By January 1, 2001, the web site shall allow access to reports, copies of reports, or copies of data and information submitted in reports, filed with the [PDC] under RCW 42.17.150, 42.17.170, 42.17.175, and 42.17.180.  In addition, the [PDC] shall attempt to make available via the web site other public records submitted to or generated by the [PDC] that are required by [RCW Chapter 42.17] to be available for public use or inspection.[4]

RCW 42.17.367; ECF #25, ¶ 15.  The legislature also has "directed that filing of reports with the PDC be made available through an electronic means," and that "the PDC shall make available an electronic copy of . . . reporting forms at no charge." ECF #25, ¶ 16; see also RCW 42.17.369; RCW 42.17.3691.

With further respect to public access, "information in lobbying reports filed with the PDC is available to the public" in the following ways:

- **By Accessing the PDC Website.** . . .  [A] person can view and copy lobbying reports filed with the PDC, including grassroots lobbying

---

[4] Further, "[t]he legislative finding from 1994 in the Code Reviser Notes after the codification of [RCW 42.17.367] in the Revised Code of Washington cites to Laws of Washington 1994, Chapter 40, Section 2, . . . states:

The legislature finds that government information is a strategic resource and needs to be managed as such and that broad public access to nonrestricted public information and records must be guaranteed.  The legislature further finds that reengineering government processes along with capitalizing on advancements made in digital technology can build greater efficiencies in government service delivery.  The legislature further finds that providing citizen electronic access to presently available public documents will allow increased citizen involvement in state policies and empower citizens to participate in state policy decision making.

ECF #25, ¶ 15.

ORDER - 9

reports. There is no charge for accessing the website, or printing documents from it.

- **By Contacting the PDC by Telephone or Email.** . . . [A] person can also request copies of lobbying reports to be mailed to them, or emailed to them. Pursuant to [RCW 42.17.362], the PDC operates a toll-free telephone number to assist in providing easier access to the PDC by the public. . . . [The PDC's] telephone numbers and email address are posted on [its] website.

- **By Visiting [the PDC's] Office.** . . . [A] person can visit the PDC's sole office location in downtown Olympia and ask for a copy of any filed form, and [the PDC] will provide it at [its] front desk. [The PDC's] street address is posted on [its] website. [The PDC] also make a computer terminal and printer available to the public in [its] front lobby, so a person can search for and print reports or other information available on [its] website. . . .

ECF #25, ¶ 21. In addition, the filer of a report who contacts the PDC, can receive both "formal and informal assistance" provided either "by PDC staff[, including via telephone and e-mail,] or, depending upon the question, by" the PDC itself. Id. at ¶ 24. Training provided by the PDC "is also available." Id. If "PDC staff are unable to answer a question or the answer is not readily available on the [PDC's] website, and the person inquiring seeks direction from the [PDC]," that person also may submit "an informal advisory opinion request, a formal declaratory order request . . . , a formal request for guidance through issuance of an interpretive statement . . . , or a formal rulemaking petition." Id. at ¶ 25; see also RCW 34.05.230(1), 34.05.240, 34.05.330; WAC 390-12-250, 390-12-255. The PDC by statute also may "respond on a case-by-case basis to 'modification requests'" seeking "a modification or suspension of the reporting requirements." Ellis Declaration, ¶ 26; see also RCW 42.17.370(10).[5]

---

[5] Pursuant to RCW 42.17.370(10), the PDC is authorized to:

After hearing, by order approved and ratified by a majority of the membership of the [PDC], suspend or modify any of the reporting requirements . . . in a particular case if it finds that literal application of [RCW Chapter 42.17] works a manifestly

ORDER - 10

To register and report as a grassroots lobbying campaign sponsor, a two-page form (the "L6 form"), which is available on the PDC's website, must be filed with the PDC. See ECF #25, ¶¶ 38-39. The following information is required to be disclosed on that form:

- The sponsor's name, address;
- Topics of legislation about which the campaign is conducted (including bill, rule, rate, standard number if any);
- Principal officers;
- Who is organizing or managing the campaign (name, address, and occupation or business, and terms of compensation);
- Expenditures made or incurred in the campaign (radio, TV, newspapers, magazines, brochures, signs, printing and mailing, consultants, public relations, office expense, travel, salaries, contributions, entertainment, other expenses);
- Total expenditures; and
- Contributors giving more than $25.

Id. at ¶ 40. The L6 form also "provides instructions on who should file, the filing deadline, where to file (including [the] PDC address), and the PDC's telephone numbers[,] including [its] toll-free number." Id. at ¶ 41. Further, "guidance and instructions on how to file . . . the L6 form . . . is also available on [the PDC's] website," as is additional information concerning grass roots lobbying such as:

- Links to further resources for . . . filing requirements, manuals and brochures, . . . electronic filing options, and training schedules . . . ;
- Links to lobbying instruction manuals . . . ;
- A flow chart showing when a grassroots lobbyist is required to file a disclosure report . . . ;
- Information on the filing deadlines for grassroots lobbying . . . ; and
- How to contact the PDC by telephone or email, plus a description of the agency's office hours . . .

---

unreasonable hardship and if it also finds that the suspension or modification will not frustrate the purposes of [RCW Chapter 42.17]. . . .

However, "[a]ny suspension or modification shall be only to the extent necessary to substantially relieve the hardship," and the PDC "shall act to suspend or modify any reporting requirements only if it determines that facts exist that are clear and convincing proof of the findings required under this section." Id.

ORDER - 11

Id. at ¶ 48.  Links to RCW Chapter 42.17 and WAC Title 390 – which contain the rules issued by the PDC – are provided on the PDC's website as well, as are "a database of enforcement cases involving various sections of RCW 42.17, . . . a summary of the cases and outcomes" and since the year 2000, "a summary of cases involving alleged violations of RCW 42.17.200." Id.  In addition, the PDC "issues declaratory orders upon request," copies of which "are available to the public and filers on the PDC's website," as are scanned copies of L6 forms that are filed with the PDC. Id. at ¶¶ 51, 55, 58.

III.     Plaintiffs Many Cultures, One Message and Conservative Enthusiasts

Plaintiff Many Cultures, One Message ("MCOM") describes itself as "an unincorporated, nonprofit volunteer association based in Seattle." ECF #1, Civil Rights Complaint, ¶ 10. [6]  It has no "bylaws, articles of incorporation, or any other governing documents." Id. at ¶ 28.  MCOM is not a candidate for political office or a political committee, and does not make any expenditures on behalf of such candidates or committees or any registered lobbyist. Id. at ¶ 39.  MCOM "does not pay any registered lobbyist to act on its behalf," nor does it "expend money on behalf of any state officials." Id.  MCOM also does not reimburse its "members" for expenditures made in regard to contacting state officials or legislators, and while MCOM itself is "not . . . compensated

_____

[6] Plaintiffs state in their motion that the complaint "was verified by representatives of each party" – Pat Murakami for MCOM and Alfred Petermann for CE – and thus being used by them "in lieu of affidavits and declarations." ECF #22, p. 5 n.3; see also ECF #1, #1-2 and #1-3.  "[A] verified complaint may serve as an affidavit for purposes of summary judgment *if* [1] it is based on personal knowledge and if [2] it sets forth the requisite facts with specificity." California Pro-Life Council, Inc. v. Randolph, 507 F.3d 1172, 1176 (9th Cir. 2007) (quoting Moran v. Selig, 447 F.3d 748, 760 n.16 (9th Cir. 2006)) (emphasis in original), *abrogation on other grounds recognized by* Human Life of Washington, Inc. v. Brumsickle ("Human Life"), 624 F.3d 990, 1013 (9th Cir. 2010); see also Human Life, 624 F.3d at 1022 (noting that "[n]ot only" was "the complaint [in that case] devoid of information from which [the Court of Appeals] could conclude that [RCW Chapter 42.17 was] unconstitutional as applied to [the plaintiff]," but that it was "not clear from the record that the complaint was verified by a[n] official [of the plaintiff] with personal knowledge of the facts alleged therein."); Schroeder v. McDonald, 55 F.3d 454, 460 (to be used as opposing affidavit under Fed. R. Civ. P. 56, verified complaint must be based on personal knowledge and set forth specific facts admissible in evidence).  As defendants have not objected on the basis of lack of personal knowledge or factual specificity, plaintiffs' complaint shall be treated as a verified complaint for summary judgment purposes.

for its efforts," it reimburses "its unpaid volunteers for expenditures made on MCOM's behalf." Id. at ¶¶ 41-42.

MCOM is "dedicated to preserving the diverse and vibrant neighborhoods of Southeast Seattle." Id. at ¶10. More specifically, it was "formed to resist efforts by the City of Seattle to use Washington's Community Renewal Law (CRL) . . . to declare portions of Southeast Seattle a 'Community Renewal Area,'" which "would have given the City [of Seattle] the power to take, via eminent domain, private homes and businesses in the area to transfer to private entities." Id. at ¶ 29. MCOM "successfully mobilized public opposition to [the City of Seattle's CRL efforts] and the City halted its efforts in 2007." Id. at ¶ 30. Those efforts included distributing fliers, organizing community meetings, contacting "City agencies," and "otherwise informing citizens about how to oppose use of the CRL in Southeast Seattle." Id. at ¶ 31. Since "these efforts were directed largely at City officials regarding a City proposal," though, MCOM "was not required to register under" RCW 42.17.200. Id. at ¶ 32.

MCOM also states in relevant part as follows in regard to its prior efforts/activities:

> 33. In the 2010 session of the Washington [State] Legislature, legislators introduced bills to reform the CRL and to prohibit eminent domain for economic development.
> 34. Similar bills had been considered in the 2006, 2007, 2008, and 2009 sessions of the Legislature. These bills did not pass.
> 35. In 2009, a bill promoting Transit Oriented Development (TOD) was introduced in the Legislature.
> 36. MCOM was concerned that TOD would rely on use of the CRL.
> 37. Prior to the 2010 Legislative session, MCOM anticipated the need to mobilize local residents and business owners to contact their legislators and the Governor to (i) urge reform of the CRL and eminent domain laws, and (ii) to reject any TOD bill that did not foreclose reliance on the CRL. MCOM anticipated that a successful effort to promote its message would require expenditures of at least $1[,]000 in three months if these bills progressed.
> 38. The bills about which MCOM intended to mobilize grassroots activism in the 2010 session of the Washington [State] Legislature died in

their respective committees by January 27, 2010.

Id. at ¶¶ 33-38.  With respect to future activities, MCOM goes on to state in relevant part:

> 40.     MCOM anticipates communicating with people who are not its members regarding eminent domain abuse.
> 41.     MCOM . . . will not be compensated for its efforts.
> 42.     . . . Although MCOM members may also contact state officials and legislators, they . . . will not be reimbursed for any expenditure related thereto.
> 43.     MCOM anticipates that [l]egislation reforming the CRL and implementing TOD will be considered by future sessions of the Legislature.
> . . .
> 45.     MCOM will seek to develop support for eminent domain reform and against the implementation of TOD premised on a use of the CRL in the coming months and during the 2011 Legislative session and beyond.

Id. at ¶¶ 40-43, 45.

Plaintiff Red State Politics, d/b/a "Conservative Enthusiasts" ("CE") describes itself as a "501(c)(3) nonprofit corporation" and/or "volunteer organization" registered "under the Internal Revenue Code," and is based in Seattle. Id. at ¶¶ 11, 55.  It is "run by unpaid volunteers," has "no employees" and is "dedicated to educating the public about the benefits of lower taxes, less regulation, and smaller government." Id.  In terms of past activities, CE states it "has advanced its political goals by (1) speaking with elected officials; (2) establishing a public website; and (3) hosting monthly meetings and speakers about public policy issues." Id. at ¶ 58.  CE further states it "has not spent $500 in the aggregate in any one month or $1,000 in the aggregate in any three months on presenting a program addressed to the public, a substantial portion of which was intended, designed, or calculated primarily to influence legislation, as those terms are defined in" RCW 42.17.020. Id. at ¶ 56.

CE states it "anticipates . . . that in future sessions of the [Washington State] legislature, legislators will seek to raise taxes, increase regulation, and grow the size of the State government," and "wants to take an active role in opposing these efforts, including urging its

ORDER - 14

supporters to contact state officials about these issues." Id. at ¶¶ 56-57. Specifically with respect to future activities:

> 59. As it grows, [CE] plans to take the following additional actions to advance its goals: (1) establish an electronic contact system with interested individuals; (2) encourage individuals to send letters and e-mails to state officials; (3) create a database to leverage resources and effectively manage its contacts; (4) mobilize and educate its members and the public about legislation; (5) run advocacy ads in direct response to political activity by opposing groups; (6) hire several staff members to support its efforts; (7) further develop its website to assist with its education and advocacy efforts; and (8) participate in strategic litigation efforts.
>
> 60. It will solicit contributions and all contributions are and will be placed in a general fund.
>
> 61. [CE] anticipates that if its ability to engage in advocacy were not affected by operation of [RCW] 42.17.200, it would spend at least $500 in the aggregate in one month or $1,000 in aggregate in three months organizing efforts regarding these initiatives.

Id. at ¶¶ 59-61. Similar to MCOM:

> 62. [CE] is not a candidate or a political committee and no registered lobbyist, candidate, or political committee has or will report any expenditures made by [CE]. [CE] does not pay any registered lobbyist to act on its behalf and does not endorse political candidates. It does not make any expenditures on behalf of state officials.
>
> 63. [CE] intends to communicate with people who are not members of [CE] about its legislative initiatives. [CE] reimburses its volunteers for expenditures made on [CE's] behalf. Although its members may make contact with state officials concerning speaking engagements and pending legislation, such volunteers will not be reimbursed for any expenses incurred. [CE] will not be paid for its political activities.

Id. at ¶¶ 62-63.

IV. Plaintiffs' Involvement with Washington's Laws Governing Grassroots Lobbying and the Public Disclosure Commission

Sometime between April and August 2009, "an Institute for Justice[7] representative met

---

[7] The Institute for Justice ("IJ") describes itself in part both as "a civil liberties law firm" and as the "nation's only libertarian public interest law firm," engaged "in cutting-edge litigation and advocacy both in the courts of law and in the court of public opinion on behalf of individuals whose most basic rights are denied by the government." http://www.ij.org/about. IJ states it pursues its mission of advancing "a rule of law under which individuals can control their destinies as free and responsible members of society," through "strategic litigation, training,

ORDER - 15

with" CE "to discuss Washington State's grassroots lobbying requirements." ECF #31-1, Exhibit 11, Defendants' First Set of Requests for Admission, ¶ 20. Included in the agenda for an August 5, 2009 meeting between CE and IJ was discussing "[a]ffiliating with a litigation effort that seeks to overturn some State and National legislations that erodes [sic] participation and oversight of our governance." Id. at ¶ 22. It is not clear whether CE was planning to challenge Washington's laws governing grassroots lobbying prior to its first contact with IJ, but no evidence in the record indicates it was. See ECF #24, Exhibit 6, Deposition of Mark Sussman at 50.[8]

For its part, MCOM was not aware of Washington's laws governing grassroots lobbying until informed thereof by the IJ. See ECF #24, Exhibit 11, Declaration of Patricia Murakami at 14, 21.[9] Plaintiffs' claim in their complaint that they reviewed "the agency materials concerning grassroots lobbying on the PDC's website, but were unable to determine if the statutes applied to them." ECF #1, ¶ 74. Neither MCOM or CE, though, requested any of the following from the PDC, although, as noted above, they could have done so:

- Training on reporting grassroots lobbying;
- An informal advisory opinion, an interpretive statement or a rulemaking petition;

---

communication, activism and research." Id. Further, IJ states in addition to training "law students, lawyers and policy activists in the tactics of public interest litigation," it "litigates to secure economic liberty, school choice, private property rights, freedom of speech and other vital individual liberties, and to restore constitutional limits on the power of government." Id.

[8] Mr. Sussman is the founder of CE, maintains the organization's bank account, is responsible for satisfying all of its reporting requirements, and handles its membership information. See id. at 13, 31-35. As to when CE first decided to challenge Washington's laws governing grassroots lobbying, Mr. Sussman stated in relevant part (in response to a question posed at his deposition as to whether it occurred prior to CE's meeting with IJ) that: "I honestly don't know the answer. I don't know the time sequence of that." Id. at 50; see also ECF #25, ¶ 72 (noting plaintiff's posting on internet indicated that they met with IJ "several months before approaching the [PDC] to seek a declaratory order," discussed in greater detail below) (emphasis in original).

[9] Patricia Murakami – who signed a "verification" for the civil rights complaint on behalf of MCOM, based on her "personal knowledge of MCOM and its activities" – is "a founder, organizer, and member of" MCOM. ECF #1-2, Verification of Pat Murakami, p. 2. Ms. Murakami states in her deposition that she did not know Washington's laws governing grassroots lobbying existed before she was informed of them by IJ, which "went over" them with her as to how they operated. ECF #24, Exhibit 11 at 14, 21. Ms. Murakami also states therein that MCOM did not "come looking for [IJ] for advice on" those laws. Id. at 23.

ORDER - 16

- A modification or suspension of the grassroots lobbying reporting requirements; or
- A rulemaking petition seeking to increase the monetary threshold reporting amounts.

See ECF #25, ¶¶ 24-26, 35, 49-50, 69.  Nor had MCOM or CE prior to the filing of their petition for a declaratory order, discussed in greater detail below, "contacted PDC staff indicating any confusion or uncertainty" on their part regarding their filing under Washington's laws governing grassroots lobbying. Id. at ¶ 68.

On December 3, 2009, plaintiffs filed a petition for a declaratory order with the PDC. See ECF #1, ¶ 75; ECF #25-3, Exhibit 21.  While plaintiffs were given a "draft" of the petition to see "perhaps ahead of time," and although it was prepared for them and filed on their behalf, the idea for pursuing that course of action "more or less" came on the legal advice IJ provided. ECF #22, Exhibit 6 at 58-59; see also ECF #22, Exhibit 11 at 26.  Indeed, the first contact the PDC had with plaintiffs was through the filing of the petition by IJ legal counsel, not plaintiffs themselves. See ECF #25, ¶71; see also ECF #28, Declaration of Lori Anderson, ¶ 10, ECF #29, Declaration of Tony Perkins, ¶ 7.  The petition states in relevant part:

> **Question the Declaratory Order Is To Answer:** Assuming [MCOM and CE] engage in the activities described below, are MCOM and CE required to (i) register with the [PDC], and (ii) file monthly statements, pursuant to RCW 42.17.200?

> **Statement of Facts Which Raise the Question:** Our clients hereby state the following facts regarding their organizations and activities.

> **1.    MCOM.**  MCOM is an unincoporated group dedicated to preserving the diverse and vibrant neighborhoods of Southeast Seattle. MCOM was initially formed to combat efforts by the City of Seattle to use Washington's [CRL] . . . to declare portions of Southeast Seattle a Community Renewal Area and authorize the taking of private homes and businesses for transfer to private entities.  MCOM successfully mobilized public opposition to this and the City halted its efforts to use the CRL in 2007.

> In the past, MCOM has not spent $500 in the aggregate in any one

month or $1,000 in the aggregate in any three months on presenting a program addressed to the public, a substantial portion of which was intended, designed, or calculated to influence legislation, as those terms are defined in RCW 42.17.020. However, MCOM anticipates that, in the coming session of the Legislature, a bill will be introduced to substantially reform the CRL. MCOM also anticipates that a bill promoting Transit Oriented Development (TOD) will also be introduced in the coming session and MCOM is concerned that such development may be premised on use of the CRL. For these reasons, MCOM anticipates mobilizing the residents and business owners of Southeast Seattle to contact their legislators and the Governor to urge them to support reform of the CRL and to stop any TOD bill that relies upon the CRL. MCOM anticipates it will spend at least $500 in the aggregate in one month or $1,000 in aggregate in three months organizing efforts regarding these Legislative initiatives.

MCOM is not a candidate or a political committee and anticipates that no registered lobbyist, candidate, or political committee will report any expenditures made by MCOM on this effort. MCOM does not pay any registered lobbyist to act on its behalf. It anticipates communicating with people who are not members of MCOM regarding these legislative initiatives. MCOM will reimburse volunteers for expenditures made on MCOM's behalf. MCOM anticipates that its volunteers will each spend more than four days or parts thereof during any three month period and that its expenditures will exceed $25. MCOM will not be paid for its efforts.

2.  **CE.**  CE is a 501(c)(3) organization dedicated to educating the public regarding the benefits of lower taxes, less regulation, smaller government, and strong national defense. In the past, CE has not spent $500 in the aggregate in any one month or $1,000 in the aggregate in any three months on presenting a program addressed to the public, a substantial portion of which was intended, designed, or calculated primarily to influence legislation, as those terms are defined in RCW 42.17.020. However, CE anticipates that, in the coming session of the Legislature, numerous bills will be introduced to raise taxes, increase regulation, and grow the size of the State government. CE anticipates changing the nature of its organization to allow it to take a more active role in opposing these Legislative efforts, including contacting people on its email list and visitors to its website and urging them to contact state officials regarding these issues. CE anticipates it will spend at least $500 in the aggregate in one month or $1,000 in aggregate in three months organizing efforts regarding these Legislative initiatives.

CE is not a candidate or a political committee and anticipates that no registered lobbyist, candidate, or political committee will report any expenditures made by CE on this effort. CE does not pay any registered lobbyist to act on its behalf. It anticipates communicating with people who are not members of CE regarding these legislative initiatives. CE reimburses

volunteers for expenditures made on CE's behalf. CE anticipates that its volunteers will each spend more than four days or parts thereof during any three month period and that its expenditures will exceed $25. CE will not be paid for its efforts.

   ***Uncertainty Necessitating Resolution Exists:***  It [sic] unclear whether MCOM or CE must register as sponsors of a grassroots lobbying campaign under RCW 42.17.200. In that regard, each organization is uncertain whether any of the exemptions to registration contained in RCW 42.17.160 would apply to their anticipated activities, specifically the exemption for uncompensated lobbying contained in RCW 42.17.160(4).

   ***An Actual Controversy Arises from Such Uncertainty:***  MCOM and CE do not wish to register and submit monthly reports as sponsors of a grassroots lobbying campaign. Neither [MCOM nor CE] wishes to report, or otherwise make public, the names, addresses, or titles of the controlling persons responsible for managing their respective . . . affairs or organizing and managing the[ir] respective . . . campaigns. Neither [MCOM nor CE] wishes to report, or otherwise make public, the names and addresses of people or organizations contributing more than $25 to their efforts. Neither [MCOM nor CE] wishes to report, or otherwise make public, any expenditures made by such organizations in seeking to effectuate political change.

   ***This Uncertainty Adversely Affects [MCOM and CE]:***  As noted above, neither [MCOM nor CE] wishes to be considered sponsors of grassroots lobbying campaigns. On the other hand, neither wishes to risk violating the registration and reporting requirements contained in RCW 42.17.200 and being subject to any attendant fines or penalties. Without a clear resolution, [MCOM and CE] may curtail [their] expressive activity to avoid having to register and report as the sponsor of a grassroots lobbying campaign.

ECF #25-3, Exhibit 21, pp. 1-3. The petition was signed by IJ legal counsel. See id. at p. 3.

   Subsequent to the filing of the petition, the PDC continued to communicate with IJ legal counsel regarding the petition process, not plaintiffs. See ECF #25, ¶ 80; ECF #25-3, Exhibit 22. The petition was scheduled to be considered at the next PDC meeting on January 28, 2010. See ECF #25, ¶ 80. Prior to that meeting, plaintiffs were sent "a series of questions about their organizational makeup and activities," to which they "provided timely responses." ECF #1, ¶ 77. Although IJ legal counsel addressed the PDC at that meeting, no representative from MCOM or

ORDER - 19

CE appears to have attended the meeting, nor did any representative therefrom address the PDC or provide any testimony concerning the petition. ECF #25, ¶¶ 86, 94.

Following this meeting, a declaratory order was drafted by the PDC and sent to IJ legal counsel for comment. Id. at ¶ 89. That draft declaratory order was scheduled for review at the PDC's February 26, 2010 meeting. See id. A copy of the order and the agenda for the February 26, 2010 meeting was posted on the PDC's website. See id. In the order, the PDC "unanimously agreed that based upon the facts presented" in IJ legal counsel's written materials and by IJ legal counsel at the January 28, 2010 meeting, and presented in the PDC staff's written materials and by the PDC staff at that meeting, none of the exceptions contained in RCW 42.17.160 applied "to exempt [MCOM and CE] from registering and reporting under RCW 42.17.200." ECF #25-3, Exhibit 24, p. 1. IJ legal counsel "submitted written comments on the draft declaratory order to the [PDC] in a letter dated February 25, 2010," asking that the PDC amend the order "to fully apply the exemptions listed in RCW 42.17.160." ECF #25, ¶ 89. On February 26, 2010, though, the PDC "determined that it would enter [its final] declaratory order [concerning the petition] as drafted." See ECF #1, ¶ 81; ECF #25, ¶ 91.

V.      Proceedings in this Court

On April 15, 2010, plaintiffs filed their civil rights complaint with this Court. See ECF #1, #1-2, #1-3. As was the case with the proceedings before the PDC, IJ legal counsel continues to represent plaintiffs in this matter. On April 6, 2011, plaintiffs filed their motion for summary judgment. See ECF #22. On May 9, 2011, defendants filed their response to plaintiffs' motion (see ECF #24), and on May 13, 2011, plaintiffs' filed their reply thereto (see ECF #32). On May 24, 2011, the Court directed the parties to file additional briefing regarding the issue of plaintiffs' standing in this case. See ECF #33. The parties have filed their briefing in response thereto (see

ORDER - 20

ECF #35-#38, #40), and thus plaintiffs' motion is now ripe for review.  Although plaintiffs have requested oral argument in this matter, the Court finds such argument to be unnecessary in order to effectively resolve the issues presented here.

DISCUSSION

I.  <u>Standard of Review</u>

Summary judgment shall be rendered if the pleadings, exhibits, and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c).  In deciding whether summary judgment should be granted, the Court "must view the evidence in the light most favorable to the nonmoving party," and draw all inferences "in the light most favorable" to that party. <u>T.W. Electrical Serv., Inc. v. Pacific Electrical Contractors Ass'n</u>, 809 F.2d 626, 630-31 (9th Cir. 1987).  When a summary judgment motion is supported as provided in Fed. R. Civ. P. 56, an adverse party may not rest upon the mere allegations or denials of his pleading, but his or her response, by affidavits or as otherwise provided in Fed. R. Civ. P. 56, must set forth specific facts showing there is a genuine issue for trial. <u>See</u> Fed. R. Civ. P. 56(e)(2).

If the nonmoving party does not so respond, summary judgment, if appropriate, shall be rendered against that party. <u>See</u> <u>id.</u>  The moving party must demonstrate the absence of a genuine issue of fact for trial. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 257 (1986).  Mere disagreement or the bald assertion that a genuine issue of material fact exists does not preclude summary judgment. <u>See</u> <u>California Architectural Building Products, Inc. v. Franciscan Ceramics, Inc.</u>, 818 F.2d 1466, 1468 (9th Cir. 1987).  A "material" fact is one which is "relevant to an element of a claim or defense and whose existence might affect the outcome of the suit," and the materiality of which is "determined by the substantive law governing the claim." <u>T.W. Electrical</u>

Serv., 809 F.2d at 630.

Mere "[d]isputes over irrelevant or unnecessary facts," therefore, "will not preclude a grant of summary judgment." Id.  Rather, the nonmoving party "must produce at least some 'significant probative evidence tending to support the complaint.'" Id. (quoting Anderson, 477 U.S. at 290); see also California Architectural Building Products, Inc., 818 F.2d at 1468 ("No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment.").  In other words, the purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. National Wildlife Federation, 497 U.S. 871, 888 (1990).

The parties agree that there are no genuine issues of material fact in this case, and thus that entry of summary judgment is appropriate here.  In addition, such judgment may be entered for the non-moving party "[e]ven when there has been no cross-motion for summary judgment," since "a district court may enter summary judgment sua sponte against a moving party," if the moving party "has had a 'full and fair opportunity to ventilate the issues involved in the matter.'" Gospel Missions of America v. City of Los Angeles, 328 F.3d 548, 553 (9th Cir. 2003) (quoting Cool Fuel, Inc. v. Connett, 685 F.2d 309, 312 (9th Cir. 1982)).  Because "[t]he salient issues" on which summary judgment is being granted for defendants were presented in plaintiffs' summary judgment motion, and because plaintiffs have had a full and fair opportunity to ventilate those issues, the Court does "not commit reversible error by acting sua sponte" for defendants absent a cross-motion for summary judgment. Id.; Commission on Independent Colleges and Universities v. New York Temporary State Commission on Regulation of Lobbying ("CICU"), 534 F.Supp. 489, 501 (N.D.N.Y. 1982) (while defendants had not made cross motion for summary judgment,

ORDER - 22

because there were no disputed facts and record was adequate regarding constitutional question presented, summary judgment could be granted for non-moving party).

II.    Exclusion of Plaintiffs' Expert Witness Evidence and Plaintiffs' Exhibit 12

Plaintiffs include with their motion for summary judgment the declaration and report of Jeffrey Milyo, Ph.D., a tenured professor at the University of Missouri at Columbia, Missouri, who describes his area of "academic expertise" as "American political economy, including the empirical analysis of the effects of political regulations and institutions." ECF #22, Declaration of Jeffrey Milyo ("Milyo Declaration"), ¶¶ 15-16, Exhibit B.  In his declaration, Dr. Milyo states there is "no scientific evidence" that laws governing grassroots lobbying "provide any public benefit" (such as increasing public confidence in government or providing useful information to legislators or the public), that those laws are "redundant or overbroad" given the existence of other laws that deal with lobbying, and that they "impose real costs on ordinary citizens." Id. at ¶¶ 8-9, 11, 13, 45, 47, 59-60, 66-67.

Dr. Milyo based his conclusions in part on his review of the text of Chapter 42.17 and of the L6 form and instructions, as well as a number of "external sources," including United States Supreme Court case law and publications concerning such topics as public opinion, lobbying, collective action, campaign disclosure, and political speech and political participation in general. Id. at ¶¶ 26, 34-36, 38, 42-43, 48-58, 61-63, 66, 70, 72-73, Exhibit A, Expert Report of Dr. Jeffrey Milyo ("Milyo Report"), Exhibit C, Source List of Dr. Jeffrey Milyo.  Dr. Milyo also based his opinions and report in part on "earlier research" he conducted, which consisted of "an experiment to evaluate the ability of ordinary citizens to comply with the campaign finance disclosure laws of different states," although it "did not examine" Washington's laws governing grassroots lobbying. Id. at ¶¶ 14, 73-86, Exhibit A, pp. 14-16.

ORDER - 23

In their response to plaintiffs' motion for summary judgment, defendants have moved to strike the evidence provided by Dr. Milyo, pursuant in part to Federal Rule of Evidence ("Fed. R. Evid.") 702 and the failure of that evidence to comply with the criteria for relevance or reliability set forth in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). See ECF #24, p. 2, n. 1. Defendants also challenge the propriety of Dr. Mylo's declaration on the basis that it "is replete with legal conclusions, case law and legal arguments." Id. Defendants, furthermore, object to Exhibit 12 attached to plaintiffs' motion for summary judgment, asserting that because it is a law review article authored by an employee of IJ – specifically, the "director of strategic research" at IJ – it "does not qualify as evidence." Id.; see also ECF #22, Exhibit 12, *Mandatory Disclosure for Ballot-Initiative Campaigns*, Dick M. Carpenter II, The Independent Review, v. 13, n. 4, p. 567 (Spring 2009).

A.    <u>*Daubert* and the Court's "Gatekeeping" Role</u>

Plaintiffs argue the Court should deny defendants' motion to strike, complaining that no analysis or explanation for their objection to the evidence from Dr. Milyo, or as to why it fails to comply with the criteria in Daubert, was provided. Plaintiffs argue that "[w]ithout more," they are not able to respond to defendants' motion, and that defendants' assertions "do not amount to a '*Daubert*' challenge for this Court's consideration." ECF #32, p. 11 (citing Fed. R. Civ. P. 7(b)(1)). What plaintiffs fail to realize, however, is that "[i]t is the *proponent* of the expert" witness – not the objecting party – "who has the burden of proving admissibility" here, which "must be established by a preponderance of the evidence." Henricksen v. ConocoPhillips Co., 605 F.Supp.2d 1142, 1154 (E.D. Wash. 2009) (quoting Lust v. Merrell Dow Pharm., Inc., 89 F.3d 594, 598 (9th Cir. 1996)) (emphasis added); see also Cooper v. Brown, 510 F.3d 870, 942 (9th Cir. 2007); Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (9th Cir. 2001).

ORDER - 24

More specifically, and as discussed in greater detail below, "[t]he party presenting the expert must demonstrate that the expert's findings are based on sound principles and that they are capable of [some objective,] independent validation." Henricksen, 605 F. Supp.2d at 1154 (citing Daubert v. Merrell Dow Pharm., Inc. ("Daubert II"), 43 F.3d 1311, 1316 (9th Cir. 1995)); see also Cooper, 510 F.3d at 942. The Court itself, furthermore, has an initial duty to ensure the requirements of Fed. R. Civ. P. 702 have been met, which are as follows:

> If scientific, technical, or other knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Thus, far from being "disabled from screening" expert testimony or evidence under Fed. R. Evid. 702, the district court "must ensure that any and all [such] testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589; see also Henricksen, 605 F.Supp.2d at 1153 ("Before a witness may come 'before the [trier of fact] cloaked with the mantle of an expert[ ]' under [Fed. R. Evid.] 702, . . . 'care must be taken to assure that a proffered witness truly qualifies as an expert, and that such [witness's] testimony meets the requirements of [that] Rule[.]'") (quoting Jinro America Inc. v. Secure Investments, Inc., 266 F.3d 993, 1004 (9th Cir. 2001)). "[A]s a threshold matter," therefore, the Court "must determine whether the proffered witness is 'qualified as an expert by knowledge, skill, experience, training, or education[.]'" Id. (quoting Fed. R. Evid. 702).

In other words, the district court at the outset has a "gatekeeping role" to perform with respect to evidence submitted as expert testimony. Cabrera v. Cordis Corp., 134 F.3d 1418, 1420 (9th Cir. 1998) (quoting Daubert, 509 U.S. at 597 ("[T]he Rules of Evidence – especially Rule

ORDER - 25

702 – . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."); see also Cooper, 510 F.3d at 942 ("The trial court acts as a 'gatekeeper' to exclude expert testimony that does not meet the relevancy and reliability threshold requirements."); Elsayed Mukhtar v. California State University, Hayward, 299 F.3d 1053, 1063 (9th Cir. 2002); Smith & Nephew, Inc., 259 F.3d at 199 (trial judges act as gatekeepers under Fed. R. Evid. 702 to ensure any and all expert testimony not only is relevant, but reliable). Thus, "[a] trial judge, faced with a proffer of expert . . . testimony, must conduct 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" Smith & Nephew, Inc., 259 F.3d at 199 (quoting Daubert, 509 U.S. at 592-93); see also United States v. Redlightning, 624 F.3d 1090, 1110 (9th Cir. 2010) (district court correct to require showing of foundation for proffered expert testimony).

"[T]his basic gatekeeping obligation" of the district court, furthermore, applies not only to "scientific" testimony, but "to all expert testimony." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 147 (1999) (noting that language of Fed. R. Evid. 702 "makes no relevant distinction between 'scientific' knowledge and 'technical' or 'other specialized' knowledge, but instead "[i]t makes clear that any such knowledge might become the subject of expert testimony"). Further, "judges are entitled to broad discretion when discharging their gatekeeping function." Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1017 (9th Cir. 2004) (citation omitted). The Ninth Circuit has emphasized the obligatory nature of the initial "gatekeeping" inquiry, by noting the "trial court's broad latitude to make the reliability determination [regarding expert witness testimony or evidence] does *not* include the discretion to abdicate completely its responsibility to

do so."[10] <u>Elsayed Mukhtar</u>, 299 F.3d at 1064 (emphasis in original); <u>see also</u> <u>United States v. Velarde</u>, 214 F.3d 1204, 1209 (10th Cir. 2000) ("While . . . the trial court is accorded great latitude in determining [admissibility of] expert testimony, *Kumho* and *Daubert* make it clear that the court must, on the record, make *some* kind of [admissibility] determination.") (emphasis in original).

"The trial court's 'special obligation' to determine the relevance and reliability of an expert's testimony . . . is vital to ensure accurate and unbiased decision-making by the trier of fact." <u>ElSayed Mukhtar</u>, 299 F.3d at 1063 (citing and quoting <u>Kumho Tire Co.</u>, 526 U.S. at 147, 152 ("*Daubert's* gatekeeping requirement . . . make[s] certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.")); <u>see also</u> <u>Cooper</u>, 510 F.3d at 943; <u>Smith & Nephew, Inc.</u>, 259 F.3d at 200. As the Supreme Court stated in *Daubert*, this is because:

> . . . Unlike an ordinary witness, . . . an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation. . . . Presumably, this relaxation of the usual requirement of firsthand knowledge – a rule which represent "a 'most pervasive manifestation' of the common law insistence upon 'the most reliable sources of information,'" . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

509 U.S. at 592 (quoting Advisory Committee's Notes on Fed. R. Evid. 602, 28 U.S.C. App., p. 755 (citation omitted)).

As indicated above, Fed. R. Evid. 702 embodies "the twin concerns of 'reliability' . . . and 'helpfulness.'" <u>Stilwell v. Smith & Nephew, Inc.</u>, 482 F.3d 1187, 1192 (9th Cir. 2007) (citation omitted); <u>see also</u> <u>Hemmings v. Tidyman's Inc.</u>, 285 F.3d 1174, 1184 (9th Cir. 2002)

---

[10] On the other hand, because "the form that the inquiry into relevance and reliability must take" has not been mandated by the Supreme Court, "a separate, pretrial hearing" regarding that inquiry also "is not required." <u>Elsayed Mukhtar</u>, 299 F.3d at 1064 (quoting <u>United States v. Alatorre</u>, 222 F.3d 1098, 1102 (9th Cir. 2000)).

("Whether testimony is helpful within the meaning of Rule 702 is in essence a relevance inquiry."); <u>Elsayed Mukhtar</u>, 299 F.3d at 1063 n.7 ("Encompassed within the determination of whether expert testimony is relevant is whether it is helpful . . . a 'central concern' of Rule 701.") (citation omitted).  Expert testimony that "does not relate to any issue in the case is not relevant, and ergo, non-helpful." <u>Daubert</u>, 509 U.S. at 591; <u>see</u> <u>also</u> <u>Stilwell</u>, 482 F.3d at 1192 ("[R]eliable testimony must nevertheless be helpful.").  To this end, the Court "must determine whether there is 'a link between the expert's testimony and the matter to be proved.'" <u>Stilwell</u>, 482 F.3d at 1192 (citation omitted); <u>see</u> <u>also</u> <u>Daubert</u>, 509 U.S. at 591-92 (helpfulness standard requires valid connection to pertinent inquiry as precondition to admissibility).  Testimony "that falls short of achieving either" concern may be excluded. <u>Stilwell</u>, 482 F.3d at 1192.

More specifically in regard to relevance, expert testimony sought to be admitted "must logically advance a material aspect of the [proponent] party's case," and "must be 'tied to the facts'" of that case. <u>Cooper</u>, 510 F.3d at 942 (citing <u>Daubert II</u>, 43 F.3d at 1315, and quoting <u>Kumho Tire Co.</u>, 526 U.S. at 150); <u>see</u> <u>also</u> <u>Henricksen</u>, 605 F.Supp.2d at 1154 ("The relevance prong under *Daubert* means that the evidence will assist the trier of fact to understand or determine a fact in issue.").  As for reliability, "Rule 702 demands that expert testimony relate to scientific, technical or other specialized knowledge, which does not include unsubstantiated speculation and subjective beliefs." <u>Diviero v. Uniroyal Goodrich Tire Co.</u>, 114 F.3d 851, 853 (9th Cir. 1997).  This twin inquiry into relevance and reliability is succinctly described by the district court in <u>Henricksen</u>:

> The court need not admit an expert opinion that is connected to the underlying data "only by the ipse dixit of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).  It may exclude such testimony if it determines "that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*  "The trial court's gate-keeping function requires more than simply taking the expert's word for it."

*Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir.1995) (" *Daubert II* "). In addition, "any step that renders [the expert's] analysis unreliable ... renders the expert's testimony inadmissible. . . . " *In re Silicone Gel Breast Implants Products Liability Litigation*, 318 F.Supp.2d 879, 890 (D.C.Cal. 2004). Something doesn't become [expert] knowledge just because it's uttered by a[n expert]; nor can an expert's self-serving assertion that his conclusions were derived by the [proper, reliable] method be deemed conclusive. *Daubert II*, at 1315–16. "[T]he expert's bald assurance of validity is not enough. Rather, the party presenting the expert must show that the expert's findings [have a sound basis], and this will require some objective, independent validation of the expert's methodology." *Id.* at 1316.

605 F.Supp.2d at 1153-54; see also Daubert, 509 U.S. at 590 ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation. The term 'applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'") (quoting Webster's Third New International Dictionary 1252 (1986)); see also Redlighting, 624 F.3d at 1112 ("Because [social science expert] did not reasonably point to any evidence in the record or other factors or data reasonably relied on by experts in his field . . . [he] could not provide any relevant testimony to assist the jury."); United States v. W.R. Grace, 504 F.3d 745, 761 (9th Cir. 2007) (facts and data relied on by expert must be reasonably relied on by experts in particular field).

As noted by the Ninth Circuit, "[t]he Supreme Court in *Daubert* identified several factors that may bear on a judge's determination of the reliability of an expert's testimony." Smith & Nephew, Inc., 259 F.3d at 199. They include:

> . . . (1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication[11]; (3) whether[, in the case of a scientific technique, the] technique has a high known or potential rate of error and whether there are standards controlling its

---

[11] Submission of the particular theory or methodology at issue to "the scrutiny" of the relevant scientific, technical or other specialized knowledge community "increases the likelihood that substantive flaws in methodology will be detected." Daubert, 509 U.S. at 593. "The fact of publication (or lack thereof) in a peer reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the . . . validity of" that theory or methodology "on which an opinion is premised." Id. at 594.

operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific[, technical or specialized knowledge] community.[12]

Id. (citing Daubert, 509 U.S. at 592-94); see also Elsayed Mukhtar, 299 F.3d at 1064. These factors are "neither definitive, nor exhaustive," though, and "particular factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." Smith & Nephew, Inc., 259 F.3d at 199-200. The Daubert inquiry, furthermore, is "a flexible one," with "[i]ts overarching subject" being the "validity" and, accordingly, the "evidentiary relevance and reliability – of the principles that underlie a proposed submission." Daubert, 509 U.S. at 594-95. The Court's "focus" thus "must be solely on principles and methodology, not on the conclusions that they generate." Id. at 595.

Such focus entails an "assessment of whether the reasoning or methodology underlying" the expert witness testimony is "valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592. In addition to the four factors identified by the Supreme Court in Daubert, another "very significant" factor to be considered is whether the proffered expert witness developed his or her opinion "expressly for the purpose of testifying." Cabrera, 134 F.3d at 1422 (citation omitted). As the Ninth Circuit has described it:

One very significant fact to be considered is whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying. That an expert testifies for money does not necessarily cast doubt on the reliability of his testimony, as few experts appear in court merely as an eleemosynary gesture. But in determining whether proposed expert testimony amounts to good science [or meets the similar standard employed in the area of specialized knowledge or expertise of the proposed expert], we may not ignore the fact that a scientist's [or other technical or specialized expert's]

---

[12] "Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known [theory or methodology] which has been able to attract only minimal support within the community' . . . may properly be viewed with skepticism." Daubert, 509 U.S. at 594 (internal citation omitted).

ORDER - 30

normal workplace is the lab or the field, not the courtroom or the lawyer's office.

That an expert testifies based on research he has conducted independent of the litigation provides important, objective proof that the research comports with the dictates of good science [or meets the similar standard employed in the area of specialized knowledge or expertise of the expert] . . . . For one thing, experts whose findings flow from existing research are less likely to have been biased toward a particular conclusion by the promise of remuneration; when an expert prepares reports and findings before being hired as a witness, that record will limit the degree to which he can tailor his testimony to serve a party's interests. Then, too, independent research carries its own indicia of reliability, as it is conducted, so to speak, in the usual course of business and must normally satisfy a variety of standards to attract funding and institutional support. . . . That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were "derived by the scientific method [or other method generally accepted in the particular area of specialized knowledge or expertise]."

<u>Daubert</u>, 43 F.3d at 1317 (internal footnote and citation omitted).

B. Dr. Milyo's Opinions Do Not Satisfy the Relevancy and Reliability Requirements Mandated by <u>Daubert</u> and Fed. R. Evid. 702

In regard to the opinions provided by Dr. Milyo in his declaration and report, the Court finds they do not meet the relevancy and reliability requirements mandated by Fed. R. Evid. 702 and the Supreme Court in <u>Daubert</u>. First, Dr. Milyo himself admits that none of the empirical research he conducted prior to this litigation involved Washington's laws governing grassroots lobbying or RCW Chapter 42.17 in general. <u>See</u> ECF #22, Milyo Declaration, ¶¶ 14, 74, and Milyo Report, p. 14. Indeed, grassroots lobbying and the impact of public disclosure thereon – even in a general sense – was not a subject of Dr. Milyo's research, but rather that subject was the ability of citizen groups to comply with state disclosure forms from other states concerning the ability to engage in ballot measure campaigns. <u>See</u> <u>id.</u>; ECF #27-2, Deposition of Jeffrey Milyo ("Milyo Deposition"), pp. 168-69. Dr. Milyo asserts his earlier research is relevant, because the states in which he conducted his research, as in Washington, require registration,

ORDER - 31

contribution itemization and reporting of expenditures. See ECF #22, Milyo Declaration, ¶¶ 14, 74, and Milyo Report, p. 14.

The mere fact that other states require registration, itemization and expenditure reporting as well, however, hardly constitutes the type of link to the particular facts of this case required by Daubert. Indeed, Dr. Milyo utterly fails to show that the laws in the other states he researched are the same as the disclosure laws at issue here, let alone that they have been implemented and enforced in the same way as RCW Chapter 42.17 is by the PDC.[13] The Court thus finds that without more – indeed, anything – in the way of evidence connecting that research to the specific facts of this case, it has no relevance. That is, his research is entirely unhelpful in understanding or determining the pertinent issues currently before the Court, let alone "logically advancing" a material aspect of plaintiffs' case.

Reliability is lacking here as well. First, it is not at all clear that Dr. Milyo's research has been subject to "peer review" as that term is generally understood, but rather it seems not to have undergone that type of academic scrutiny.[14] IJ also paid Dr. Milyo $2,500 for the report that he

---

[13] Even on the issue of the impact of public disclosure laws on grassroots lobbying without regard to any differences among the various states, for example, Dr. Milyo did not separate out data on such laws from data concerning laws governing public disclosure of campaign finance or lobbying in general. See ECF #27-2, Milyo Deposition, pp. 128, 133. Dr. Milyo also did not conduct any research regarding the historical development, legal interpretation, application or implementation of Washington's laws governing grassroots lobbying specifically, or of the particular grassroots lobbying registration and reporting forms used in Washington. See id. at pp. 131-35, 156-57, 166, 175-76, 179-80, 184, 188. Nor does Dr. Milyo know anything about either plaintiff in this case or their interactions or dealings with the PDC or their obligations under those specific laws. See id. at 135-37. Further, Dr. Milyo admits that in regard to the appropriateness of extrapolating the information he obtained from researching other states to the specific laws at issue in this case, and that were not themselves the subject of that research, "[t]here is always a concern of external validity with experiments and the lessons drawn from them." Id. at 186. Although Dr. Milyo later testified that it is appropriate to make such extrapolations in the social science context (see id. at 194), it is not at all clear what level of external validity or lack therof is deemed acceptable when doing so.

[14] For example, Dr. Milyo distinguishes "peer review" from peer "refereed", the latter of which is "usually used in the context of academic articles" and "at some of the most prominent academic journals." ECF #27-1, Milyo Deposition, p. 26. "Peer review" as that term is used by Dr. Milyo, is "a process less formal than . . . a double blind submission to arm's length reviewers in the profession." Id. There is no indication in the record that Dr. Milyo has subjected the research he conducted to the type of peer "refereeing" he distinguishes here, and which appears to be much more in line with the type of "peer review" the Supreme Court had in mind in Daubert. Indeed, the results of

ORDER - 32

produced for this litigation.[15] See Milyo Declaration, ¶ 2.  In addition, on the same day plaintiffs' civil rights complaint was filed with this Court, another "policy report" Dr. Milyo prepared for IJ, titled *Mowing Down the Grassroots: How Grassroots Lobbying Disclosure Laws Suppress Political Participation*, was "publicly issued" by IJ. ECF #31-1, Defendants' First Set of Requests for Admission Nos. 47-49.  IJ paid Dr. Milyo for preparing that report as well. See id. at No. 49.  At the time Dr. Milyo was working on that latter report, furthermore, he was aware that IJ was engaged in "what some groups call strategic research," i.e., research to help "support future litigation." ECF #27-1, Milyo Deposition, pp. 30-31.

Accordingly, it appears not only was Dr. Milyo paid for preparing a non-peer reviewed report for the purpose of aiding this litigation – as well as for the earlier research he conducted underlying that report – but he was involved in preparing, again for payment, similar research of an apparent "strategic" nature issued contemporaneously with the filing of this lawsuit,[16] which clearly does not enhance the reliability of Dr. Milyo's opinions.  It also is far from clear that Dr. Milyo's opinions enjoy "general acceptance within" his academic discipline.  For example, Dr. Milyo uses the term "grass roots issue advocacy" instead of "grass roots lobbying," claiming the former term is a more accurate description of the type of activity contemplated by the latter term.

that research were "described in a *Campaign Finance Red Tape: Strangling Free Speech and Political Debate*, which was published by [IJ] in 2007," and which Mr. Milyo lists as a "policy report" in his curriculum vitae. ECF #22, Milyo Report, p. 14 and Exhibit B.  Dr. Milyo himself segregates such policy reports from the type of peer "refereed academic articles" just discussed. ECF #27-1, Milyo Deposition, pp. 27-28.

[15] It seems Dr. Milyo also was paid $30,000 for the research results that were published by IJ in 2007. See ECF #27-1, Milyo Deposition, pp. 103-06.  In addition, Dr. Milyo would have been paid $250 per hour for "any subsequent testimony" he provided in this case. Milyo Declaration, ¶ 2.

[16] Also sometime in 2010, Dr. Milyo prepared yet another "policy report" titled *Keep Out: How State Campaign Finance Laws Erect Barriers to Entry for Political Entrepreneurs*, which once more was published by IJ, and with respect to which again Dr. Milyo appears to have been funded by IJ. See ECF #22, Milyo Report, Exhibit B; ECF #27-1, pp. 111-12.  There is evidence as well that payment for this report instead may have come from The Charles Koch Foundation, which apparently provided the "seed funding" for IJ. See ECF #27-1, Milyo Deposition, p. 112; *2001: A Freedom Odyssey*, Chip Miller and Clint Bolick, available at http://www.ij.org/component/content/article /42-liberty/1686-2001-a-freedom-odyssey.

ORDER - 33

See, e.g., ECF #22, Milyo Declaration, ¶¶ 4-6, 27-36, 40-41.

Dr. Milyo admits, though, that "grass roots issue advocacy" is a term he himself came up with, and that he has not seen that term used by anyone else. See ECF #27-2, Milyo Deposition, pp. 143-45. In addition, there is some indication in the record that in supporting the opinions contained in his declaration and report, Dr. Milyo may have relied as much on what he terms "common sense," the "general sense" of a term used or the "logical implication" of regulation of grassroots lobbying by the state, as he may have on scholarly or academic research conducted in a manner generally accepted in his field. See id. at p. 155, 164-65, 178, 187. Dr. Milyo makes other assertions in his report as well, which appear not to be supported either by his own or such other research. See id. at pp. 176-78.

Admission of Dr. Milyo's declaration and report is inappropriate for another important reason. While "expert testimony that is 'otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact,'" that witness may not provide an opinion as to a "*legal conclusion, i.e.*, an opinion on an ultimate issue of law." Mukhtar, 299 F.3d at 1065, n.10 (quoting Fed. R. Evid. 702) (emphasis in original); see also McHugh v. United Serv Auto. Ass'n, 164 F.3d 451, 454 (9th Cir. 1999); United States v. Duncan, 42 F.3d 97, 101 (2nd Cir. 1994) ("When an expert undertakes to tell the [trier of fact] what result to reach, this does not *aid* the [trier of fact] in making a decision, but rather attempts to substitute the expert's judgment for the [trier of fact's].") (emphasis in original). In other words, such legal conclusions are the province of the Court, not the expert witness.

As the Ninth Circuit has noted:

> It is well settled that the judge instructs the jury in the law. Experts "interpret and analyze factual evidence. They do not testify about the law because the judge's special legal knowledge is presumed to be sufficient, and it is the judge's duty to inform the jury about the law that is relevant to their

deliberations."

United States v. Scholl, 166 F.3d 964, 973 (9th Cir. 1999), *as amended* (citations omitted); see also Aguilar v. International Longshoremen's Union, 966 F.2d 443, 447 (9th Cir. 1992) (matters of law are for court's determination, not that of expert witness); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509-10 (2nd cir. 1977) (expert testimony consisting of legal conclusions is inadmissible); Bonn v. Calderon, 59 F.3d 815, 838 (9th Cir. 1995) (because Fed. R. Evid. 702 permits expert testimony if it will assist trier of fact, and because district court is qualified to assess likely responses of jury to evidence and understand legal analysis required in that case, there was no abuse of discretion in district court concluding juror psychology expert would not be helpful).  Here, by concluding Washington's laws governing grassroots lobbying are vague and overbroad, and thereby chill protected First Amendment speech, Dr. Milyo's declaration and report impermissibly offers legal conclusions that more appropriately come within the province of this Court. See Milyo Declaration, ¶¶ 52, 91-92, Exhibit A.  Thus, for all of the above reasons, the Court finds that Dr. Milyo's declaration and report should be excluded from consideration in this case, because they fail to meet the relevance and reliability requirements of Daubert and Fed. R. Evid. 702, and because they improperly contain legal conclusions.

      C.      Plaintiffs' Exhibit 12 Constitutes Neither Relevant Evidence Nor Admissible Expert Witness Testimony

      As for the article attached to plaintiffs' summary judgment motion as Exhibit 12, titled *Mandatory Disclosure for Ballot-Initiative Campaigns*, this too the Court finds should be excluded from consideration.  Defendants argue this article should be excluded on the basis that it is not evidence.  The Court agrees. See Black's Law Dictionary (9th ed. 2009) (defining evidence as being "[s]omething . . . that tends to prove or disprove the existence of an alleged fact.").  Certainly, the article is not relevant evidence, as it does not "make the existence of any

ORDER - 35

fact that is of consequence to the determination of th[is] action more probable or less probable than it would be without the evidence," particularly since it does not concern the subject of this lawsuit, namely Washington's laws governing grassroots lobbying. Fed. R. Evid. 401; see also Fed. R. Evid. 402 ("Evidence which is not relevant is not admissible.").[17]

III.    Plaintiffs Lack Standing

A.    Article III's Case and Controversy Requirement

"[T]he Constitution mandates that prior to [the Court's] exercise of jurisdiction there exist a constitutional 'case or controversy,' that the issues presented [to the Court] are 'definite and concrete, not hypothetical or abstract.'" Human Life, 624 F.3d at 1000 (quoting Thomas v. Anchorage Equal Rights Comm'n, 220 F.3d 1134, 1138 (9th Cir. 2000) (en banc) (quoting Ry. Mail Ass'n v. Corsi, 326 U.S. 88, 93 (1945))); see also Arizona Right to Life Political Action Committee v. Bayless ("ARLPAC"), 320 F.3d 1002, 1006 (9th Cir. 2003) ("Under Article III [of the United States Constitution], a federal court only has jurisdiction to hear claims that present an actual 'case or controversy.'") (qouting Allen v. Wright, 468 U.S. 737, 750 (1984)).  As such, "before reaching the merits of" plaintiffs' constitutional claims, the Court "must determine whether [those claims are] justiciable." Human Life, 624 F.3d at 1000; see also American Civil Liberties Union of Nevada v. Lomax, 471 F.3d 1010, 1015 (9th Cir. 2006) (although neither party raised justiciability issue of standing, court had "an 'independent obligation' to consider [it] sua sponte.") (citations omitted).

While standing is determined by the facts in existence at the time the complaint is filed,

---

[17] In addition, while the Court is not treating that article as expert witness evidence or reviewing its admissibility in terms of the Daubert or Fed. R. Evid. 702 requirements, it should be noted that the article suffers from many of the same infirmities that Dr. Milyo's declaration and report do.  For example, the article was written by an IJ employee (indeed, IJ's "Director for Strategic Research"). See ECF #31-1, Defendants' First Set of Requests for Admissions, No. 50.  Nor is it clear that the article has been subject to appropriate peer review.

ORDER - 36

"Article III's 'case-or-controversy requirement subsists through all stages of federal judicial proceedings,'" and therefore "'[i]t is not enough that a dispute was very much alive when suit was filed.'" Federal Election Commission v. Wisconsin Right to Life, Inc., 551 U.S. 449, 461 (2007) (quoting Lewis v. Continental Bank Corp., 494 U.S. 472, 477 (1990)); Lomax, 471 F.3d at 1015. Thus, at the outset, plaintiffs "must establish standing to sue" to satisfy the case or controversy requirement. Human Life, 624 F.3d at 1000. That is, they must show they have "suffered a constitutionally cognizable injury-in-fact," or, in other words, "some threatened or actual injury resulting from the putatively illegal action." California Pro-Life Council, Inc. v. Getman ("CPLC-I"), 328 F.3d 1088, 1093 (9th Cir. 2003); see also Human Life, 624 F.3d at 1000; 4805 Convoy, Inc. v. City of San Diego, 183 F.3d 1108, 1111 (9th Cir. 1999) (quoting Virginia v. American Booksellers Ass'n, Inc., 484 U.S. 383, 392 (1988)); Doucette v. City of Santa Monica, 955 F.Supp. 1192, 1198-99 (C.D. Cal. 1997) (party that fails to meet Article III requirements may not litigate in federal courts) (citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 475-76 (1982)).

"To meet this requirement," though, "[a]bstract injury is not enough." 4805 Convoy, Inc., 183 F.3d at 1111. Instead, plaintiffs must show they have sustained or they are "immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." Id. at 1111-1112; see also ARLPAC, 320 F.3d at 1006 (there must be "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement.") (quoting Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979)). Further, in the "context of injunctive and declaratory relief," plaintiffs must show they have suffered or are threatened with "a 'concrete and particularized' legal harm, . . . coupled with 'a sufficient likelihood that [they] will again be

ORDER - 37

wronged in a similar way.'" <u>Canatella v. State of California</u>, 304 F.3d 843, 852 (9th Cir. 2002) (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560 (1992), and <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 111 (1983)).

On the other hand, "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief." <u>ARLPAC</u>, 320 F.3d at 1006 (quoting <u>Reg'l Rail Reorg. Act Cases</u>, 419 U.S. 102, 143 (1974)). Instead:

> . . . [I]t is "sufficient for standing purposes that the plaintiff intends to engage in 'a course of conduct arguably affected with a constitutional interest' and that there is a credible threat that the challenged provision will be invoked against the plaintiff."

<u>Id.</u> (quoting <u>LSO, Ltd. v. Stroh</u>, 205 F.3d 1146, 1154-55 (9th Cir. 2000) (quoting <u>Babbit</u>, 442 U.S. at 298); <u>see</u> <u>also</u> <u>Canatella</u>, 304 F.3d at 852. But because the Court's role is not to "issue advisory opinions" or to "declare rights in hypothetical cases," the case or controversy requirement also necessitates that constitutional claims "be ripe for review." <u>Human Life</u>, 624 F.3d at 1000 (quoting <u>Thomas</u>, 220 F.3d at 1138). [18] "[A] case is not ripe where the existence of the dispute itself hangs on future contingencies that may or may not occur." <u>Porter v. Jones</u>, 319 F.3d 483, 491 (9th Cir. 2003) (citation omitted). The Court, more specifically, is to determine "the ripeness of a [constitutional] claim by asking whether the issues are fit for judicial decision

---

[18] In reality, though, ripeness frequently "coincides squarely with standing's injury in fact prong," and indeed, "[s]orting out where standing ends and ripeness begins is not an easy task" (<u>CPLC-I</u>, 328 F.3d 1094 and n.2 (quoting <u>Thomas</u>, 220 F.3d at 1138)):

> We have noted that "the ripeness inquiry contains both a constitutional and a prudential component," [<u>Thomas</u>, 220 F.3d at 1138] (quoting *Portman v. County of Santa Clara*, 995 F.2d 898, 902 (9th Cir. 1993)), and that the constitutional component of ripeness is synonymous with the injury-in-fact prong of the standing inquiry. *See id.* Because most of the case law analyzes the constitutional component of ripeness under the "standing" framework, we analyze justiciability in this case [framed as an issue of ripeness by both the district court and the parties] as a standing concern. Regardless of how we characterize our discussion, the inquiry is the same: we ask whether there exists a constitutional "case or controversy" and whether "the issues presented are 'definite and concrete, not hypothetical or abstract.'" *Id.* at 1139 (quoting [<u>Corsi</u>, 326 U.S. at 93]).

<u>Id.</u>

ORDER - 38

and whether the parties will suffer hardship if [the Court] decline[s] to consider the issues."
Canatella, 304 F.3d at 854. "In the context of pre-enforcement constitutional challenges,"
furthermore, where the party making the challenge "has not yet been penalized for violating the
challenged statute, . . . 'neither the mere existence of a prescriptive statute nor a generalized
threat of prosecution satisfies" the case or controversy requirement.'" Human Life, 624 F.3d at
1000 (quoting Thomas, 220 F.3d at 1139).

Additionally, in general plaintiffs "must assert [their] own legal rights and interests, and
cannot rest [their] claim[s] to relief on the legal rights or interests of third parties." 4805 Convoy,
Inc., 183 F.3d at 1112 (quoting Secretary of State of Maryland v. Joseph H. Munson Co., 467
U.S. 947, 955 (1984)); see also Joseph H. Munson Co., 467 U.S. at 955 (requirement that only
one's own legal rights and interests may be asserted described as "prudential considerations that
limit the challenges courts are willing to hear," which are "[i]n addition to the limitations on
standing imposed by Article III's case-or-controversy requirement"). Accordingly, "the federal
courts have supplemented this requirement of 'constitutional standing' [under Article III], with
the doctrine of 'prudential standing,' which requires [courts] to ask whether [plaintiffs'] claim is
sufficiently individualized to ensure effective judicial review." Get Outdoors II, LLC v. City of
San Diego, California ("Get Outdoors II"), 506 F.3d 886, 891 (9th Cir. 2007) ("We employ the
prudential standing doctrine to avoid usurping the legislature's role as policymaking body in our
separation of powers [framework].").

Further, in addition to demonstrating "an injury-in-fact," the "irreducible constitutional
minimum of standing" requires plaintiffs to establish both "causation" and "a likelihood that the
injury will be redressed by a decision in" their favor. Get Outdoors II, 506 F.3d at 891 (citing
Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)); CPLC-I, 328 F.3d at 1093

ORDER - 39

(quoting <u>Lujan</u>, 504 U.S. at 560-61); <u>see</u> <u>also</u> <u>Canatella</u>, 304 F.3d at 852 (plaintiff generally demonstrates standing by showing injury in fact traceable to challenged action and redressable by favorable decision).[19]   However, as noted above, "neither the mere existence of a proscriptive statute nor a generalized threat of prosecution" is sufficient to satisfy the case or controversy requirement. <u>CPLC-I</u>, 328 F.3d at 1094 (quoting <u>Thomas</u>, 220 F.3d at 1139).  "Rather, a plaintiff must face a 'genuine threat of imminent prosecution.'" <u>Id.</u>  "In evaluating the genuineness of a claimed threat of prosecution," the following factors are considered: (1) whether plaintiffs "have articulated a 'concrete plan' to violate the law in question"; (2) "whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings"; and (3) "the history of past prosecution or enforcement under the challenged statute." <u>Id.</u>

Lastly, Article III's case or controversy requirement also may implicate the mootness doctrine.  "Whereas standing is evaluated by the facts that existed when the complaint was filed, '[m]ootness inquiries . . . require courts to look to changing circumstances that arise after the complaint is filed.'" <u>Lomax</u>, 471 F.3d at 1016 (citations omitted); <u>see</u> <u>also</u> <u>City of Erie v. Pap's</u> <u>A.M.</u>, 529 U.S. 277, 287 (2000) (if "live" controversy no longer exists, claim is moot).  Thus, "[t]he question of mootness focuses upon whether [the Court] can still grant relief between the parties." <u>Lomax</u>, 471 F.3d at 1016-17 (quoting <u>Dream Palace v. County of Maricopa</u>, 384 F.3d 990, 999-1000 (9th Cir. 2004)).  There is a recognized exception to the mootness doctrine, though, where a claim has been found to be "capable of repetition, yet evading review." <u>Id.</u> at 1017 (quoting <u>First Nat'l Bank of Boston v. Bellotti</u>, 435 U.S. 765, 774 (1978)).  This exception "applies when (1) the challenged action is too short in duration to allow full litigation before it

---

[19] "In determining redressability, courts 'assume that plaintiff's claim has merit.'" <u>Lomax</u>, 471 F.3d at 1015 (quoting <u>Bonnichsen v. United States</u>, 367 F.3d 864, 873 (9th Cir. 2004) ("The question in deciding whether a plaintiff's injury is redressable is not whether a *favorable decision* is likely but whether a favorable decision *likely will redress* a plaintiff's injury.")) (emphasis in original).

ceases, and (2) there is a reasonable expectation that the plaintiffs will again be subject to the same action." Id. (citing Bellotti, 435 U.S. at 774); see also Wisconsin Right to Life, Inc., 551 U.S. at 462.

As for the first of the above two elements, "a challenged action evades review if it is 'almost certain to run its course before [the Court] can give the case full consideration.'" Lomax, 471 F.3d at 1017 (quoting Miller ex rel. NLRB v. Cal. Pac. Med. Ctr., 19 F.3d 449, 454 (9th cir. 1994)). "The second prong of the 'capable of repetition' exception" requires that there be a "reasonable expectation" or "demonstrated probability" that "the same controversy will recur involving the same complaining party." Wisconsin Right to Life, Inc., 551 U.S. at 463 (quoting Murphy v. Hunt, 455 U.S. 478, 482 (1982) ("Our cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it 'will again be subjected to the alleged illegaility,' . . . or 'will be subject to the threat of prosecution' under the challenged law.") (quoting Lyons, 461 U.S. at 109 and Bellotti, 435 U.S. at 774-775)); see also Lomax, 471 F.3d at 1018 (challenging party must show it is reasonable to expect action by challenged party "will once again give rise to the assertedly moot dispute") (citation omitted).

B.     Standing in the First Amendment Context

"[I]n recognition that that Amendment 'needs breathing space,' the Supreme Court has relaxed the prudential requirement of standing in the First Amendment context." Canatella, 304 F.3d at 853 (quoting and citing Broadrick v. Oklahoma, 413 U.S. 601, 611-12 (1973), and Joseph H. Munson Co., 467 U.S. at 947-56). Under the "overbreadth" doctrine, "an overly broad statute or regulation" may be challenged "by showing that it may inhibit the First Amendment rights of individuals who are not before the court." 4805 Convoy, Inc., 183 F.3d at 1112. This doctrine "is based on the observation that 'the very existence of some broadly written laws has the

ORDER - 41

potential to chill the expressive activity of others not before the court.'" Id. (quoting Forsyth County v. Natioanlist Movement, 505 U.S. 123, 129 (1992)), and citing Lind v. Grimmer, 30 F.3d 1115, 1122 (9th Cir. 1994) (doctrine designed to avert potential chilling effect on speech). As the Ninth Circuit has explained:

> . . . [S]tanding arises "not because [the plaintiff's] own rights of free expression are violated, but because of a judicial prediction or assumption that the [challenged statute's] very existence may cause others not before the court to refrain from constitutionally protected speech or expression." . . .

Canatella, 304 F.3d at 853. (quoting Broadrick, 413 U.S. at 612).

The overbreadth doctrine thus "serves to overcome what would otherwise be a plaintiff's lack of standing." 4805 Convoy, Inc., 183 F.3d at 1112 (citation omitted). Nevertheless, in determining whether overbreadth standing exists, the issue of whether the plaintiff "satisfies the requirement of 'injury-in-fact'" remains "the crucial issue." Id. (quoting Joseph H. Munson, Co., 467 U.S. at 958). As such, "to demonstrate standing for an overbreadth claim," a plaintiff must show "he [or she] and others in his [or her] position face *a credible threat* of discipline under the challenged statutes, and may consequently forego their expressive rights under the First Amendment." Canatella, 304 F.3d at 854 (since plaintiff alleged "*concrete and particularized harms* to his First Amendment rights," and had demonstrated "a sufficient likelihood that he and others may face similar harm in the future," this showing was deemed to be "enough to satisfy the prudential requirements of standing for a First Amendment overbreadth claim.") (emphasis added). As the Ninth Circuit has further explained:

> [The] slender [overbreadth] exception to the prudential limits on standing . . . does not affect the rigid constitutional requirement that plaintiffs must demonstrate an injury in fact to invoke a federal court's jurisdiction. Rather, the exception only allows those who have suffered some cognizable injury, but whose conduct is not protected under the First Amendment, to assert the constitutional rights of others.

ORDER - 42

4805 Convoy, Inc., 183 F.3d at 1112 (citation omitted); see also Bigelow v. Virginia, 421 U.S. 809, 816-17 91975) (plaintiff "must present more than allegations of a subjective chill," rather "[t]here must be a claim of specific present objective harm or a threat of specific future harm") (quoting Laird v. Tatum, 408 U.S. 1, 13-14 (1972)). Accordingly, the requirement remains that "[t]he potential plaintiff . . . have 'an actual and well-founded fear that the law will be enforced against [him or her].'" CPLC-I, 328 F.3d at 1095 (quoting American Booksellers Ass'n, Inc., 484 U.S. at 393); see also Get Outdoors II, 506 F.3d at 891 (plaintiff still required to show injury in fact when raising claim of overbreadth); ARLPAC, 320 F.3d at 1006.

"Without this bare minimum of standing, the overbreadth exception would nullify the notion of standing generally in First Amendment litigation." Get Outdoors II, 506 F.3d at 891; see also Doucette, 955 F.Supp. at 1199 (even plaintiff bringing facial challenge on First Amendment overbreadth grounds has standing only if he or she is able to establish some actual or threatened injury to himself or herself). As one district court has succinctly described what must be shown here:

> Where a plaintiff argues that he is harmed by the chilling of his speech, he is still "required to show that he is seriously interested in subjecting himself to, and the defendant seriously intent on enforcing, the challenged measure." *NAACP v. City of Richmond*, 743 F.2d 1346, 1351 (9th Cir.1984). As a result, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13-14, 92 S.Ct. 2318, 2325-26, 33 L.Ed.2d 154 (1972). "Rather, to establish standing in this manner, a plaintiff must proffer some objective evidence to substantiate his claim that the challenged [statutory provision] has deterred him from engaging in protected activity." *Bordell[ v. General Elec. Co.]*, 922 F.2d [1057,] 1061 [(2nd Cirr. 1991)]. The question is how likely it is that the government will attempt to use the challenged provisions against the plaintiff, not merely how much the prospect of enforcement worries the plaintiff. *See American Library Ass'n v. Barr*, 956 F.2d 1178, 1193 (D.C.Cir.1992).

Doucette, 955 F.Supp. at 1199-1200. However, where the plaintiff fails "to allege even a desire

ORDER - 43

to engage in [protected] conduct or speech," that party "lacks standing even if he [or she] alleges that his [or her] speech has been chilled." Id. at 1200.  Important to determining whether the requisite evidentiary showing has been made, therefore, will be the plaintiff's "history" with the challenged statute or body charged with enforcing it, as well as his or her "continuing activities." Canatella, 304 F.3d at 854 n.14.

On the other hand, in terms of the type of injury needed to be shown, "the Supreme Court has endorsed what might be called a 'hold your tongue and challenge now' approach rather than requiring litigants to speak first and take their chances with the consequences." ARLPAC, 320 F.3d at 1006 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).  "[W]here a plaintiff has refrained from engaging in expressive activity for fear of prosecution under the challenged statute, such self-censorship is a 'constitutionally sufficient injury' as long as it is based on 'an actual and well-founded fear' that the challenged statute will be enforced." Human Life, 624 F.3d at 1001 (citations omitted); see also ARLPAC, 320 F.3d at 1006 ("[o]ne does not have to await consumption of threatened injury to obtain preventive relief") (quoting Reg'l Rail Reorg Cases, 419 U.S. at 143).  Still, "[t]he self-censorship door to standing does not open for every plaintiff," and, as noted above, a challenging party will not succeed merely by "nakedly asserting that his or her speech [has been] chilled." CPLC-I, 328 F.3d at 1095; see also Canatella, 304 F.3d at 854 n.14 (challenged statute's mere existence is not enough to give rise to injury sufficient for standing purposes).

C.     Plaintiffs Have Failed to Allege Concrete and Particularized Harms

Plaintiffs argue they "unquestionably have standing to present their claims," because they have "muted their speech, modified the content of their messages, and altered their behavior all in an attempt to avoid triggering [Washington's] registration and disclosure requirements." ECF

ORDER - 44

#35, pp. 1-2. They argue "[a]bsent a decision by this Court striking down" those requirements, they "will continue to silence their speech, modify their intended communications, and alter their behavior." Id. Specifically, in an attempt to avoid "triggering" Washington's laws governing grassroots lobbying, plaintiffs assert:

- CE has: changed "the message it communicates to the public"; "stopped urging the public to contact legislators in support of lowering taxes and shrinking the size of government"; ensured "that invited speakers refrain from making a public 'call to action' on these and similar state issues"; "refrained from petitioning and lobbying activity as it had previously planned"; "tailored its message to 'avoid characterizing certain activities as a campaign'"; "slowed its outreach and development plans"; "brought in fewer participants"; "put its formal fundraising plans on hold"; "created spreadsheets to carefully track expenditures made in support of its state activities"; and avoided "spending more than $500 in a given month to advance its legislative and policy goals".

- MCOM has: "changed the message it communicates to the public"; avoided "urging the public to contact legislators in support of eminent domain reform to avoid triggering the definition of 'lobbying'"; "deliberately 'ratchet[ed] down' its activities"; and "looked for ways to 'fly under the radar or not fall within – or get caught up within' the requirements of the law[s governing grassroots lobbying]."

Id. at pp. 3-4. Plaintiffs also assert that "[a] corporation that had pledged money in support of CE refused to donate after learning that its name, support of CE, and amount of donation might be disclosed to and made public by the PDC," and that but for Washington's laws governing grassroots lobbying:

- MCOM would: (1) "actively distribute fliers, organize community meetings, and contact government officials in an effort to support reforms of Washington's . . . CRL . . . and eminent domain laws and to oppose . . . TOD . . ."; (2) "not track expenditures made in support of its activities"; and (3) "spend more than $500 in a given month to advance its legislative and policy goals."

Id. at p. 4. Plaintiffs further assert that it was reasonable for them to modify their activities and that they have a well-founded fear of being subject to enforcement action by the PDC, given that

ORDER - 45

the PDC has made clear RCW Chapter 42.17 will be enforced if it or any other organization fails to comply with the requirements thereof. Id. at pp. 4-5.

The problem for plaintiffs, however, is that they have not presented sufficient objective evidence of the requisite specificity to establish standing in this case. As discussed above, the factors the Court must consider in determining whether the case and controversy requirement has been met include whether the challenging party has "articulated a 'concrete plan' to violate the law in question," as well as "the history of past prosecution or enforcement under the challenged statute." CPLC-I, 328 F.3d at 1094. Even under the more relaxed standing requirements in the First Amendment context, "concrete and particularized harms" still must be alleged with the requisite specificity. Canatella, 304 F.3d at 853; see also Bigelow, 421 U.S. at 816-17 (claim of specific present objective or future harm must be made); Doucette, 955 F.Supp. at 1199 (plaintiff "still 'required to show that he is *seriously interested* in subjecting himself to . . . the challenged measure'") (quoting NAACP, 743 F.2d at 1351) (emphasis added).

Neither MCOM nor CE, however, have shown through their "history" either with RCW Chapter 42.17 or the PDC itself – such as, for example, being subject to enforcement action or prosecution by the PDC under those statutes – through their "continuing activities" or through the articulation of any "concrete plan" to actually violate RCW Chapter 42.17, the type of actual or threatened injury the case and controversy requirement demands. Also as noted above, RCW 42.17.200 is concerned solely with grassroots lobbying aimed at affecting state legislation. But neither MCOM nor CE has provided any evidence they have engaged in any actual past activity, are engaging in any current activity or have an articulated, concrete plan to affect such legislation – or are even seriously interested doing so – in the future.

For example, MCOM has focused on resisting eminent domain efforts at the local level.

ORDER - 46

See ECF #1, ¶¶ 10, 29, 31.  Indeed, MCOM itself admits that in the past it has not been required to register and report under RCW 42.17.200, because of its focus on efforts made by the City of Seattle. See id. at ¶ 32.  Further, while plaintiffs point to proposed state legislation introduced in the years 2006 through 2009, regarding eminent domain, CRL and TOD as being areas of concern for MCOM, they have not alleged or pointed to any evidence that MCOM actually was engaged in affecting such legislation during this period. See Id. at ¶¶ 33-36.  Plaintiffs also claim MCOM "anticipated the need" for and "intended to mobilize grassroots activism" in regard to similar proposed legislation in 2010 – which failed to be enacted, but apparently not because of any efforts on MCOM's part – but once more cannot point to any evidence of actual mobilization activities on their part. See id. at ¶¶ 37-38.

CE's past and present activities have been and are even less specifically oriented toward affecting past, current or proposed state legislation than those of MCOM.  Thus, for example, CE claims it is "dedicated to educating the public about the benefits of lower taxes, less regulation, and smaller government," and in the past has spoken with elected officials, established a public website and hosted monthly meetings and speakers about "public policy issues." Id. at ¶¶ 11, 58. No showing has been made, however, as to the extent, if any, such activities have been or are directed toward state – as opposed to federal or local levels of government – the latter two of which clearly are not governed by RCW 42.17.200.  In addition, CE admits it has never met that statute's monetary thresholds triggering coverage thereunder. See id. at ¶ 56.

MCOM's anticipated future activities are similarly devoid of the necessary specificity to reasonably qualify as an articulated, concrete plan to violate RCW 42.17.200. See id. at ¶¶ 40-45. In particular, while MCOM states it anticipates future legislation to be introduced concerning eminent domain, CRL and TOD – and thus "would like to create fliers, organize and hold public

ORDER - 47

meetings, send email blasts, organize trips to [the Washington State capital], speak to the press, and explicitly urge the public to contact their legislators to support" reform in those areas – again they have not identified any particular legislative proposal they are targeting, any actual efforts they have undertaken so far to do so (even ones that may fly under the radar of RCW 42.17.200) or any "concrete" plan in that regard, other than the mere fact that they "would like" to do so. ECF #35, p. 8. Similarly deficient claims of future desired activities are made by CE concerning anticipated "legislation seeking to raise taxes, grow the size of state government, and increase regulatory burdens."[20] Id. at p. 9.

Plaintiffs claim that in early 2011, Washington State's Office of the Attorney General requested the help of MCOM representatives in mobilizing "community support for legislation reforming" the state's eminent domain laws. ECF #35-2, ¶ 9. But none of the documentary evidence provided by plaintiffs to support this claim actually does so. See ECF #40, Declaration of Jeanette M. Petersen, Email Correspondence Regarding Testimony in Support of Attorney General Eminent Domain Legislation.[21] To the extent any MCOM representative did participate in efforts to reform state eminent domain legislation, furthermore, such participation appears to have occurred for the most part in early November 2008, and even then largely in the capacity of witnesses testifying in regard to how eminent domain has affected them both as individual home owners and as residents of Seattle.[22] See ECF #38, Declaration of Tim Ford, ¶¶ 2-7, 9, 13-14,

---

[20] CE also would like to engage in such activities in regard to anticipated legislation "seeking to implement the provisions of the federal Patient Protection and Affordable Care Act, P.L. 111-148 (President Obama's healthcare law)," but clearly this concerns proposed *federal* legislation, and thus does not implicate RCW 42.17.200 or any of Washington's other laws governing grassroots lobbying. Id. at p. 9.

[21] See Lujan, 497 at 888 (purpose of summary judgment "is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit.").

[22] Plaintiffs state that to the extent there remains "a question" as to whether MCOM has standing in this case, they will amend their complaint to add the names of these representatives in their individual capacities. See ECF #40, p. 4 and n. 1. At this stage in the proceedings, however, plaintiffs may amend their complaint "only with the opposing

ORDER - 48

Minutes of November 7, 2008 Meeting of Eminent Domain Task Force, pp. 2-3.

Citing American Civil Liberties Union of Nevada v. Heller, 378 F.3d 979 (9th Cir. 2004), plaintiffs argue the level of specificity this Court finds they must show to establish standing is simply not required. Plaintiffs' reliance on Heller, though, is misplaced. Specifically, the Ninth Circuit found the plaintiff in that case had standing to bring its First Amendment overbreadth claim, as the plaintiff's complaint alleged the challenged statute had "already prohibited and continue[d] to restrict" its protected speech, and provided "examples of such restrictions." Id. at 983-84 (noting further plaintiff's complaint identified specific proposed legislation it intended to engage in, and produced evidence that one of its members had been "prosecuted for violations" of statute in question). As discussed above, plaintiffs have made no such showing in this case.

Plaintiffs have not presented the Court with any other Ninth Circuit – or Supreme Court – case holding that it is sufficient to merely allege a general desire or plan to engage in activities that are likely to implicate the challenged statute, without any history of having previously done so, evidence of actually currently doing so or an articulated, concrete plan to do so in the future. Rather, Ninth Circuit case law – including Heller – appears to require the opposite showing. For example, the plaintiff in Human Life "[o]ver the years . . . ha[d] expended considerable time and resources opposing efforts to legalize physician-assisted suicide" – which was the subject of the specific ballot initiative it sought to oppose – and had undertaken "plans to solicit funds for and launch a public education campaign" consisting of "three proposed public communications,"

party's written consent or the [C]ourt's leave." Fed. R. Civ. P. 15(a)(2). Defendants have not so consented here, and there is no evidence before the Court that defendants in fact would consent to such an amendment. Further, while it is true that leave should be freely given "when justice so requires" – and ignoring the fact that plaintiffs have not properly moved to amend its complaint – the Court finds justice does not require the granting of leave in this case. First, plaintiffs fail to explain why the above MCOM representatives could not have been added earlier. Second, it would not be fair to defendants at this late stage of the proceedings to allow such an amendment. Third, and most importantly, no showing has been made that either of the above MCOM representatives would be any more entitled to standing in this case than MCOM itself.

ORDER - 49

including distribution of a "solicitation letter" already drafted, targeting of individual voters by telephone using planned scripts (again already written), and the broadcasting of "four proposed scripts for thirty-second radio spots" (once more already planned). 624 F.3d at 995-96. On this basis, the Ninth Circuit found standing existed. See id. at 1000-02 (noting "[the plaintiff was] a politically active organization that ha[d] been heavily involved in public debates about pro-life issues in the past and intend[ed] to undertake future communications like those it wished to make in conjunction with the [specific ballot initiative it sought to oppose]").

In Lomax, standing was found to exist where the plaintiffs, in anticipating the upcoming election, had "circulated a petition to place [an initiative] on the ballot," which they submitted to the state's Secretary of State for determination as to whether that initiative qualified to be placed on that ballot (which it did not, because it was found to have failed to comply with a state rule on acquiring signatures). 471 F.3d at 1012. While the election had passed by the time the case came before the Ninth Circuit for consideration, plaintiff's claim challenging that rule was determined to fall within the capable of repetition, yet evading review exception to the mootness doctrine, as it was reasonable to expect the plaintiff would again be subject to the above state rule. See id. at 1013. Once more, the demonstrated history of violating the particular state law at issue shown in Lomax has not been established by plaintiffs' in this case.

As in Human Life, the plaintiff in CPLC-I – which "frequently" took "a position" on state propositions relating to abortion and assisted suicide – was found to have standing to challenge the state's campaign disclosure laws. 328 F.3d at 1091-95. "Among its many activities," it was noted that the plaintiff published "voter guides" that reported "the positions of some federal and most statewide candidates on abortion-related topics," and urged "readers to vote for or against certain ballot initiatives that concern[ed] abortions or related subjects." Id. at 1092. The plaintiff

ORDER - 50

also "introduced evidence . . . that it planned to spend more than" the threshold spending amount in regard to a state initiative on the ballot during the 2000 general election, which would trigger the state reporting and disclosure requirements. <u>Id.</u> at 1092-93.

In <u>ARLPAC</u>, the plaintiff – to further its stated mission of educating the public in regard to issues such as abortion and euthanasia – "often [made] independent expenditures to express its support for or opposition to [political] candidates." 320 F.3d at 1005. While plaintiff had wanted to "disseminate advertising without providing twenty-four hour notice to candidates" as required by the state statute it was challenging, it "provided the [required] notice and delayed its speech both before the September 2000 primary election and subsequent elections." <u>Id.</u> at 1006. Thus, the Ninth Circuit found the plaintiff faced "actual harm" here, although it did not actually violate the statue and had never been subject to penalties for doing so. <u>Id.</u>

In <u>Porter</u>, one of the plaintiffs "in anticipation of the November 2000 national presidential election," created a website that offered "general information about the electoral college, election predictions, and voting," and it provided "a forum to allow individuals around the country to contact one another and discuss their political beliefs and strategies for the upcoming election." 319 F.3d at 487. The plaintiff soon learned, though, that California's Secretary of State had sent the founders of another similar website a cease and desist letter, threatening them with criminal prosecution "for allegedly brokering the exchange of votes" in violation of state law. <u>Id.</u> at 487-88. Although he himself had not received such a letter, because the plaintiff was "deeply afraid" of being similarly prosecuted, he suspended the operation of his own website. <u>Id.</u> at 488. Since the plaintiff had "expressed his intent to create a similar website in future presidential elections," other plaintiffs were likely to use that website and there was no indication the Secretary of State would not enforce the election laws against him, plaintiffs' challenge to those laws were ripe, as

ORDER - 51

well as capable of repetition, yet evading review. <u>Id.</u> at 488-90.

Finally, in <u>Canatella</u>, while not involving a campaign or lobbying disclosure challenge, as noted above, the Ninth Circuit expressly noted that it was the plaintiff's "history" of disciplinary proceedings before the California State Bar and "his continuing activities as a zealous advocate," as well as the nature of his challenge to the Bar's statutes and rules of professional conduct, that led it "to conclude the requirements of standing" had been met. 304 F.3d at 854 n. 14. All of the cases just discussed thus make clear that at least some objective showing of having engaged in, of presently engaging in or of an articulated, concrete plan to engage in the type of activity that is the object of the challenged statute is required to establish standing, even under the more relaxed standards for First Amendment claims. As explained above, such a showing is simply absent in this case. Having so determined, the Court nevertheless shall go on to address in the alternative plaintiffs' constitutional claims on their merits.

IV.    <u>Plaintiff's Constitutional Claims Are Without Merit</u>

A.    <u>Plaintiffs' Alleged Constitutional Harms</u>

Plaintiffs allege the registration and reporting requirements contained in RCW 42.17.200 burden their free speech, in that they are "expensive, complex, and time-consuming" and as such, "interfere with, and chill [their] ability to . . . engage in [anonymous] political speech." ECF #1, ¶ 82. Plaintiffs further allege those requirements violate their First Amendment "to associate with, and have individuals contribute to, their causes," as well as the right of association of "any potential donors or volunteers who wish to support" those causes. <u>Id.</u> at ¶¶ 84, 86. In addition, plaintiffs claim the "dissemination of the information contained in [the reports they are required to file with the PDC], create the reasonable probability that [their] respective members will face threats, harassment, or reprisals if their names, addresses, and occupations were disclosed." <u>Id.</u> at

ORDER - 52

¶ 85. Plaintiffs also claim the efforts they have made or anticipate having to make to avoid the registration and reporting requirements contained in RCW 42.17.200 – such as limiting their expenditures and changing their communications content – interfere with their right to exercise their "unfettered ability to craft their message." Id. at ¶ 87; ECF #35, pp. 2-4.

Plaintiffs, furthermore, allege the exemption of "media entities" and public officials in RCW 42.17.160 from the registration and reporting requirements contained in RCW 42.17.200, "discriminates against those citizens who do not fall into those categories and deprives" plaintiffs and others "of the equal protection of the laws."[23] ECF #1, ¶ 88. Plaintiffs allege as well those same registration and reporting requirements, and "the interaction" thereof with the exemptions contained in RCW 42.17.160, "result in regulations that are vague, overbroad, and deprive" them "of their right to receive fair notice of what the law requires." Id. at ¶ 89. They claim the PDC's "procedures for obtaining a formal declaration of the application of [RCW 42.17.200 and RCW 42.17.160] are lengthy and complex and do not allow [them] and others to receive a definitive statement regarding the application of such laws in a timely manner." Id. at ¶ 90.

Plaintiffs assert "[t]his lack of clarity also leaves [them] and others at risk of arbitrary and ad hoc enforcement of" the above laws. Id. at ¶ 91. Specifically, plaintiffs claim the manuals the PDC publishes to give citizens guidance in complying with Washington's lobbying registration and reporting requirements are lengthy, and fail to provide definitive answers, thereby requiring further consultation of the applicable state laws and rules themselves (which plaintiffs also claim are overly lengthy) See ECF #22, p. 6. Plaintiffs assert they have struggled with the complexity of RCW Chapter 42.17, and have "serious concerns" regarding their ability to comply with RCW

---

[23] As noted by defendants, plaintiffs further allege in their motion for summary judgment that the exemption RCW 42.17.160(5) gives to those "who restrict their lobbying activities to no more than four days or parts thereof during any three-month period" deprives them and others of the equal protection of the laws as well. ECF #22, pp. 22-23.

ORDER - 53

42.17.200, the biggest of which concerns how "small community groups" such as themselves should "keep track of and report amounts spent in connection with their varied activities." Id. at pp. 7-8. Lastly, plaintiffs allege they "face a credible threat of prosecution" if, as they intend, they make expenditures in excess of the amounts set forth in RCW 42.17.200, and they do not register with the PDC. Id. at ¶ 92.

B.     Facial Versus As-Applied Constitutional Challenges

There are two types of constitutional challenges a party may make regarding a contested statute, and which plaintiffs, as noted above, have presented in this case. First, a statute may be challenged "as applied." 4805 Convoy, Inc., 183 F.3d at 1111 n.3. "This type of challenge contends that the law is unconstitutional as applied to the plaintiff's particular expressive activity, even though the law may be capable of valid application to others." Id. "[A] successful 'as-applied' challenge," therefore, "does not invalidate the law itself, but only the particular application of that law." Id. "As-applied" challenges are the norm due to the "general rule" that an individual "who has engaged in activity that is not constitutionally protected cannot complain that the statute is unconstitutional as applied to others." Doucette, 955 F.Supp. at 1199 n.1 (citing United States v. Raines, 362 U.S. 17, 21 (1960)).

By contrast, a "facial" challenge to the constitutionality of a statute "does not depend upon whether [the challenging party's] own activity is shown to be constitutionally privileged." Bigelow, 421 U.S. at 815. Such a challenge thus does not require the party "making the attack" to demonstrate that the statute is unconstitutional as applied to him or her. Id. at 815-16; see also Doucette, 955 F.Supp. at 1199 n.1. However, "a plaintiff whose conduct *is* protected may also bring a facial challenge to a statute that he [or she] contends is unconstitutional, . . . by arguing that the statute could never be applied in a valid manner and would chill the speech of others."

ORDER - 54

4805 Convoy, Inc., 183 F.3d at 1112 n.4 (emphasis in original). As noted above, "a 'facial' challenge is generally rejected for prudential reasons," although the "'ordinary reluctance to entertain [one] is somewhat diminished in the First Amendment context' because of the 'concern that those who desire to engage in legally protected expression may refrain from doing so rather than risk prosecution or undertake to have the law declared . . . invalid." Doucette, 955 F.Supp. at 1199 n.1 (quoting Roulett v. City of Seattle, 78 F.3d 1425, 1427 (9th Cir. 1996)).

"A successful challenge to the facial constitutionality of a law invalidates the law itself." 4805 Convoy, Inc., 183 F.3d at 1111 (citation omitted). "Thus, facial challenges 'are allowed not primarily for the benefit of the litigant, but for the benefit of society – to prevent the statute from chilling the First Amendment rights of other parties not before the court.'" Id. at 1111 (quoting Secretary of State of Maryland v. Joseph H. Munson Co., 467 U.S. 947, 958 (1984)). "Declaring a statute facially unconstitutional," however, "'is, manifestly, strong medicine,' and 'has been employed by the [Supreme] Court sparingly and only as a last resort.'" Bigelow, 421 U.S. at 817 (quoting Broadrick, 413 U.S. at 613).

"A facial challenge to a [statute] is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which [it] would be valid," i.e., "that the law is unconstitutional in all of its applications." Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 449 (2008) (facial challenge must fail where statute has "plainly legitimate sweep.") (quoting Washington v. Glucksberg, 521 U.S. 702, 739-40 (1997))); United States v. Salerno, 481 U.S. 739, 745 (1987) (fact that statute "might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since [the Supreme Court has] not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment."). This is "a high burden of proof" for a plaintiff to

meet. <u>S.D. Meyers, Inc. v. City and County of San Francisco</u>, 253 F.3d 461, 467 (9th Cir. 2001).

As the Supreme Court has further explained:

> . . . In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate about "hypothetical" or "imaginary" cases. *See . . . Raines*, 362 U.S. [at] 22 . . . Exercising judicial restraint in a facial challenge "frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations of statutes in areas where their constitutional application might be cloudy." *Raines, supra* at 22 . . .
>
> Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." *Sabri v. United States*, 541 U.S. 600, 609, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither " 'anticipate a question of constitutional law in advance of the necessity of deciding it' " nor " 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' " *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) (quoting *Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 28 L.Ed. 899 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that " '[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " *Ayotte v. Planned Parenthood of Northern New Eng.*, 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652, 104 S.Ct. 3262, 82 L.Ed.2d 487 (1984) (plurality opinion)). . . .

<u>Washington State Grange</u>, 552 U.S. at 449-51; <u>see</u> <u>also</u> <u>United States v. Harriss</u>, 347 U.S. 612, 625 (rejecting facial challenge because challenging parties' predictions of unconstitutionality had amounted to "[h]ypothetical borderline situations," finding "too remote" possibility others will engage in self-censorship); <u>Florida League of Professional Lobbyists v. Meggs</u>, 87 F.3d 457, 460 (11th Cir. 1996). "It is with these principles in view that" the Court must consider the facial challenges presented by plaintiffs. <u>Washington State Grange</u>, 552 U.S. at 451. But as explained in greater detail below, plaintiffs have failed to demonstrate that Washington's laws governing

ORDER - 56

grassroots lobbying, including RCW 42.17.200 and RCW 42.17.160, are unconstitutional, either as applied to them or on their face.

C.    The Right to Engage in Anonymous or Political Speech and the Right of Association Have Not Been Unduly Burdened

As indicated above, plaintiffs claim RCW 42.17.200 and the PDC's regulations on their face and as applied to them prohibit – or at least chill and/or severely burden – their ability and that of others to engage in political speech, both anonymous and otherwise, and to associate. See ECF #1, ¶¶ 99-100, 102, 108, 110.  Plaintiffs claim RCW 42.17.200 and the PDC's regulations "create the reasonable probability that [their] respective members, supporters and contributors, and their potential members, supporters and contributors, will face threats, harassment, or reprisals if their names, addresses, and occupations were disclosed." Id. at 101.  In addition, plaintiffs allege RCW 42.17.200 and the PDC's regulations impose "onerous, expensive, time-consuming, and complex" requirements that are "in excess relative to" and are "not supported" by a "compelling, important, substantial or even legitimate state interest," and that are "not sufficiently tailored to support any such interest." Id. at ¶¶ 103, 106, 112.

1.    The Right to Engage in Political and Anonymous Speech and the Right of Association under the First Amendment

"The First Amendment prohibits Congress from enacting laws 'abridging the freedom of speech.'" Long Beach Area Peace Network v. City of Long Beach ("Long Beach"), 574 F.3d 1011, 1020-21 (9th Cir. 2009) (quoting U.S. Const. amend. I); see also Speechnow.org v. Federal Election Commission ("Speechnow"), 599 F.3d 686, 692 (D.C. Cir. 2010).  That Amendment "is applicable to the States through the Fourteenth [Amendment]." First National Bank of Boston v. Bellotti, 435 U.S. 765, 778 (1978); see also Long Beach, 574 F.3d at 1021.  In addition, "certain types of speech enjoy special status." Long Beach, 574 F.3d at 1021.  For example, "[p]olitical

speech is core First Amendment speech," that has been deemed "critical to the functioning of our democratic system." Id.

In terms of free speech and anonymity, the Supreme Court has held in the literary context that the decision of an author "to remain anonymous . . . is an aspect of the freedom of speech protected by the First Amendment." McIntyre v. Ohio Elections Commission, 514 U.S. 334, 342 (1995) ("[A]t least in the field of literary endeavor, the interest in having anonymous works enter the marketplace of ideas unquestionably outweighs any public interest in requiring disclosure as a condition of entry."). Id. "The freedom to publish anonymously," however, "extends beyond the literary realm." Id. (noting that "[p]ersecuted groups and sects from time to time throughout history have been able to criticize oppressive practices and laws either anonymously or not at all.") Id. (quoting Talley v. California, 362 U.S. 60, 64 (1960)).

In addition to protecting "political expression," the First Amendment protects "political association as well." Buckley v. Valeo, 424 U.S. 1, 15 (1976); see also Citizens Against Rent Control/Coalition for Fair Housing v. City of Berkeley, California ("Citizens Against Rent Control"), 454 U.S. 290, 295 (1981); Long Beach, 574 F.3d at 1020-21 ("The First Amendment prohibits Congress from enacting laws 'abridging . . . the right of people peaceably to assemble.'") (quoting U.S. Const. amend. I). Indeed, the Supreme Court has found the right of association is "a 'basic constitutional freedom' . . . that is 'closely allied to freedom of speech.'" Buckley, 424 U.S. at 25; see also Citizens Against Rent Control, 454 U.S. at 295 (recognizing importance of freedom of association in guaranteeing right of people to make voice heard on public issues); National Association for the Advancement of Colored People v. State of Alabama ("NAACP"), 357 U.S. 449, 460 (1958) (noting "close nexus between the freedoms of speech and assembly," and that "[e]ffective advocacy of both public and private points of view, particularly

controversial ones, is undeniably enhanced by group association.").

"[G]roup association is protected [under the First Amendment,] because it enhances '(e)ffective [sic] advocacy.'" <u>Buckley</u>, 424 U.S. at 65 (quoting <u>NAACP</u>, 357 U.S. at 460). Further, "compelled disclosure of affiliation with groups engaged in advocacy may" be an "effective . . . restraint on freedom of association." <u>NAACP</u>, 357 U.S. at 462 ("This Court has recognized the vital relationship between freedom to associate and privacy in one's association."). "The right to join together 'for the advancement of beliefs and ideas,'" furthermore, "is diluted if it does not include the right to pool money through contributions, for funds are often essential if 'advocacy' is to be truly or optimally 'effective.'" <u>Buckley</u>, 424 U.S. at 65-66 (internal citation omitted). "Moreover," the Supreme Court has noted that "the invasion of privacy of belief may be as great when the information sought concerns the giving and spending of money as when it concerns the joining of organizations, for '(f)inancial transactions can reveal much about a person's activities, associations, and beliefs.'" <u>Id.</u> at 66 (quoting <u>California Bankers Ass'n v. Shultz</u>, 416 U.S. 21, 78-79 (1974)).

### 2.     <u>Plaintiffs' Overbreadth Claim</u>

Plaintiffs argue that what RCW 42.17.200 "calls 'grassroots lobbying' is more accurately described as 'grass roots issue advocacy' or grass roots political speech," not lobbying "as that term is commonly understood" – i.e., that which involves "direct contact with public officials." ECF #22, pp. 9-10. Rather, plaintiffs assert the type of activity RCW 42.17.200 governs is core political speech involving individuals or groups communicating with the general public about various issues. <u>See</u> <u>id.</u> at p. 10. Because the "[e]ffective exercise" of the right to communicate with the general public in this manner also "requires [the ability to engage in both] anonymous speech and association," that law's reporting and disclosure requirements "impose serious

ORDER - 59

impediments to the exercise [all of these protected] rights." <u>Id.</u>  Plaintiffs thus are "essentially

contend[ing]" here that RCW 42.17.200 is invalid because it "sweeps too broadly" – both as

applied to them and in regard to others – in that its reporting and disclosure requirements burden

"more speech than is constitutionally permissible." <u>Human Life</u>, 624 F.3d at 1020 n.9; <u>Kimbell

v. Hooper</u>, 164 Vt. 80, 83 (1995).

"A law will be struck down for overbreadth when 'it does not aim specifically at evils

within the allowable area of government control but instead sweeps within its ambit other

activities that constitute an exercise' of protected expressive or associational rights." <u>CICU</u>, 534

F.Supp. at 493 (quoting <u>Thornhill v. Alabama</u>, 310 U.S. 88, 97 (1940)).  "[V]oiding a law for

overbreadth," however, "is 'strong medicine' that" should only be applied "as a last resort." <u>Id.</u>

at 494 (quoting <u>Broadrick</u>, 413 U.S. at 613, 615 ("[O]verbreadth adjudication is an exception to

our traditional rules of practice and . . . where conduct and not merely speech is involved, we

believe that the overbreadth of a statute must not only be real, but substantial as well, judged in

relation to the statute's plainly legitimate sweep.").  Accordingly, "claimed flaws must be of a

substantial concern in the context of the statute as a whole before" the statute will be invalidated.

<u>Kimbell</u>, 164 Vt. at 85.  Further, the protected speech a plaintiff intends to engage in – but has

refrained from doing so for fear of prosecution – must "arguably" fall "within the [challenged]

statute's reach" to establish a "constitutionally sufficient injury." <u>Human Life</u>, 624 F.3d at 1001

(citations omitted); <u>see</u> <u>also</u> <u>CPLC-I</u>, 328 F.3d at 1095.

3.     <u>Standard of Review: Exacting Scrutiny Applies</u>

Since "compelled disclosure, in itself, can seriously infringe on privacy of association

and belief," disclosure requirements "burden First Amendment interests." <u>Speechnow</u>, 599 F.3d

ORDER - 60

at 696 (quoting <u>Buckley</u>, 424 U.S. at 64).[24]  "[I]n contrast with limiting a person's ability to spend money on political speech," however, "disclosure requirements 'impose no ceiling on campaign-related activities,'" nor do they "prevent anyone from speaking." <u>Id.</u> (quoting <u>Buckley</u>, 424 U.S. at 64, and <u>McConnell v. Federal Election Comm'n</u>, 540 U.S. 93, 201 (2003)); <u>see also</u> <u>John Doe v. Reed</u>, 130 S.Ct. 2811, 2818 (2010) (noting that "a *disclosure* requirement" is "not a prohibition on speech," because while such "requirements may burden the ability to speak, . . . they do not prevent anyone from speaking") (quoting <u>Citizens United v. Federal Election Comm'n</u>, 130 S.Ct. 876, 914 (20101) (emphasis in original)).  As such, disclosure requirements "inhibit speech less than do contribution and expenditure limits," or than do sanctions on "pure speech." <u>Speechnow</u>, 599 F.3d at 696 (citing <u>Citizens United</u>, 130 S.Ct. at 914)[25]; <u>see also</u> <u>CICU</u>, 534 F.Supp. at 494.

Indeed, the Supreme Court has recognized disclosure as "a less restrictive alternative to more comprehensive regulations of speech.'" <u>Id.</u> (quoting <u>Citizens United</u>, 130 S.Ct. at 915); <u>see also</u> <u>Buckley</u>, 424 U.S. at 68.  Thus, a "basic distinction" exists between "financial limitations" that "'necessarily reduce[ ] the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached,' and disclosure

---

[24] As the Supreme Court noted in <u>Buckley</u>:

> It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute.  In some instances, disclosure may even expose contributors to harassment or retaliation.  These are not insignificant burdens on individual rights, and they must be weighed carefully against the interests which Congress has sought to promote by this legislation.

424 U.S. at 68.

[25] <u>See id.</u> at 692 (noting that because contribution limits "implicate fundamental First Amendment interests," when the government "attempts to regulate political campaigns and express advocacy through contribution limits, . . . it must have a countervailing interest that outweighs the limit's burden on the exercise of First Amendment rights," and "[t]hus a 'contribution limit involving significant interference with associational rights must be closely drawn to serve a sufficiently important interest.'") (quoting <u>Davis v. Federal Election Comm'n</u>, 128 S.Ct. 2759, 2772 n.7 (2008); <u>see also</u> <u>Citizens Against Rent Control</u>, 454 U.S. at 299 (limits on expenditures operate as direct restraint on freedom of expression).

requirements, which 'impose no ceiling on campaign-related activities.'" <u>Human Life</u>, 624 F.3d at 1003 (quoting <u>Buckley</u>, 424 U.S. at 19). Accordingly, "[t]he Supreme Court has consistently upheld organizational and reporting requirements against facial challenges." <u>Speechnow</u>, 599 F.3d at 696; <u>see also</u> <u>Taylor</u>, 582 F.3d at 9 (noting Supreme Court, recognizing "lesser burdens" that disclosure imposes on First Amendment interests, "has upheld numerous statutes requiring disclosures by those endeavoring to influence the political system.").

Nevertheless, the Supreme Court has "recognized that significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest." <u>Buckley</u>, 424 U.S. at 64; <u>see also</u> <u>Davis</u>, 554 U.S. at 744. Rather, "the subordinating interests of the State [offered to justify compelled disclosure]" must "survive exacting scrutiny."[26] <u>Reed</u>, 130 S.Ct. at 2818; <u>see also</u> <u>Davis</u>, 554 U.S. at 744. This means, therefore, that there must "be a 'relevant correlation' or 'substantial

---

[26] As noted by the Ninth Circuit, "[t]he Supreme Court has established different levels of scrutiny for analyzing alleged First Amendment violations, depending on where the speech takes place." <u>Long Beach Area Peace Network</u>, 574 F.3d at 1022. In addition to the application of "exacting scrutiny" in the case of disclosure requirements, for example, "strict scrutiny" is required where a law favors "some speakers over others" and "the legislature's speaker preference reflects a content preference." <u>Turner Broadcasting System, Inc. v. Federal Communications Comm'n</u> ("<u>Turner Broadcasting</u>"), 512 U.S. 622, 658 (1994); <u>see also</u> <u>Citizens United</u>, 130 S.Ct. at 898; <u>Bellotti</u>, 435 U.S. at 786. A law is "content based . . . if its manifest purpose is to regulate speech because of the message it conveys." <u>Turner Broadcasting</u>, 512 U.S. at 645. "Laws that burden political speech" also "are 'subject to strict scrutiny.'" <u>Citizens United</u>, 130 S.Ct. at 898 (citation omitted). So too are laws that place limitations on campaign contributions and independent political expenditures. <u>See</u> <u>Davis</u>, 554 U.S. at 737, 740 n.7; <u>Randall</u>, 548 U.S. at 246-47; <u>Human Life</u>, 624 F.3d at 1010. In order "[t]o satisfy strict scrutiny," the following three elements must be established:

> . . . (1) "the interests the government proffers in support" of the statute must be "properly characterized as 'compelling' "; (2) the statute must "effectively advance[ ] those interests"; and (3) the statute must be "narrowly tailored to advance the compelling interests asserted." . . .

<u>Taylor</u>, 582 F.3d at 11 (citation omitted); <u>see also</u> <u>Federal Election Comm'n v. Wisconsin Right to Life, Inc.</u>, 551 U.S. 449, 464-65 (2007); <u>Bellotti</u>, 435 U.S. at 786. The "narrow tailoring" requirement, furthermore, "is satisfied 'so long as the [statute] promotes a substantial government interest that would be achieved less effectively absent" that statute. <u>Turner Broadcasting</u>, 512 U.S. at 662 (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 799 (1989). The challenged statutory provision thus "need not be the least speech-restrictive [or least intrusive] means of advancing the Government's interests." <u>Id.</u> That is, narrow tailoring requires merely that "the means chosen do not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" <u>Id.</u>; <u>see also</u> <u>Bellotti</u>, 435 U.S. at 786 (government "must employ means 'closely drawn to avoid unnecessary abridgment.'") (quoting <u>Buckley</u>, 424 U.S. at 25).

ORDER - 62

relation' between the governmental interest and the information required to be disclosed."[27]

Davis, 554 U.S. at 744 (citation omitted); see also Reed, 130 S.Ct. at 2818 Speechnow, 599 F.3d at 696 (government may point to "sufficiently important" interest that bears "substantial relation" to its disclosure requirement) (citing Citizens United, 130 S.Ct. at 914); Taylor, 582 F.3d at 10.

In other words, "the strength of the governmental interest must reflect the seriousness of the actual burden on First Amendment rights." Davis, 554 U.S. at 744; see also Reed, 130 S.Ct. at 2818. "This type of [exacting] scrutiny is necessary," furthermore, "even if any deterrent effect on the exercise of First Amendment rights arises, not through direct government action,

_____

[27] Citing Citizens United, 130 S.Ct. at 889, plaintiffs assert strict scrutiny rather than exacting scrutiny should be the standard that is applied here, because the statute they challenge is unconstitutionally vague and unconstitutionally exempts preferred speakers and subjects from its application. But Citizens United does not hold that strict scrutiny is applied in regard to the issue of alleged vagueness itself. Nor do plaintiffs point to any other legal authority that so holds in regard to vagueness or overbreadth challenges. Rather, as just discussed, the distinction between strict scrutiny and exacting scrutiny centers on whether the statute merely mandates the disclosure of financial or other related information, or instead whether it places actual limits on political speech (e.g., by restricting the amount of independent expenditures or campaign finance contributions or the content of speech itself). See Human Life, 624 F.3d at 1013 (Citizens United underscored "the fundamental distinction between the burdens imposed by financial regulations . . . and those imposed by disclaimer and disclosure requirements") (citing 130 S.Ct. at 897). Further, as discussed in greater detail below, Washington's laws governing grassroots lobbying fall into the category of laws that merely mandate disclosure, and do not place actual limits on political speech. Lastly, also as discussed in greater detail below, because plaintiffs are not similarly situated to the subjects of the exemptions contained in RCW 42.17.160 they are challenging, and because those exemptions are not both speaker-based *and* content-based, strict scrutiny does not apply here as well.

Plaintiffs also erroneously assert that to survive exacting scrutiny, the statute must be narrowly tailored to advance the governmental interest being asserted. See ECF #22, p. 11 (citing McIntyre, 514 U.S. at 347). But in McIntyre, the Supreme Court found the statute at issue – which banned the distribution of anonymous campaign literature – to be "a regulation of pure speech." 514 U.S. at 345 ("[E]ven though this provision applies evenhandedly to advocates of differing viewpoints, it is a direct regulation of the content of speech."). Thus, while the Supreme Court did use the term "exacting scrutiny," it in effect was applying – and appropriately so – strict scrutiny. See id. at 347 ("When a law *burdens core political speech*, we apply 'exacting scrutiny,' and we uphold the restriction only if it is narrowly tailored to serve an *overriding* state interest.") (emphasis added). Indeed, in setting forth this standard, the Supreme Court cited its earlier decision in Bellotti, which held that where "a prohibition is *directed at speech itself*, and the speech is intimately related to the process of governing, 'the State may prevail only upon showing a subordinating interest which is *compelling.*'" 435 U.S. at 786 (noting further that burden of showing existence of such interest is on government, which "[e]ven then . . . must employ means '*closely drawn* to avoid unnecessary abridgement.'") (emphasis added) (quoting Buckley, 424 U.S. at 25). In so applying strict scrutiny, the Supreme Court also pointed out specifically that although financial disclosures "undeniably" impede "protected First Amendment activity," that "intrusion is a far cry from compelled self-identification on all election-related writings" at issue in McIntyre. 514 U.S. at 355. Although plaintiffs – as explained in greater detail below – attempt to frame Washington's grassroots lobbying disclosure requirements in terms of a prohibition directed at core political speech itself, it is well in line with the type of disclosure laws the federal courts have found merely require that the asserted governmental interest be "sufficiently important," or bear "a substantial relation" to, the information to be disclosed.

but indirectly as an unintended but inevitable result of the government's conduct in requiring disclosure." Buckley, 424 U.S. at 65. The Supreme Court, though, has "acknowledged that there are governmental interests sufficiently important to outweigh the possibility of infringement" of First Amendment rights. Id. at 66. In Buckley, the Supreme Court found three categories of such sufficient governmental interests:

> . . . First, disclosure provides the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office. . . .

> Second, disclosure requirements deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity. . . .

> . . .

> Third, and not least significant, recordkeeping, reporting, and disclosure requirements are an essential means of gathering the data necessary to detect violations of [political] contribution limitations . . .

Id. at 66-67 (internal footnotes omitted). The government, however, "need not . . . employ the least restrictive means to satisfy its [asserted] interest," but, as noted above, "it need only ensure that its means are substantially related to that interest." Human Life, 624 F.3d at 1013.

        4.     <u>Washington Has a Sufficiently Important Interest in Providing Information to the Public in Regard to Grassroots Lobbying</u>

Disclosure requirements consistently have been upheld on the basis of "a governmental interest in 'provid[ing] the electorate with information' about the sources of political campaign funds, not just the interest in deterring corruption and enforcing anti-corruption measures," as is the case regarding limitations on contributions for political speech. Speechnow, 599 F.3d at 692, 696 (noting that only interest Supreme Court has recognized as being sufficiently important to outweigh First Amendment interests implicated by contribution limits is preventing corruption or appearance of corruption) (quoting Buckley, 424 U.S. at 66; citing Davis, 128 S.Ct. at 2773,

ORDER - 64

McConnell, 540 U.S. at 196 (upholding similar requirements for same reasons), FEC v. Nat'l Conservative Political Action Comm., 470 U.S. 480, 496-97 (1985)); see also Citizens United, 130 S.Ct. 913-14 (citing government interest in providing information to electorate in upholding disclaimer and disclosure requirements for electioneering communications); Human Life, 624 F.3d at 1005-06 (providing information repeatedly has been recognized as sufficiently important, if not compelling, interest) (citing Buckley, 424 U.S. at 66-67).

The courts thus have found "[p]roviding information to the electorate" to be "vital to the efficient functioning of the marketplace of ideas, and thus to advancing the democratic objectives underlying the First Amendment."[28] Human Life, 634 F.3d at 1005; see also CICU, 534 F.Supp. at 495 n.4 ("Exposing [sources of pressure placed on government officials] to public scrutiny is considered beneficial because 'informed public opinion is the most potent force of all restraints on misgovernment.'") (quoting Grosjean v. American Press Co., 297 U.S. 233, 250 (1936)). "[B]y revealing information about the contributors to and participants in public discourse and debate, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention." Human Life, 624 F.3d at 1005. The Ninth Circuit has

---

[28] Indeed, it is "well-established . . . that the right to receive information is an inherent corollary of the rights of free speech and press, because the right to distribute information necessarily protects the right to receive it." Monteiro v. The Tempe Union High School Dist., 158 F.3d 1022, 1027 n.5 (9th Cir. 1998). As the Washington State Supreme Court has observed:

> . . . [T]he right to receive information is the fundamental counterpart of the right of free speech. . . . The constitutional safeguards which shield and protect the communicator, perhaps more importantly also assure the public the right to receive information in an open society. Time Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). Freedom of speech without the corollary – freedom to receive – would seriously discount the intendment purpose and effect of the first amendment.

Fritz v. Gorton, 83 Wn.2d 275, 296 (1974). Thus, "[t]he right to receive information, or the right of the people to know, has been repeatedly recognized by the United States Supreme Court as a fundamental tenet of the American political system." Id. at 296 n.3 (citing Stanley v. Georgia, 394 U.S. 557, 564 ("(T)he Constitution protects the right to receive information and ideas. 'This freedom (of speech and press) . . . necessarily protects the right to receive,'" and "[t]his right to receive information and ideas, regardless of their social worth (citation omitted) is fundamental to our free society."); see also Voters Education Committee v. Washington State Public Disclosure Commission, 161 Wn.2d 470, 483 (2007).

ORDER - 65

"frequently reiterated," therefore, "that in the 'cacophony of political communications through which . . . voters must pick out meaningful and accurate messages . . . being able to evaluate who is doing the talking is of great importance.'" Id. at 1006 (citation omitted).

As the Federal Circuit also has noted in the election context:

> . . . [T]he public has an interest in knowing who is speaking about a candidate and who is funding that speech, no matter whether the contributions were made towards administrative expenses or independent expenditures. Further, requiring disclosure of such information deters and helps expose violations of other campaign finance restrictions . . . These are sufficiently important governmental interests to justify [having to organize and report as required].

Speechnow, 599 F.3d at 698. In Citizens United, the Supreme Court stated that in such a context, "the public has an interest in knowing who is speaking about a candidate." 130 S.Ct. at 915. It went on to note:

> . . . With the advent of the Internet, prompt disclosure of expenditures can provide . . . citizens with the information needed to hold . . . elected officials accountable for their positions and supporters. . . . The First Amendment protects political speech; and disclosure permits citizens . . . to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.

Id. at 916; see also Buckley, 424 U.S. at 82 (noting disclosure to be "reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view").

The Supreme Court also "has repeatedly acknowledged the constitutionality of state laws requiring the disclosure of funds spent to pass or defeat ballot measures." CPLC-I, 328 F.3d at 1102 (citing Bellotti, 435 U.S. at 792, 795 (specifically noting "prophylactic effect" of requiring source of communication to be disclosed), and quoting Buckley v. American Constitutional Law Foundation, Inc. ("ACLF"), 525 U.S. 182, 203, 205 (observing with approval requirement that ballot initiative sponsors disclose amount and source of payments to petition circulators, because

it provided voters with such information); see also Federal Election Comm'n v. Massachusetts Citizens for Life, Inc. ("MCL"), 479 U.S. 238, 262 (1986) (finding to be invalid limitations on independent expenditures made by certain entities, but noting such entities still had to disclose contribution sources that paid for those expenditures); Bellotti, 435 U.S. at 792 n.32 (noting "[i]dentification of the source of [corporate political] advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected"); Taylor, 582 F.3d at 9, 13-15; CPLC-I, 328 F.3d at 1104-05 (finding government information interest in regulating express ballot-measure advocacy to be sufficiently compelling, noting that: "[g]iven the complexity of the issues and the unwillingness of much of the electorate to independently study the propriety of individual ballot measures, being able to evaluate who is doing the talking is of great importance").[29]  Indeed, the above considerations have been noted to

---

[29] The Ninth Circuit in CPLC-I explained in greater detail :

> The Supreme Court has recognized as much. In *Buckley*, the Court noted that disclosure advances the substantial government interest of providing

>> the electorate with information "as to where political campaign money comes from and how it is spent by the candidate" in order to aid the voters in evaluating those who seek federal office.  It allows voters to place each candidate in the political spectrum more precisely than is often possible solely on the basis of party labels and campaign speeches.  The sources of a candidate's financial support also alert the voter to the interests to which a candidate is most likely to be responsive and facilitate predictions of future performance in office.

> 424 U.S. at 66-67, 96 S.Ct. 612 (internal citation omitted).

> Though the *Buckley* Court discussed the value of disclosure for candidate elections, the same considerations apply just as forcefully, if not more so, for voter-decided ballot measures.  "Even more than candidate elections, initiative campaigns have become a money game, where average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest." David S. Broder, *Democracy Derailed: Initiative Campaigns and the Power of Money* at 18 (2000).  Knowing which interested parties back or oppose a ballot measure is critical, especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown.  At least by knowing who backs or opposes a given initiative, voters will have a pretty good idea of who stands to benefit from the legislation.

> Voters act as legislators in the ballot-measure context, and interest groups and individuals advocating a measure's defeat or passage act as lobbyists; both groups aim at pressuring the

"apply just as forcefully, if not more so, for voter-decided ballot measures," than in the election context. <u>Human Life</u>, 624 F.3d at 1006 (quoting <u>CPLC-I</u>, 328 at 1105).[30]

---

> public to pass or defeat legislation. We think Californians, as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much. *See United States v. Harris*, 347 U.S. 612, 625, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

> In *Harris*, the Supreme Court upheld the Lobbying Act, which required lobbyists to disclose to Congress any contributions they had received and any expenditures they had made "for the purpose of influencing the passage or defeat of any legislation by Congress." 347 U.S. at 614, 74 S.Ct. 808. In articulating the governmental interest for this restriction on speech, the Court wrote:

>> Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

>> Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose.

> *Id.* at 625, 74 S.Ct. 808.

> If our Congress "cannot be expected to explore the myriad pressures to which they are regularly subjected," then certainly neither can the general public. People have jobs, families, and other distractions. While we would hope that California voters will independently consider the policy ramifications of their vote, and not render a decision based upon a thirty-second sound bite they hear the day before the election, we are not that idealistic nor that naive. By requiring disclosure of the source and amount of funds spent for express ballot-measure advocacy, California – at a minimum – provides its voters with a useful shorthand for evaluating the speaker behind the sound bite.

<u>Id.</u> at 1105-06 (internal footnotes omitted). The Court of Appeals further noted that disclosure in this context "also prevents the wolf from masquerading in sheep's clothing." <u>Id.</u> at 1106 n.24.

[30] As the Ninth Circuit went on to explain:

> We have observed that these considerations "apply just as forcefully, if not more so, for voter-decided ballot measures." . . . In the ballot initiative context, where voters are responsible for taking positions on some of the day's most contentious and technical issues, "[v]oters act as legislators," while "interest groups and individuals advocating a measure's defeat or passage act as lobbyists." . . . As a result of this process, "average citizens are subjected to advertising blitzes of distortion and half-truths and are left to figure out for themselves which interest groups pose the greatest threats to their self-interest." . . . Thus, the high stakes of the ballot context only amplify the crucial need to inform the electorate that is well recognized in the context of candidate elections.

> Notably, in the lobbying context, the Supreme Court has upheld disclosure requirements enabling lawmakers "to know who is being hired, who is putting up the money, and how

In the lobbying context too, the government's informational interest has been seen as a sufficient basis for requiring disclosure. See Taylor, 582 F.3d at 9 (disclosure requirements serve "vital national interest" in "manner restricted to its appropriate end"; "Congress did not seek "to prohibit [lobbying] pressures," but "merely provided for a modicum of information") (quoting Harriss, 347 U.S. at 626); Meggs, 87 F.3d at 460-61 (burdens of registration and disclosure on lobbyists do not substantially interfere with ability to raise their voices); CICU, 534 F.Supp. at 494-95 ("The lobby[ing disclosure] law serves to apprise the public of the sources of pressure on

much." . . . The Court found these requirements necessary because "legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures." . . .

In a similar manner, citizens, acting "as lawmakers, have an interest in knowing who is lobbying for their vote, just as members of Congress may require lobbyists to disclose who is paying for the lobbyists' services and how much." . . . Indeed, the provision of this information is particularly critical in the ballot measure context, "especially when one considers that ballot-measure language is typically confusing, and the long-term policy ramifications of the ballot measure are often unknown." . . . If nothing else, "knowing who backs or opposes a given initiative" will give voters "a pretty good idea of who stands to benefit from the legislation." . . .

Access to reliable information becomes even more important as more speakers, more speech – and thus more spending – enter the marketplace, which is precisely what has occurred in recent years. Like campaigns for elected office, ballot initiatives are the subject of intense debate and, accordingly, greater expenditures to ensure that messages reach voters. . . .

. . .

Campaign finance disclosure requirements thus advance the important and well-recognized governmental interest of providing the voting public with the information with which to assess the various messages vying for their attention in the marketplace of ideas. An appeal to cast one's vote a particular way might prove persuasive when made or financed by one source, but the same argument might fall on deaf ears when made or financed by another. The increased "transparency" engendered by disclosure laws "enables the electorate to make informed decisions and give proper weight to different speakers and messages." . . . As the Supreme Court has stated: "[T]he people in our democracy are entrusted with the responsibility for judging and evaluating the relative merits of conflicting arguments. They may consider, in making their judgment, the source and credibility of the advocate." . . .

Human Life, 624 F.3d at 1006-07 (internal citations and footnote omitted).

ORDER - 69

government officials, thus better enabling the public to assess their performance.").[31]  Nor has

permitting disclosure based on an informational interest been limited to the realm of "direct"

lobbying.  In Meggs, for example, the Eleventh Circuit noted the Supreme Court "has made

clear" that this "legitimate" government interest applies with the same force to the reporting of

indirect lobbying expenses, i.e., to the reporting of "expenses when there is no direct contact

with government officials." 87 F.3d at 460.

This is because, the Eleventh Circuit continued, indirect lobbying expenses "implicate the

correlative interests of voters (in appraising the integrity and performance of officeholders and

candidates, in view of the pressures they face) and legislators (in 'self-protection' in the face of

coordinated pressure campaigns)." Id. at 460-61 (further noting that "these interests continue to

apply when the pressures to be evaluated by voters and government officials are 'indirect' rather

than 'direct'"); see also Minnesota State Ethical Practices Board v. National Rifle Ass'n of

America ("MSEPB"), 761 F.2d 509, 512-13 (8th Cir. 1985) (recognizing interest in requiring

reporting of intra-organization lobbying activity not involving direct contact with state officials,

and finding no "constitutionally significant" distinction between such indirect activity and direct

lobbying, because "[w]hen persons engage in an extensive letter[ ]writing campaign for the

purpose of influencing specific legislation," state's "interest is the same whether or not those

persons are members of an association").[32]

---

[31] The district court in CICU noted further that the particular law at issue in that case did not limit "the amount or kind of lobbying that [could] be undertaken, but [did] provide that lobbyists must register, disclose the identity of their employers, and submit periodic reports of income and expenses." 534 F.Supp. at 495 n. 7, 498 (noting as well that Supreme Court in Harriss "emphasized the fact that Congress had not sought to curtail lobbying," but rather the lobbying law at issue there "merely provided that a lobbyist give information as to 'who is putting up the money, and how much'") (quoting Harriss, 347 U.S. at 625).

[32] Indeed, "the government interest in providing the means to evaluate these pressures may in some ways be stronger when the pressures are indirect, because then they are harder to identify without the aid of disclosure requirements." Meggs, 87 F.3d at 461 (noting Supreme Court "appears to have acknowledged as much when, even reading the [applicable lobbying] statute narrowly to apply only to 'direct communication,' it nonetheless defined

ORDER - 70

Citing <u>Buckley</u> and <u>Citizens United</u>, plaintiffs assert the Supreme Court has limited the application of the governmental interest in providing information to the public "to laws aimed at disclosure of *candidate* contributions and expenditures." ECF #22, p. 16 (emphasis in original). But while it is true that <u>Buckley</u> and <u>Citizens United</u> concerned application of the informational interest in the candidate context – naturally, given both cases dealt with electoral campaigns – nowhere in those decisions did the Supreme Court expressly limit application of such an interest to that context.  Indeed, plaintiffs point to nothing in the language of either case that even implies such a limitation was contemplated by the Supreme Court.[33]  Further, their interpretation would go against what, as indicated above, appears to be the consensus among other courts – certainly in this Circuit – that the government's informational interest is sufficient to uphold reporting and disclosure requirements in other contexts, such as those regarding ballot measures and direct and indirect lobbying.  The Supreme Court itself explicitly recognized this with respect to lobbying

direct communication to include 'artificially stimulated letter campaign[s],'") (quoting <u>Harriss</u>, 347 U.S. at 620).

[33] <u>See</u> <u>Citizens United</u>, 130 S.Ct. at 914-16; <u>Buckley</u>, 424 U.S. at 64-68, 83-84.  In addition, even though occurring in the context of its "campaign finance jurisprudence," the Supreme Court strongly intimated in <u>Citizens United</u> that the interest had a much broader application:

> . . . With the advent of the Internet, prompt disclosure of expenditures can provide *shareholders* and citizens with the information needed to hold *corporations* and elected officials accountable for their positions and supporters.  *Shareholders* can determine whether their *corporation's* political speech advances the *corporation's* interest in making profits, and citizens can see whether elected officials are " 'in the pocket' of so-called moneyed interests."
> . . . The First Amendment protects political speech; and disclosure permits citizens and *shareholders* to react to the speech of *corporate entities* in a proper way.  This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.

130 S.Ct. at 916 (internal citations omitted) (emphasis added); <u>Human Life</u>, 624 F.3d at 1005-06 ("[B]y revealing information about the contributors to and participants in *public discourse and debate*, disclosure laws help ensure that voters have the facts they need to evaluate the various messages competing for their attention") (emphasis added); <u>see</u> <u>also</u> <u>McConnell</u>, 540 U.S at 197 (questioning how "uninhibited, robust, and wide-open" speech can occur when organizations hide from scrutiny of voting public) (citation omitted).  Plaintiffs also rely on the recent Supreme Court case in <u>Reed</u>, asserting that it had "refused to rely on Washington's asserted information interest in upholding a law requiring disclosure of referendum petitions" in that case. ECF #22, p. 17; ECF #32, p. 6.  This characterization, though, clearly misstates the holding in that case.  The Supreme Court did not *refuse* to rely on the state's information interest to uphold the law, but merely declined to "address" it, because the state's other asserted interest – "preserving the integrity of the electoral process" – alone was sufficient to defeat the plaintiffs' argument that the law was unconstitutional. <u>Reed</u>, 130 S.Ct. at 2819.

ORDER - 71

and the ballot measure context, including in <u>Citizens United</u> at least in regard to lobbying. <u>See</u> 130 S.Ct. at 915; <u>ACLF</u>, 525 U.S. at 203, 205; <u>MCL</u>, 479 U.S. at 262; <u>Bellotti</u>, 435 U.S. at 792 n.32; <u>Harriss</u>, 347 U.S. at 625-26.

Plaintiffs assert the Supreme Court has never upheld laws aimed at disclosure of "citizen-to-citizen speech" outside the electoral context based on the government's informational interest. ECF #22, p. 17. Plaintiffs argue that since they engage in such speech – which, as noted above, they describe as communicating with "fellow citizens" to "urge them to take political action," and which they equate with "issue advocacy" – an informational interest is insufficient to justify the burdens imposed thereon by grassroots lobbying disclosure laws such as those enacted in Washington. ECF #22, p. 17; ECF #32, p. 2. In other words, plaintiffs would like the Court to treat such disclosure laws the same as those that regulate speech – e.g., laws that are content or speaker based or laws that limit campaign contributions or independent expenditures – which do require more than just a governmental interest in providing information to the public to justify the restrictions placed on such speech.

Plaintiffs, however, have provided no evidence to support their interpretation of the term "grassroots lobbying" contained in RCW 42.17.200, other than the declaration and report of Dr. Milyo, which, as discussed above, are not admissible in this case. The Court notes, furthermore, that the term "grassroots lobbying" – which is expressly employed within the statute to describe the activities governed thereby – itself contains the term "lobbying," which is defined in relevant part as follows:

> . . . [A]ttempting to influence the passage or defeat of any legislation by the legislature of the state of Washington, or the adoption or rejection of any rule, standard, rate, or other legislative enactment of any state agency under the state Administrative Procedure Act, chapter 34.05 RCW

RCW 42.17.200(31) (emphasis added). In addition, a "sponsor" of grassroots lobbying is any

ORDER - 72

person who spends more than the statutorily specified expenditure amount "in presenting a program addressed to the public, a substantial portion of which is intended, designed, or calculated *primarily to influence legislation*." RCW 42.17.200(1) (emphasis added).

The above statutory language thus is "quite clear" in aiming the reporting and disclosure requirements contained in RCW 42.17.200 at lobbying – and, in particular, "grassroots lobbying" – not grassroots "issue advocacy." Taylor, 582 F.3d at 12. As noted by the Federal Circuit in Taylor, "the Supreme Court has repeatedly emphasized that courts should" not reach beyond the plain meaning of a statute – such as by "resort[ing] to legislative history" – "to cloud a statutory text that is clear." 582 F.3d at 12 (quoting Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994)); see also Barnhart v. Sigmon Coal Co., Inc., 534 U.S. 438, 457 (2002) (noting source material outside statutory provision "cannot [be used to] amend the clear and unambiguous language" thereof). In addition, as noted above, the official declaration of policy contained in Washington's campaign finance, lobbying and public disclosure laws, expressly provides in relevant part that "*lobbying* contributions and expenditures be fully disclosed" to the public. RCW 42.17.010(1), (10) (emphasis added).

Accordingly, the Court declines to adopt plaintiffs' use of the term "issue advocacy" here or to find the reporting and disclosure requirements contained in RCW 42.17.200 impose a direct limit on core speech or any related associational rights. Plaintiffs further seem to argue that the term "legislation" is defined so broadly that "there appears to be no political activity that the law does not reach," and thus that RCW 42.17.200 governs more than just lobbying activity designed to influence governmental decision-making. ECF #22, p. 3. The Court, however, finds plaintiffs' argument is supported neither by the statutory definition of that term nor case law interpreting it. That argument thus is rejected.

ORDER - 73

As noted above, the term "legislation" is statutorily defined to mean:

> . . . [B]ills, resolutions, motions, amendments, nominations, and other matters pending or proposed in either house of the state legislature, and includes any other matter that may be the subject of action by either house or any committee of the legislature and all bills and resolutions that, having passed both houses, are pending approval by the governor.

RCW 42.17.020(30). Specifically, plaintiffs take issue with the phrase "any other matter that may be the subject of action by . . . the legislature" contained in the above definition, which also as noted above, they assert indicates there is "no political activity" the reporting and disclosure requirements set forth in RCW 42.17.200 do not reach. The "primary objective in interpreting a statute," however, "is to ascertain and give effect to the Legislature's intent as manifested in the statute's express language." Peacock v. Public Disclosure Commission, 84 Wn.App. 282, 286, 289 (1996) (citing American Legion Post No. 32 v. City of Walla Walla, 116 Wn.2d 1, 8 (1991) (in construing statute, statutory definitions generally control)). "Legislative intent," furthermore, "is derived" not just from the specific provision being challenged, but "from the statutory context as a whole." Id. at 286-87.

Accordingly, the Court must interpret RCW 42.17.200 in light of the purpose of RCW Chapter 42.17, which is, as noted above "to inform the public and its elected representatives about 'sponsors of campaigns and lobbying efforts which seek to affect, directly or indirectly, governmental decision making.'" Id. at 287 (noting also court's duty to consider official public policy declaration contained in RCW Chapter 42.17, which requires liberal construction of that chapter "to promote complete disclosure of all information *respecting the financing of . . . lobbying* and . . . assure continuing public confidence in fairness of . . . governmental processes") (quoting Young Americans For Freedom, Inc. v. Gorton ("YAF"), 83 Wn.2d 728, 733 (1974), and RCW 42.17.010(11) (emphasis in original)).

ORDER - 74

In <u>Peacock</u>, the Washington State Court of Appeals was tasked with interpreting the term "legislation" used in RCW 42.17.200(1) and defined in RCW 42.17.020(30). In so doing, it first observed the term's "full statutory meaning as set forth by the Legislature" must be considered. 84 Wn.App. at 288. The court of appeals then focused on the phrase "and includes any other matter that may be the subject of action by . . . the legislature," to find the petition-drive begun by the plaintiff was "directed at legislation," because its hope was that "its signed petitions [would] force the Legislature to create a new county," which would "have to create and pass legislation" to do so. <u>Id.</u> at 289. The court of appeals went on to state that "[b]ecause the matter of creating a new county *will be the subject of future legislative action* if the [plaintiff] is successful, the petition drive *is directed at legislation*." <u>Id.</u> (emphasis added). In so holding, the court of appeals gave no indication any activities other than those that are designed to be the subject of legislative action, would fall within that portion of the above statutory definition that reads "any other matter that may be the subject" thereof.

In <u>YAF</u>, upon which as noted above the court in <u>Peacock</u> relied in part, the Washington State Supreme Court was even more specific in its analysis of the relation between the reporting and disclosure requirements contained in RCW 42.17.200 and the term "legislation":

> The clear and basic intent of [RCW 42.17.200] is to require disclosure of (1) those individuals and organizations who, directly or indirectly, attempt to influence governmental decision making, and (2) the sums expended in such efforts. In our opinion, [RCW 42.17.200] does not mandate the reporting of every . . . expenditure [made by the plaintiff] nor does it require the disclosure of the [plaintiff's] entire membership list. [RCW 42.17.200] was designed not to inhibit the free expression of ideas, but to inform the electorate of the source and sponsorship of persuasional influences which are designed to sway and procure their political interest, allegiance, and support. As we interpret [RCW 42.17.200], it requires a grass roots organization to report expenditures exceeding the *de minimis* amounts which are spent in furtherance of a *specific* campaign. *See* [RCW 42.17.200(1)]. By way of illustration, [RCW 42.17.200] would require a grass roots organization to report qualifying expenditures incurred in a campaign which urged the support or defeat of an

ORDER - 75

initiate measure directed to the legislature.  Reporting would not be required when the subject campaign does not have as its objective the support or rejection of specific legislation.[34]  Thus, no reporting is required of the [plaintiff] unless it seeks to affect the disposition of *specific* pending or proposed legislation.

Specificity is likewise the key to [RCW 42.17.200] which mandates the disclosure of campaign contributors and their donations.  Contrary to the assertions of the [plaintiff], this section *does not* require the disclosure of its membership lists.  If a member or non-member contributes to a past, present or future campaign [of the plaintiff] which has as its objective the passage or failure of *specific* legislation, then the reporting of the contribution and its donor is required.  If, however, the [plaintiff] does not receive funds earmarked for a specific campaign, but expends reportable amounts from its general funds, then there is no need to divulge the names and addresses of the membership.  In this instance, the members have only contributed dues to the organization, but not to a *specific* campaign.  In instances where the [plaintiff] receives funds identified or earmarked for expenditure in a campaign which is directed at specific pending or proposed legislation, it is required to report the contributions in accordance with [RCW 42.17.200].  Hence by definition, [RCW 42.17.200] requires the disclosure of *contributors*, as distinguished from members, and therefore, does not violate the rule of *N.A.A.C.P. v. Alabama*, as an impermissible impingement upon constitutional rights.[35]  *See United States v. National Comm. for Impeachment*, 469 F.2d 1135 (2nd Cir. 1972); *American Civil Liberties Union, Inc. v. Jennings*, 366 F.Supp. 1041 (D.C.D.C.1973) (three judge panel upheld the constitutionality of the Federal Elections Campaign Act). *See also Pichler v. Jennings*, 347 F.Supp. 1061, 1068 (S.D.N.Y.1972).

[RCW 42.17.200] must be viewed with the other sections of [RCW Chapter 42.17] as a part of a matrix or program designed to ensure that public officials and the electorate are informed of the sponsors of campaigns and lobbying efforts which seek to affect, directly or indirectly, governmental

---

[34] In a footnote, the Washington State Supreme Court stated it was using "the term 'legislation'" here "generically to also include pending or proposed rules, rates, standards or proposals." 83 Wn.2d at 732 n.2.

[35] In NAACP, the question presented was whether the state could compel the plaintiff "to reveal . . . the names and addresses of all its Alabama members and agents, without regard to their positions or functions" within the plaintiff. 357 U.S. at 451.  The Supreme Court held the state's "production order" seeking those names and addresses entailed "a substantial restraint upon the exercise by [the plaintiff's] members of their right to freedom of association." Id. at 462.  The Supreme Court found this to be the case, since the state had failed to show a sufficient justification for or a compelling interest in "obtaining names of ordinary members." Id. at 464-65.  Specifically, the Supreme Court held the state's request had no "substantial bearing" on the "exclusive purpose" of the production order, which was to determine whether the plaintiff was "conducting intrastate business in violation of the Alabama foreign corporation registration statute," given that the plaintiff had: (1) admitted its presence and activities in the state; (2) offered to comply with the registration statute; and (3) "apparently complied satisfactorily with the production order, except for the [ordinary] membership lists." Id. at 464-65.

ORDER - 76

decision making. In *Fritz v. Gorton*, 83 Wash.2d 275, 302-311, 517 P.2d 911 (1974), we upheld the initiative sections which require reporting and disclosure of *direct* lobbying activities by lobbyists and their employers. The [plaintiff] concedes that it is required to file appropriate reports under those sections, but contends that its *indirect* lobbying activities may not be subjected to the requirements of [RCW 42.17.200]. To strike down this portion of [RCW Chapter 42.17] would leave a loophole for indirect lobbying without allowing or providing the public with information and knowledge re the sponsorship of the lobbying and its financial magnitude. In affirming the constitutionality of the Federal Regulation of Lobbying Act of 1946, 2 U.S.C. ss 261-270 (1970), in *United States v. Harriss*, 347 U.S. 612, 620, 74 S.Ct. 808, 813, 98 L.Ed. 989 (1954), the United States Supreme Court noted,

> (t)he legislative history of the Act makes clear that, at the very least, Congress sought disclosure of such direct pressures, exerted by the lobbyists themselves *or through their hirelings or through an artifically stimulated letter campaign*.

(Italics ours). *See also United States v. Harriss, supra*, 347 U.S. at 620 n. 10. Thus, it seems abundantly clear, and we are convinced, that the right of the public to be informed is paramount to any inconvenience that reporting under [RCW 42.17.200] may cause respondent.

83 Wn.2d at 732-34 (emphasis in original). Accordingly, it is clear that only those activities and issues, which are designed to be the subject of pending or proposed legislative action, fall within the statutory definition of the term "legislation".[36]

The interpretation of the term "legislation" adopted by the Washington state courts also is well in line with the long-held rule of statutory construction that "[l]aws are to be interpreted in a reasonable way to avoid constitutional overreaching." Kimball, 164 Vt. at 49. If a provision of a statute therefore "is readily susceptible to a narrowing construction that will remedy [an alleged] constitutional infirmity" – as it is in this case – that provision then "will be upheld." Citizens for Responsible Government State Political Action Committee v. Davidson, 236 F.3d 1174, 1194 (10th Cir. 2000) (it is well-settled that statute must be upheld if it is "readily susceptible" to

---

[36] Thus, RCW 42.17.200 does not require "disclosure of information from ordinary citizens who have done nothing more than spend $500 to speak to their fellow citizens about issues" as plaintiffs claim. ECF #22, p. 17.

narrowing construction that makes it constitutional) (quoting <u>American Booksellers Ass'n, Inc.</u>, 484 U.S. at 397); <u>see also</u> <u>Buckley</u>, 424 U.S. at 77-78 (court has duty to construe statute in way that avoids creating unconstitutionality if it can be done consistent with legislative purpose); <u>Harriss</u>, 347 U.S. at 618 (if statutory language can be made constitutionally permissible by "reasonable construction" thereof, courts are under duty to give it that construction); <u>CICU</u>, 534 F.Supp. at 497 (courts are not "roving" commissions "charged with invalidating laws by straining to find unconstitutional applications") (quoting <u>Broadrick</u>, 413 U.S. at 610-11); <u>YAF</u>, 83 Wn.2d at 732 ("The court is under no obligation to construe a statute to unnecessarily render it unconstitutional.").

Plaintiffs next argue no sufficiently important governmental interest is advanced by the reporting and disclosure requirements contained in RCW 42.17.200. As discussed above, the promotion of complete disclosure of all information in regard to lobbying to assure continuing public confidence in fairness of governmental processes has been advanced as the primary policy behind Washington's laws governing lobbying in general. This has been upheld as a sufficiently important governmental interest, and valid basis for requiring disclosure of financial information under RCW Chapter 42.17, by several Washington courts. <u>See</u> <u>Voters Education Committee</u>, 161 Wn.2d at 479-80, 498; <u>YAF</u>, 83 Wn.2d at 732-34 (upholding the validity of RCW 42.17.200); <u>Fritz</u>, 83 Wn.2d at 298, 306-10[37]; <u>Peacock</u>, 84 Wn.App. at 287-89. So too have both the Ninth

---

[37] Plaintiffs assert any reliance on <u>Fritz</u> and <u>YAF</u> is misplaced, as they were decided before <u>Buckley</u>, and, as such, those cases "analyzed the law under an entirely different constitutional framework and failed to apply any level of scrutiny." ECF #32, p. 6. Instead, plaintiffs argue, this case is controlled by the holding in <u>McIntyre</u>. But <u>McIntyre</u>, as discussed herein, is entirely inapplicable, given that the issue there was the direct regulation of speech itself, whereas, also as discussed herein, this case involves the disclosure of financial information, which the courts have upheld on the basis of the government's informational interest. Indeed, the Supreme Court itself in <u>McIntyre</u> noted that while "mandatory reporting" of expenditures "in excess of a threshold level . . . undeniably impedes protected First Amendment activity, [such an] intrusion is a far cry from compelled self-identification on all election-related writings," as was required by the statute at issue in that case. 514 U.S. at 355. The Supreme Court went on to state:

Circuit and this Court. See Human Life, 624 F.3d at 996-97, 1005-08; Family PAC v. Reed, *et al*, Case No. 3:09-cv-05662-RBL (W.D. Wash. 2009), ECF #88, Transcript of Proceedings, pp. 46-47).  As further discussed above, the government interest in providing information to the public has been upheld by federal courts in other lobbying contexts, including other *indirect* lobbying contexts. See, e.g., Meggs, 87 F.3d at 461 (recognizing indirect lobbying activity implicates information interest just as much, or even more so, than direct lobbying); MSEPB, 761 F.2d at 512-13 (concluding there exists governmental interest in requiring reporting of intra-organization lobbying activity).

Plaintiffs assert that accepting the government's information interest as justification for its grassroots lobbying disclosure laws would lead to "breathtaking" implications. ECF #22, p. 17 (quoting Reed, 130 S.Ct. at 2824 (Alito, J., concurring), and citing United States v. Rumely, 345 U.S. 41, 46 (1953)).  But, as discussed above, neither the Supreme Court nor any of the other many federal courts that have upheld this interest in a number of contexts have found it to be so. Rather, they have found it to be sufficiently important to outweigh the constitutional burdens imposed by reporting and disclosure requirements.  Plaintiffs cite Rumely for the uncontroversial proposition that statutes that give the government "the power to inquire into all efforts of private individuals to influence public opinion[,] . . . raises doubts of constitutionality." 345 U.S. at 46. But this is not what reporting and disclosure statutes such as RCW 42.17.200 do, again as many

---

. . . [I]dentification of the author against her will is particularly intrusive; it reveals unmistakably the content of her thoughts on a controversial issue.  Disclosure of an expenditure and its use, without more, reveals far less information.  It may be information that a person prefers to keep secret, and undoubtedly it often gives away something about the spender's political views.  Nonetheless, even though money may "talk," its speech is less specific, less personal, and less provocative than a handbill – and as a result, when money supports an unpopular viewpoint it is less likely to precipitate retaliation.

514 U.S. at 535.  Nor, again as discussed herein, are the holdings in Fritz and YAF inconsistent with those decided subsequent to Buckley – including Human Life, Voters Education Committee, Peacock, and Family PAC – which did apply the proper framework and level of scrutiny.

courts, including this one, have recognized.[38]

Plaintiffs also rely on <u>California Pro-Life Council, Inc. v. Randolph</u> ("<u>CPLC-II</u>"), 507 F.3d 1172 (9th Cir. 2007), arguing the Ninth Circuit there held the interest in informing voters did not justify requiring those engaging in ballot issue advocacy to create formal committees and regularly report all contributions and expenditures. But the statute at issue in that case imposed "political action committee-like requirements" on groups such as the plaintiff, requirements that clearly are not required by RCW 42.17.200. <u>Id.</u> at 1187-88. Earlier in <u>CPLC-II</u>, furthermore, the Ninth Circuit expressly stated that "*in the context of disclosure requirements*, the government's interest in providing the electorate with information [on contributions made to groups seeking to influence voters in the context of] election and ballot issues *is well-established*." <u>Id.</u> at 1179 n.8 (emphasis added). The relevance of the holding in <u>CPLC-II</u> is even more suspect, given that the Ninth Circuit itself subsequently recognized intervening Supreme Court precedent has resulted in that opinion's abrogation. <u>See</u> <u>Human Life</u>, 624 F.3d at 1013.

As the Ninth Circuit explained:

> We reject Human Life's contention that *CLPC-II* governs the issue of whether Washington State's political committee disclosure requirements are unconstitutionally onerous because we apply a different standard of review than that applied in *CLPC-II*. Though we are bound to follow circuit precedent, an exception to this rule exists: "[I]n the face of intervening Supreme Court and en banc opinions, 'a three-judge panel of this court and district courts should consider themselves bound by the intervening higher authority and reject the prior opinion of this court as having been effectively overruled.'" *United States v. Broussard*, 611 F.3d 1069, 1072 (9th Cir.2010) (quoting *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir.2003) (en banc)).

---

[38] It should be pointed out, furthermore, that <u>Rumely</u> concerned a conviction for refusing to disclose to Congress the names of those to whom the plaintiff sold "books of a particular political tendentiousness," and not application of a governmental information interest in imposing reporting and disclosure requirements. <u>See</u> 345 U.S. at 42. Indeed, the quotation from <u>Rumely</u> from which plaintiffs take their proposition reads in its entirety as follows: "Surely it cannot be denied that giving the scope to the resolution for which the Government contends, that is, deriving from it the power to inquire into all efforts of private individuals to influence public opinion *through books and periodicals, however remote the radiations of influence which they may exert upon the ultimate legislative process*, raises doubts of constitutionality in view of the prohibition of the First Amendment." (emphasis added).

ORDER - 80

Since *CLPC-II* was decided, the Supreme Court has made clear that exacting scrutiny, not strict scrutiny, is applicable to campaign finance disclosure requirements. *See Reed*, 130 S.Ct. at 2818; *Citizens United*, 130 S.Ct. at 914. In light of this intervening Supreme Court authority, it is clear that CLPC-II set the bar too high in applying strict scrutiny. The government need not, as we suggested in *CLPC-II*, employ the least restrictive means to satisfy its interest in providing the electorate with information; it need only ensure that its means are substantially related to that interest. Washington State's disclosure scheme passes that test.

> Indeed, it is the Supreme Court's decision in *Citizens United*, rather than the panel decision in *CLPC-II*, that provides the best guidance regarding the constitutionality of [RCW Chapter 42.17's] requirements. The *Citizens United* Court underscored the fundamental distinction between the burdens imposed by financial regulations, *see Citizens United*, 130 S.Ct. at 897, and those imposed by disclaimer and disclosure requirements, *see id.* at 915-16. Recounting the series of Supreme Court cases that had upheld disclosure requirements while simultaneously striking down other regulations on campaign speech, the Court affirmed and reiterated the importance of disclosure requirements-even requirements that apply to issue advocacy-to the government's interest in informing the electorate. *Id.*

Human Life, 624 F.3d at 1013. Plaintiffs argue Human Life does not control here, because that case dealt with the ballot initiative context, and thus, as with Buckley and Citizens United, it is limited to the electoral situation. This argument, however, fails for the same reasons plaintiffs' argument regarding Buckley and Citizens United fails, and thus the Court finds it to be without merit.

Plaintiffs further attempt to distinguish Human Life by making much of the Ninth Circuit's statement in that case that "[r]eporting requirements do not extend indiscriminately to all issue advocacy conducted at any time, for example . . . at a time when no related ballot measure is pending," but "[r]ather, by definition," they "do not apply absent a pending election or ballot initiative campaign." 624 F.3d at 1018. But plaintiff takes this statement out of context. The Ninth Circuit there was making the point that disclosure requirements in the ballot measure context pose far fewer potential constitutional issues than those in the electoral campaign context, stating in relevant part:

ORDER - 81

Before analyzing the relationship between the particular burdens imposed by [RCW Chapter 42.17] and the government interests it furthers, we note that there is less danger of a regulation sweeping too broadly in the context of a ballot measure than in a candidate election. As the district court noted, where a disclosure requirement regulates issue advocacy, the scope of that regulation is naturally "more targeted and limited" when the relevant vote involves a ballot initiative. . . . "Ballot initiatives present a single *issue* for public referendum," and thus the only relevant campaign speech that a disclosure requirement could reach is "speech intended to influence the voter's opinion as to the merits of this single issue-in other words, it is 'issue advocacy,' plain and simple." . . . Whereas the broadly defined regulation of campaign speech in the candidate election context "threatens to burden debate on a *broad range* of issues – indeed, any issue that is arguably 'pertinent' to the election," broadly defined speech regulation in the ballot measure context poses a much less significant burden; in the ballot context, the only issue advocacy that could potentially be regulated is advocacy regarding "the *single* issue put before the public." . . . Thus, the potential of [RCW Chapter 42.17] to incidentally regulate issue advocacy, to which [the plaintiff] objects, would engender far more concern if the relevant election involved a candidate. In the ballot initiative context, on the other hand, where express and issue advocacy are arguably "one and the same," any incidental regulation of issue advocacy imposes more limited burdens that are more likely to be substantially related to the government's interests. Because regulation of issue advocacy in the ballot context is virtually indistinguishable from regulation of express advocacy (an admittedly appropriate enterprise), such regulation is more closely related to the government's interest in informing the electorate. We agree with the district court's reasoning that "[f]rom the perspective of the state's compelling interest," it makes little difference whether speech urges the public to vote for or against a ballot measure implicating a particular issue or whether it advocates or attacks that particular issue while the ballot measure is pending.

The particular requirements of [RCW Chapter 42.17] are substantially related to the government's informational interest in that they target only those expenditures and advertisements made in conjunction with an ongoing election or vote. Reporting requirements do not extend indiscriminately to all issue advocacy conducted at any time – regulating, for example, an advertisement about physician – assisted suicide placed at a time when no related ballot measure is pending. Rather, by definition, disclosure obligations do not apply absent a pending election or ballot initiative campaign. . . .

Id. (emphasis in original) (internal citations omitted). Plaintiffs' crabbed reading of Human Life ignores the general acknowledgment by courts discussed elsewhere herein, that the government has an important interest in providing information to the public in contexts other than those

ORDER - 82

dealing with campaign elections or ballot measures, including direct and indirect lobbying. Further, the reasoning of the Ninth Circuit here applies equally to grassroots lobbying, since in that context – as in the case of ballot measures – RCW Chapter 42.17 targets only those expenditures and contributions "made in conjunction" with proposed or pending legislation, and therefore do not pose the potential overbreadth dangers that similar disclosure requirements in the candidate election context do. See id. at 1018 n.7 (contrasting vote on ballot measure with "a candidate election, where there is a greater distance between speech urging a vote for or against a particular candidate and advocating or attacking one of a 'broad range of issues' on which the candidate may have a particular view").

Plaintiffs also look to Tenth Circuit case law for help. They note the Court of Appeals in Sampson v. Buescher, 625 F.3d 1247 (2010), declined to find a government interest in providing information regarding disclosure of activities of grassroots groups in the "ballot issue" context. 625 F.3d at 1249. The Court, however, finds Sampson to be both distinguishable on its facts and unpersuasive in terms of its legal reasoning, particularly in light of the Ninth Circuit's own precedent – which is binding on this Court – and the other court decisions discussed above. In Sampson, a statute requiring "any group of two or more persons that has accepted or made contributions or expenditures exceeding $200 to support or oppose a ballot issue must register as an issue committee and report the names and addresses who contributes $20 or more." Id. at 1249. In striking down that statute, the Tenth Circuit noted that it was at odds with the language of Colorado's Constitution, which reads in relevant part:

> The people of the state of Colorado hereby find and declare . . . that *large campaign contributions* made to influence election outcomes *allow wealthy individuals, corporations, and special interest groups to exercise a disproportionate level of influence over the political process;* . . . that political contributions from corporate treasuries are not an indication of popular support for the corporation's political ideas *and can unfairly influence the*

*outcome of Colorado elections*; and that the interests of the public are best served by . . . providing for full and timely disclosure of campaign contributions, independent expenditures, and funding of electioneering communications, and strong enforcement of campaign finance requirements.

Id. at 1254 (quoting Colo. Const. art XXVIII, § 1) (emphasis added by court of appeals). "It would take a mighty effort to characterize the [plaintiffs'] expenditure of $782.02," the Tenth Circuit continued, "as an exercise of a 'disproportionate level of influence over the political process' by a wealthy group that could 'unfairly influence the outcome' of an election." Id. "The disconnect between the avowed purpose of [Colorado's] constitutional disclosure requirements and their effect in this case," the Court of Appeals went on to note, "should in itself provoke doubt about whether the burden on the First Amendment associational rights of the members of the [plaintiffs] could be justified." Id. at 1254, 1261.

Accordingly, Sampson is wholly inapplicable to the case at hand, where the citizens of Washington – through the initiative process – overwhelmingly supported a law that requires the reporting and full disclosure of campaign finance and lobbying information, without distinction between wealthy and less wealthy actors. See id. at 1254 ("It is unlikely that the Colorado voters who approved the disclosure requirements of Article XXVIII of the state's Constitution were thinking of [groups such as the plaintiff].").  The Tenth Circuit in Sampson also found "the public interest in knowing who is spending and receiving money" – at least in the context of that case – was "not obvious." Id. at 1256.  This, though, is directly contrary to the holdings of the majority of other courts that have considered this issue, again including the Ninth Circuit. Finally, the Tenth Circuit found the difficulty of complying with the law's reporting disclosure requirements was not outweighed by the state's interest in requiring disclosure at the above threshold levels. See id. at 1259-61.  But as the Court discusses in greater detail below, such is not the case here.

ORDER - 84

Despite earlier arguing that the Supreme Court has not found the government information interest to be sufficient outside the electoral campaign context, plaintiffs now admit that interest has been applied in the lobbying context, but only in the *direct* lobbying context. See ECF #22, p. 18 (citing Harriss, at 620-21). But, as discussed above, at least two circuit courts have found a sufficient government information interest in the *indirect* lobbying context. See Meggs, 87 F.3d at 461; MSEPB, 761 F.2d at 512-13. Indeed, the informational interest "may in some ways be stronger when the [lobbying] pressures [on government officials] are indirect," and the Supreme Court in Harriss, as noted by the Eleventh Circuit, "appears to have acknowledged as much when, even reading the [lobbying] statute [at issue in that case] narrowly to apply only to 'direct communication,' it nonetheless defined direct communications to include 'artificially stimulated letter campaign[s].'" Meggs, 87 F.3d at 461 (quoting Harriss, 347 U.S. at 620).[39]

---

[39] In Harriss, the Supreme Court specifically noted that the lobbying statute at issue applied "chiefly to three distinct classes of so-called lobbyists," including "[t]hose who do not visit the Capital but initiate propaganda from all over the country, in the form of letters and telegrams, many of which have been based entirely upon misinformation as to facts." 347 U.S. at 620 n.10. Plaintiffs emphasize that the Supreme Court in Harriss stated it believed the purposes of the specific reporting and disclosure provisions of the lobbying statute at issue there "should be construed to refer only to 'lobbying in its commonly accepted sense' – to direct communication with members of Congress on pending or proposed federal legislation." Id. at 620. But the Supreme Court said this in the context of rejecting the position of the government that those provisions should be applied even to those who do not by themselves, "*or through any agent or employee or other persons* in any manner whatsoever, directly *or indirectly*, solicits, collects, or receives money or any thing of value to be used principally to aid, or the principal purpose of which person is to aid in" the "passage or defeat of any legislation" or to "influence, directly *or indirectly*, the passage or defeat" thereof. Id. at 618-20 (citation omitted) (emphasis added). Accordingly, it seems quite clear that the Supreme Court had intended to included indirect as well as direct lobbying in its definition of the term "lobbying". Further, the statement made by the Supreme Court that "[i]t is likewise clear that Congress would have intended the [lobbying law] to operate on this *narrower* basis, *even if a broader application to organizations seeking to propagandize the general public were not permissible*," refers to the Supreme Court's decision to reject the government's position and "narrow" the definition of "lobbying" to include direct and *indirect* lobbying as noted above. Id. at 620-21 (emphasis added).

The reliance plaintiffs place on Sampson here is misplaced as well. See 625 F.3d at 1256 n.4 (distinguishing Hariss on basis that it dealt with issue of preventing appearance of corruption in direct lobbying context, and thus it taught "little" about disclosure requirements in ballot issue campaigns to influence public opinion). For the reasons discussed above, furthermore, the Court finds unpersuasive the Tenth Circuit's intimation that Harriss is limited only to prevention of the appearance of corruption in the direct lobbying context. Finally, plaintiffs cite a Montana State Supreme Court case, arguing that court narrowly construed Harriss as applying only to direct communication with legislators. See Montana Automobile Ass'n v. Greely ("MAA"), 193 Mont. 378, 390-91 (1981). But in that case, the court was tasked with having to construe a vague statutory provision, which required disclosure from people and entities that appeared not to fall within the definition of the term "lobbying" adopted by the Supreme Court in

ORDER - 85

Plaintiffs go on to argue, though, that there is no evidence that disclosure of information related to grassroots lobbying in Washington is necessary. In other words, plaintiffs assert that because the state "has failed to identify any problem that prompted its" reporting and disclosure requirements, the state "can do no more than simply 'posit the existence of the disease sought to be cured.'" ECF #22, p. 20 (quoting <u>Davidson</u>, 236 F.3d at 1198). But plaintiffs misapprehend the level of empirical evidence the state is required to show to justify its reporting and disclosure requirements. It is true that the state "must demonstrate that the recited harms [it seeks to protect against] are real, not merely conjectural," that the law at issue "will in fact alleviate these harms in a direct and material way" and that "mere conjecture" is inadequate "to carry a First Amendment burden." <u>Nixon v. Shrink Missouri Gov't PAC</u>, 528 U.S. 377, 391 (2000) (citations omitted); <u>Turner Broadcasting</u>, 512 U.S. at 664.

In <u>Nixon</u>, the Supreme Court found it sufficient that the state had presented an affidavit from a State Senator intimately involved in working on the contribution limits law at issue in that case, and that the district court had cited "newspaper accounts of large contributions supporting inferences of impropriety." <u>Id.</u> at 393; <u>see also Taylor</u>, 582 F.3d at 15 (noting that although legislative record was limited, it was "no less substantial" than record Supreme Court regarded as sufficient in <u>Nixon</u>). The Supreme Court further noted that an "overwhelming 74 percent of the [state's voters] determined that contribution limits [were] necessary to combat corruption and the appearance thereof." <u>Id.</u> at 394. Significantly, the Supreme Court went on to posit in relevant part as follows:

> There might, of course, be need for a more extensive evidentiary documentation if [the plaintiffs] had made any showing of their own to cast

---

<u>Harriss</u>, and which the Montana State Supreme Court itself noted included attempts to "influence, directly *or indirectly*, the passage or defeat of any legislation." <u>MAA</u>, 193 Mont. at 390-91 (quoting <u>Harriss</u>, 347 U.S. at 620) (emphasis added).

ORDER - 86

doubt on the apparent implications of . . . the record here, but the closest [the plaintiffs] come to challenging these conclusions is their invocation of academic studies said to indicate that large contributions to public officials or candidates do not actually result in changes in candidates' positions. . . .

Id.  "The First Amendment," furthermore, "does not require" the government, for example, "to conduct new studies or produce evidence independent of that already generated," as long as "whatever evidence the [government] relies upon is reasonably believed to be relevant to the problem that the [law at issue] addresses." Renton v. Playtime Theatres, Inc., 475 U.S. 41, 51-52 (1986); see also Taylor, 582 F.3d at 15 (rejecting plaintiff's contention that Congress's findings set forth in Lobbying Disclosure Act were insufficient to support informational interest, and that there must be studies, statistics or empirical evidence explaining why organizations like plaintiff should be required to file disclosure statements).

Thus, although the government "must base its conclusions upon substantial evidence," "'substantiality is to be measured' by a 'deferential' standard," and "deference must be accorded to [the government's] findings as to the harm to be avoided and to the remedial measures adopted for that end," if the courts are not to "infringe on traditional legislative authority to make predictive judgments." Taylor, 582 F.3d at 15 (quoting Turner Broadcasting, 520 U.S. at 195-96); see also Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 210 (1982) (observing that legislative determination as to the need for prophylactic measures where corruption is evil feared will not be second-guessed).  Further, "while '[i]t is true that in some First Amendment cases the Supreme Court has demanded an evidentiary showing in support of a state's law,'" as the Federal Circuit has noted:

 . . . '[i]t is also true that in other First Amendment cases the Supreme Court has found 'various unprovable assumptions' sufficient to support the constitutionality of state and federal laws,' [*Nat'l Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996, 1000 (D.C.Cir. 2009)] (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 61, 93 S.Ct. 2628, 37 L.Ed.2d 446 (1973)).  At bottom,

this is not a case like *Turner Broadcasting*, where Congress' justification for a statute rested on 'economic' analysis that was susceptible to empirical evidence. 520 U.S. at 199, 117 S.Ct. 1174. What we have instead is simply a claim that good government requires greater transparency. That is a value judgment based on the common sense of the people's representatives, and repeatedly endorsed by the Supreme Court as sufficient to justify disclosure statutes. *See Harriss*, 347 U.S. at 625-26, 74 S.Ct. 808; *Buckley*, 424 U.S. at 66-67, 96 S.Ct. 612; *McConnell*, 540 U.S. at 196, 124 S.Ct. 619. 'The fact that a congressional directive reflects unprovable assumptions about what is good for the people . . . is not a sufficient reason to find that statute unconstitutional.' *Paris Adult Theatre*, 413 U.S. at 62, 93 S.Ct. 2628. It certainly was not a sufficient reason in *Harriss*, in which the Court made no inquiry into whether the legislative record supported the determination that disclosure of who was endeavoring to influence Congress was 'a vital national interest.' 347 U.S. at 626, 74 S.Ct. 808."

Talyor, 582 F.3d at 15 (also quoting Nat'l Cable & Telecomms. Ass'n, 555 F.3d at 1000 (citing Turner Broadcasting, 520 U.S. at 195).

As the Federal Circuit found in Taylor, the Court here too finds the record in this case is "no less substantial" than the record the Supreme Court regarded as sufficient in Nixon. First, as noted above, as in Nixon, an overwhelming percentage of Washington voters – 72% and thus almost nearly identical to that in Nixon as well – approved Initiative 276, which became RCW Chapter 42.17. Also as noted above, defendants have provided the declaration of Jolene Unsold, a former State Senator and member of Congress from Washington, who was "an early participant in the effort that led to the passage of Initiative 276, and who described the "strong" public interest in and "overall thrust" of that Initiative being "the people's right to know, and to enable citizens to 'follow the money,'" not only in electoral campaigns, but in ballot measure campaigns and with respect to "legislative lobbying" as well. ECF #25-2, Exhibit 1, ¶¶ 2, 4-5.

Also similar to Nixon, defendants have provided newspaper editorials from the time of the Initiative 276 campaign, noting the emphasis on open disclosure in regard to both campaigns and lobbying, and endorsing that effort. See id. at Exhibits A-1-A-4. In addition, the Court notes

the strong open disclosure language contained in the public policy declaration set forth in RCW

Chapter 42.17, which emphasizes the importance of full disclosure in the campaign and lobbying

contexts – and recognized, also as discussed above, by both Washington State and federal courts

– and views this in mind of the "deferential" standard with which the legislature's findings are to

be accorded. As succinctly put by the Washington State Supreme Court:

> The electorate, we believe, has the right to know of the sources and
> magnitude of financial and persuasional influences upon government. The
> voting public should be able to evaluate the performance of their elected
> officials in terms of representation of the electors' interest in contradistinction
> to those interests represented by lobbyists. . . . [T]he mosaic of [RCW Chapter
> 42.17] is designed to reveal the flow of expenditures incurred in efforts to
> guide and direct government. The removal of any one element[, such as the
> provisions thereof governing grassroots lobbying] would conceivably leave a
> loop-hole area for exploitation by self-serving special interests. . . .

Fritz, 83 Wn.2d at 309-10. Given the widely recognized interest the state has in informing the

public as to the potential influences on the electoral and legislative processes – and the fact that

doing so in regard to grassroots lobbying is an integral aspect of that interest – the Court rejects

plaintiffs' assertion that the state "has failed to identify any problem that prompted its regulation

of" grassroots lobbying. ECF #22, p. 20. To the contrary, that burden has been met.

> 5. Washington's Grassroots Lobbying Disclosure Requirements Are
> Substantially Related to Its Asserted Informational Interest

Plaintiffs argue the reporting and disclosure requirements contained in RCW 42.17.200

are not narrowly tailored to the state's informational interest. Specifically, plaintiffs argue the

expenditure reporting amounts contained in RCW 42.17.200 are so low, that the value of having

that information disclosed to the public is negligible. As noted above, the current amounts are

$500 in any one-month period and $1,000 in any three-month period. See ECF #25, ¶ 35; RCW

42.17.200(1). In addition, the names and addresses of each person contributing $25 or more to a

grassroots lobbying campaign, along with the "aggregate amount contributed," must be reported

ORDER - 89

as well. RCW 42.17.200(2)(c).  These numbers, though, are not out of line with those that both

the Supreme Court and other federal courts have upheld.

For example, in <u>Buckley</u>, the law at issue there required records to be "kept by political

committees of the names and addresses of those who make contributions in excess of $10," and

of those whose contributions "aggregate more than $100." 424 U.S. at 82.  In upholding those

thresholds, the Supreme Court stated in relevant part:

> The $10 and $100 thresholds are indeed low.  Contributors of relatively small
> amounts are likely to be especially sensitive to recording or disclosure of their
> political preferences.  These strict requirements may well discourage
> participation by some citizens in the political process, a result that Congress
> hardly could have intended.  Indeed, there is little in the legislative history to
> indicate that Congress focused carefully on the appropriate level at which to
> require recording and disclosure.  Rather, it seems merely to have adopted the
> thresholds existing in similar disclosure laws since 1910.  *But we cannot*
> *require Congress to establish that it has chosen the highest reasonable*
> *threshold.  The line is necessarily a judgmental decision, best left in the*
> *context of this complex legislation to congressional discretion.  We cannot*
> *say, on this bare record, that the limits designated are wholly without*
> *rationality.*[40]

<u>Id.</u> at 83 (internal footnote omitted) (emphasis added); <u>see also</u> <u>Canyon Ferry Road Baptist</u>

<u>Church of East Helena, Inc. v. Unsworth</u> ("<u>Canyon Ferry</u>"), 556 F.3d 1021, 1033 (9th Cir. 2009);

<u>CICU</u>, 534 F.Supp. at 499 ("This Court . . . will not substitute its judgment as to what constitutes

the proper threshold amount for lobbying disclosure.").

In support of their argument here, plaintiffs cite <u>Canyon Ferry</u> for the proposition that

---

[40] The Supreme Court went on to further state:

> "Looked at by itself without regard to the necessity behind it the line or point seems arbitrary.
> It might as well or nearly as well be a little more to one side or the other.  *But when it is seen*
> *that a line or point there must be, and that there is no mathematical or logical way of fixing it*
> *precisely, the decision of the legislature must be accepted unless we can say that it is very*
> *wide of any reasonable mark.*"

<u>Id.</u> at 83 n.11(citation omitted) (emphasis added).  But because there was "no warrant" in <u>Buckley</u> "for assuming
that public disclosure of contributions between $10 and $100 [was] authorized by the [statute at issue]," the
Supreme Court did "not reach the question [of] whether information concerning gifts of this size [could] be made
available to the public without trespassing impermissibly on First Amendment rights." <u>Id.</u> at 84.

ORDER - 90

"[a]s a matter of common sense, the value of [the] *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level." 556 F.3d at 1033 (emphasis in original). Plaintiffs, however, take this quote completely out of context. The Ninth Circuit in Canyon Ferry declined to apply the disclosure provisions at issue in that case to the plaintiff church's "*de minimis in-kind* expenditures." Id. at 1034 (emphasis in original). As the Court of Appeals went on to explain:

> . . . Expending a few moments of a pastor's time, or a marginal additional space in the Church for petitions, is so lacking in economic substance that we have already held that requiring their reporting creates fatal problems of unconstitutional vagueness. Similarly, the value of public knowledge that the Church permitted a single likeminded person to use its copy machine on a single occasion to make a few dozen copies on her own paper – as the Church did in this case – does not justify the burden imposed by Montana's disclosure requirements.

Id. Indeed, the "question" for the Ninth Circuit in Canyon Ferry was whether the state's "'zero dollar' threshold for disclosure was 'wholly without rationality.'" Id. at 1033 (quoting Buckley, 424 U.S. at 83). The Court of Appeals explained in further relevant part:

> . . . On the one hand, we recognize the principle that "signals are transmitted ... not only by a contribution's size but also by the contributor's identity." *Vote Choice v. DiStefano*, 4 F.3d 26, 32 (1st Cir.1993). On the other hand, we cannot say that the informational value derived by the citizenry is the same across expenditures of all sizes. As we have explained, in the ballot issue context, the relevant informational goal is to inform voters as to "who backs or opposes a given initiative" financially, so that the voters "will have a pretty good idea of who stands to benefit from the legislation." [CPCL-I], 328 F.3d at 1106. As a matter of common sense, the value of this *financial* information to the voters declines drastically as the value of the expenditure or contribution sinks to a negligible level. As the monetary value of an expenditure . . . approaches zero, financial sponsorship fades into support and then into mere sympathy. In the present case, the voters could learn little about the *financial* backing . . . by gaining access to information about the Church's activities of minimal economic effect.
>
> Meanwhile, the burden of reporting remains constant even though the size of the in-kind expenditure decreases to a negligible level. . . . While not exceedingly onerous, such requirements undoubtedly constitute a burden,

even in the case of one-time expenditures, which may be reported in a combined initial and closing report.

We conclude that, if the Supreme Court's "rationality" test for threshold disclosure levels has any force at all, there must be a level below which mandatory disclosure of campaign expenditures . . . runs afoul of the First Amendment. It may very well be that such a level is not susceptible to dollar estimation or that all monetary contributions convey sufficiently valuable information about the supporters of an initiative to justify the burden of disclosure. But if we are to give *any* effect to *Buckley's* "rationality" test, at some point enough must be enough. . . .

Id. at 1033-34 (finding, as noted above, that the above *de minimis* in-kind expenditures made by plaintiff lay beyond this point) (emphasis in original).

The Ninth Circuit therefore concluded that "by applying its disclosure provisions" as it did to the plaintiff's "*de minimis* in-kind contributions," the state violated the plaintiff's First Amendment rights. Id. at 1034. But the Court of Appeals expressly limited its holding "to this formulation." Id. It went on to note that it was "not concerned with – and express[ed] no view about – the constitutionality of [the state's] disclosure requirements . . . *as applied to monetary contributions of any size*." Id. (emphasis added). The Ninth Circuit also did "not purport to establish a level above *de minimis* at which a disclosure requirement for in-kind expenditures . . . passes constitutional muster." Id. Rather, the Court of Appeals noted, "[t]he fixing of any such level" was for the state "authorities in the first instance." Id.

Plaintiffs point as well to the decision in Sampson, wherein the Tenth Circuit stated there was "virtually no proper governmental interest in imposing disclosure requirements on" groups such as the plaintiff, which had raised "so little money" in that case, namely "less than $1,000 in monetary and in-kind contributions." 625 F.3d at 1249. As noted above, the disclosure statute at issue in Sampson required any group "that ha[d] accepted or made contributions or expenditures exceeding $200" to register, and to "report the names and addresses of anyone" who contributed

"$20 or more." Id. The Tenth Circuit held the expenditures at issue to be "sufficiently small that they [said] little about the contributors' views of their financial interest." Id. at 1261.

In so holding, though, the Tenth Circuit explicitly relied on the Ninth Circuit's language in Canyon Ferry that the value of such financial information to voters declined "drastically as the value of the expenditure or contribution [sank] to a negligible level." Id. at 1260-61 (quoting 625 F.3d at 1033). As just discussed, the focus of the Ninth Circuit's inquiry in Canyon Ferry was *de minimis* in-kind expenditures that essentially approached "zero" value. Indeed, also as discussed above, the Ninth Circuit expressly declined to set a minimum threshold level for expenditures or contributions, leaving that to the state "in the first instance." 625 F.3d at 1034. Nor should can the Court ignore, again as discussed above, the fact that the public policy animating Colorado's disclosure requirements concerned primarily large expenditures and contributions, which played an important part in the Tenth Circuit holding in that case.

The Court further notes that although the threshold amounts at issue here may be low, it is important to keep in mind – as did the Honorable Ronald B. Leighton in a recent case dealing with a similar challenge to the reporting and disclosure requirements contained in RCW Chapter 42.17 – that "even low dollar disclosure thresholds have a palliative purpose." Family PAC v. Reed, *et al*, Case No. 3:09-cv-05662-RBL, ECF #88, Transcript of Proceedings, p. 9. This is because "*in the aggregate* those [amounts] can make a profound difference in an election" or the legislative decision-making process, "if they are being orchestrated by some group." Id. (emphasis added). Washington thus "has an interest in making sure that" its citizens "know that," and "that they can follow the money." Id. at pp. 9, 11 (specifically finding this to be true in regard to lower $25 and $100 thresholds at issue in that case).

ORDER - 93

6.  <u>Washington's Grassroots Lobbying Disclosure Requirements Are Not Unduly Burdensome</u>

In arguing that the reporting and disclosure requirements contained in RCW 42.17.200 are unduly burdensome, plaintiffs assert the Ninth Circuit recognized in <u>Human Life</u> that such requirements may be unduly onerous when: (1) they limit the amount that may be contributed to or spent by non-profit groups; (2) impair the fundraising capabilities of such groups; or (3) make such groups undergo major, unwarranted structural changes. <u>See</u> ECF #22, p. 11 (citing 624 F.3d at 1014). But plaintiffs have failed to demonstrate such has occurred either with respect to their own situations or in general in regard to groups such as theirs. First, as the Ninth Circuit went on to note with respect to the first factor above, reporting and disclosure laws such as the one at issue in this case are "*not a financial limitation*," but rather only require reporting and disclosure of financial-related information. <u>Human Life</u>, 624 F.3d at 1014 (emphasis added).

As for plaintiff's contention that RCW 42.17.200 "imposes a *de facto* limitation on the amount of [money] they may spend in advancing their political speech," what they essentially assert is that although that statute does not expressly require that they limit their expenditures, their desire to avoid complying with the reporting and disclosure requirements contained therein have caused them to voluntarily do so. ECF #22, p. 12; <u>see also</u> ECF #22, Exhibit 5, Declaration of Ray Akers, p. 17 ("[M]y first inclination [after realizing possibility of having to report] was that I should rachet down my activities to avoid coming under the jurisdiction of the law."), Exhibit 9, Declaration of Alfred R. Petermann, p. 26 ("[W]e had several choices, and one of them was we were to restrict ourselves, which is what we did."). Such a *de facto* limitation, however, is not what is required to be shown here. Rather, plaintiffs must show the language of the statute itself imposes the alleged limitation.

There is "no allegation" in this case – or at least no credible allegation – that the actual

ORDER - 94

"reporting provisions [contained in RCW 42.17.200] limit the fundraising ability" of those who are regulated thereby. <u>Human Life</u>, 624 F.3d at 1014 (quoting <u>Arizona Right to Life Committee v. Miles</u> ("<u>ARTLC</u>"), 441 F.3d 773, 791 (9th Cir. 2006)). In <u>ARTLC</u>, the Ninth Circuit found the burdens imposed by the state's financial reporting requirements were "not particularly onerous," in part because they required only the "reporting" of contributions and expenditures, and "*in no way* limit[ed] the amount that may be" contributed or spent. 441 F.3d at 791 (emphasis added). Second, the Court of Appeals noted the requirements did not result in an ability to "hardly raise any funds at all to engage in political speech[.]" <u>Id.</u>; <u>see</u> <u>also</u> <u>Federal Election Com'n v. Massachusetts Citizens for Life, Inc.</u> ("<u>MCFL</u>"), 479 U.S. 238, 260 (1986). So too, here, the reporting and disclosure requirements in RCW 42.17.200 themselves pose no such limitation on plaintiffs' ability to raise or spend funds to advance their political speech.

As for having to undergo major, unwarranted structural changes, plaintiffs have not been "forced" by RCW 42.17.200 to make the kind of changes the Ninth Circuit noted in <u>Human Life</u>. There, the disclosure law at issue required political committees to "appoint a treasurer and open a bank account in the state of Washington," in addition to having to comply with certain reporting requirements. 624 F.3d at 998 (citing RCW 42.17.050(1)). The Ninth Circuit found that because these requirements were "somewhat modest" and were "substantially related to the government's interest in informing the electorate," they survived exacting scrutiny. <u>Id.</u> at 1014. In <u>ARTLC</u>, the Ninth Circuit also upheld the challenged disclosure provisions in part on the basis that they were "not 'broad prophylactic rule[s]' that require[d] structural changes," such as requiring funds to be "segregated". 441 F.3d at 791; <u>compare</u> <u>MCFL</u>, 479 U.S. at 254 (finding statutory provision that required incorporated entities to establish "separate segregated fund" in order "to engage in any independent spending whatsoever, and to "appoint a treasurer" to, among other duties, keep "an

account of every contribution regardless of amount" and "the name and address of any person to whom a disbursement is made regardless of amount," along with other reporting and disclosure requirements, to be unduly burdensome).[41]

In this case, plaintiffs assert that because of the reporting and disclosure requirements in RCW 42.17.200, they have had to "substantially modify their operations to properly comply with the demands" thereof. ECF #22, p. 12. In support of this assertion, they point to the declaration of Alfred R. Petermann, a representative of CE, who states therein that "it was obvious to [them] that [they] could not, under the terms and conditions that [they] were operating," do so under the requirements imposed by RCW 42.17.200. ECF #22, Exhibit 9, p. 26. That is, complying with the law simply "was not a workable thing." Id.[42] Plaintiffs, however, provide no specifics as to

---

[41] As the Supreme Court in MCFL further explained in finding the particular statutory provision at issue in that case to be unduly burdensome:

> It is evident . . . that [the plaintiff] is subject to more extensive requirements and more stringent restrictions than it would be if it were not incorporated. These additional regulations may create a disincentive for such organizations to engage in political speech. Detailed recordkeeping and disclosure obligations, along with the duty to appoint a treasurer and custodian of the records, impose administrative costs that many small entities may be unable to bear. Furthermore, such duties require a far more complex and formalized organization than many small groups could manage. Restriction of solicitation of contributions to "members" vastly reduces the sources of funding for organizations with either few or no formal members, directly limiting the ability of such organizations to engage in core political speech. It is not unreasonable to suppose that, as in this case, an incorporated group of like-minded persons might seek donations to support the dissemination of their political ideas and their occasional endorsement of political candidates, by means of garage sales, bake sales, and raffles. Such persons might well be turned away by the prospect of complying with all the requirements imposed by the [law at issue]. Faced with the need to assume a more sophisticated organizational form, to adopt specific accounting procedures, to file periodic detailed reports, and to monitor garage sales lest nonmembers take a fancy to the merchandise on display, it would not be surprising if at least some groups decided that the contemplated political activity was simply not worth it.

479 U.S. at 254-55 (internal footnote omitted); but see Speechnow, 599 F.3d at 698 (stating "organizational requirements . . . such as designating a treasurer and retaining records" do not "impose much of an additional burden," especially if targeted entity "intends to operate" with "relative simplicity").

[42] Plaintiffs also point to the declaration of Ray Akers, a representative of MCOM, in which, they assert, he explains how MCOM has "no method of tracking various contributions or expenditures." ECF #22, pp. 12-13. But the particular section of that declaration they cite does not actually contain such an explanation. See id., Exhibit 5, pp. 62-68. In addition, even if one could be implied therefrom, neither Mr. Akers nor plaintiffs explain why MCOM has

ORDER - 96

why the way that CE – or MCOM for that matter – operates will not work if they were to comply with RCW 42.17.200. That is, it is entirely insufficient to claim they will suffer undue burdens merely on the stated basis that it is not "workable". More importantly, though, again the statute itself makes no actual demands on how plaintiffs or other similar organizations should structure their operations, let alone ones that reach the level of those addressed in <u>MCFL</u>.

Plaintiffs do argue that the mandatory reporting and disclosure requirements contained in RCW 42.17.200, have prevented – or will prevent – others from contributing to them, thus chilling their First Amendment rights. Mr. Akers states in his declaration that "it's hard to get people . . . to sign anything in [his] neighborhood," because "[t]hey come from cultures where government cannot be trusted" and "has a real history of abuse," and therefore "you cannot get them to sign their names to things." ECF #22, Exhibit 5, p. 46. Mr. Akers also voiced having both "a fear" and "an experience" of being "pigeonholed by State elected leaders" as "an archconservative," if MCOM had "to document" themselves and make themselves "official". <u>Id.</u> at p. 48. He further stated that in his community, people would not sign any forms, because, he believed, they do not "want to be associated with membership in a lot of groups," i.e., they "like to fly under the radar." <u>Id.</u> at p. 77. Mr. Akers points as well to "a tremendous language barrier," so that it would make it "difficult enough to get a signature and even more difficult to tell them they need to tell [him] how much they spent" on MCOM-related activities. <u>Id.</u> Ms. Murakami, another representative of MCOM, also states in relevant part in her declaration that:

---

not adopted one or why it would be unduly burdensome for it to do so. Further, as the holdings in <u>MCFL</u>, <u>Human Life</u> and <u>ARTL</u> make clear, not just any structural change will be found to be unduly burdensome. In addition, while Mr. Akers, similar to Mr. Peterman, states that "keep[ing] track of [contributions and expenditures] is onerous, and . . . unreasonable," as MCOM is "very, very grass roots" (<u>see</u> ECF #22, Exhibit 5, p. 47), as with Mr. Peterman, this statement is completely lacking in specifics, such that the Court is unable to determine therefrom if MCOM actually faces any undue burdens on its operations. <u>See</u> <u>also</u> ECF #22, Exhibit 11, Declaration of Patricia Murakami (stating that because MCOM does not "have any paid staff," it would be "time-consuming to report").

> . . . [W]e've got so many people that were part of our group when we were fighting eminent domain and community renewal that are from other countries, they're immigrants to this country, so they're afraid -- there is no way that they would have exposed their name out publicly.  They're afraid of authority.  They're afraid to go to a meeting and speak up.  I mean, it was like pulling teeth to get some of them to speak and say, no, I don't want you to take my property.  Because they -- like one gentleman came from Communist China, and you can get killed for doing things like that.
>
> So we had all kinds of barriers to overcome in getting that together to keep people's homes and businesses intact.  And there's no way that they would want their names on a public record.

Id., Exhibit 11, p. 15.

Mr. Sussman, a founder of CE, states in his declaration that Washington's reporting and disclosure requirements are "intimidating [them] from doing the kinds of political things" either they should be or could be doing. ECF #22, Exhibit 6, p. 40.  Mr. Sussman further states CE does not want to report the names and addresses of "people who might be willing to donate to [CE] in the future but now have become afraid because of the invasion of their own privacy." Id. at pp. 40-41.  In terms of anyone actually not donating to CE because of this fear, though, Mr. Sussman can only point to one instance as reported to him by Mr. Peterman, of a Ford dealership declining to donate after being informed of the possible disclosure requirements. Id. at pp. 89-90.  Indeed, Mr. Sussman states he himself has no direct knowledge of this incident. See id.

Mr. Peterman for his part, states that CE is "deeply concerned," not because the PDC will "come after" it, but because of the belief that there are "some aggressive groups in Seattle," and that if CE was "to be lucky enough to influence legislation" or if it was "mentioned as [being] supporters of something," then "someone might use the [PDC] as a tool to harm [it] financially or legally." Id., Exhibit 9, p. 19.  In regard to whether he knew of anyone who had been subject to any threats or harassment as a result of having to comply with RCW 42.17.200, however, Mr. Peterman could only state that from talking to people about contributing to CE "for educational

ORDER - 98

advocacy," they did have a "concern" that "they would suffer some type of harassment or some type of reaction to supporting a conservative group." Id. at p. 55-56.

These statements do not rise to the requisite level of evidentiary proof plaintiffs have the burden of showing to establish constitutional harm in this case. To satisfy that burden, plaintiffs must establish "'a reasonable probability that the compelled disclosure . . . will subject them to threats, harassment, or reprisals from either Government officials or private parties." Reed, 130 S.Ct. at 2820 (quoting Buckley, 424 U.S. at 74). Plaintiffs can do so by demonstrating that "on past occasions revelation of the identity of its rank-and-file members has exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility." NAACP, 357 U.S. at 462. [43]

As in this case, the plaintiff in Citizens United argued "disclosure requirements can chill donations to an organization by exposing donors to retaliation," and as evidence of such, pointed "to recent events in which donors to certain causes were blacklisted, threatened, or otherwise targeted for retaliation." 130 S.Ct. at 916; see also ECF #22, Exhibit 9, p. 55 (pointing out in context of petition for gay marriage, as example of harassment, calls by activists in Seattle for names of petition signers, so their bosses and neighbors would know what they are thinking). As the Supreme Court noted, though, while "[t]he examples cited" were "cause for concern," the plaintiff itself had "offered no evidence that *its* members may face similar threats or reprisals." Citizens United, 130 S.Ct. at 876 (recognizing statute "would be unconstitutional as applied to an organization if there were a *reasonable probability* that the group's members would face threats,

---

[43] "Under these circumstances," the Supreme Court continued, "we think it apparent that compelled disclosure . . . is likely to affect adversely the ability of [the plaintiff] and its members to pursue their collective effort to foster beliefs which they admittedly have the right to advocate, in that it may induce members to withdraw from the [plaintiff] and dissuade others from joining it because of fear of exposure of their beliefs shown through their associations and of the consequences of this exposure." Id. at 462-63.

harassment, or reprisals if their names were disclosed.") (emphasis added).

As the Supreme Court explained in greater detail in <u>Buckley</u> in regard to an overbreadth challenge to the application of disclosure requirements to minor parties and independents, which are in a not dissimilar position to groups such as plaintiffs in this case:

In NAACP v. Alabama the organization had "made an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members (had) exposed these members to economic reprisal, loss of employment, threat of physical coercion, and other manifestations of public hostility," 357 U.S., at 462, 78 S.Ct., at 1172, and the State was unable to show that the disclosure it sought had a 'substantial bearing' on the issue it sought to clarify, *id.*, at 464, 78 S.Ct. at 1172. Under those circumstances, the Court held that "whatever interest the State may have in (disclosure) has not been shown to be sufficient to overcome [the plaintiff's] constitutional objections." *Id.*, at 465, 78 S.Ct., at 1173.

. . . No record of harassment on a similar scale was found in this case. . . . NAACP v. Alabama is inapposite where, as here, any serious infringement on First Amendment rights brought about by the compelled disclosure of contributors is highly speculative.

. . .

We are not unmindful that the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisal may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena.

There could well be a case, similar to those before the Court in NAACP v. Alabama . . . where the threat to the exercise of First Amendment rights is so serious and the state interest furthered by disclosure so insubstantial that the [disclosure statute's] requirements cannot be constitutionally applied. *But no appellant in this case has tendered record evidence of the sort proffered in NAACP v. Alabama. Instead, [the plaintiffs] primarily rely on "the clearly articulated fears of individuals, well experienced in the political process." . . . At best they offer the testimony of several minor-party officials that one or two persons refused to make contributions because of the possibility of disclosure. On this record, the substantial public interest in*

ORDER - 100

*disclosure identified by the legislative history of [the disclosure statute] outweighs the harm generally alleged.*

> *. . .*

> We recognize that unduly strict requirements of proof could impose a heavy burden, but it does not follow that a blanket exemption for minor parties is necessary. Minor parties must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of their claim. *The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties. The proof may include, for example, specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself. A pattern of threats or specific manifestations of public hostility may be sufficient. New parties that have no history upon which to draw may be able to offer evidence of reprisals and threats directed against individuals or organizations holding similar views.*

> *Where it exists* the type of chill and harassment identified in NAACP v. Alabama can be shown. . . .

424 U.S. at 69-72, 74. (internal footnotes omitted) (emphasis added). The evidence, or rather the lack thereof, presented by plaintiffs in this case, is substantially similar to that the Supreme Court found lacking in <u>Buckley</u>. For the same reasons, this Court so concludes as well. <u>See</u> <u>Reed</u>, 130 S.Ct. at 2821 ("Plaintiffs . . . have provided . . . scant evidence or argument beyond the burdens they assert disclosure would impose.")[44]

---

[44] Other federal courts are in agreement. For example, in the lobbying context, the district court in <u>CICU</u> noted the plaintiffs in that case had argued that "since their public policy advocacy is labeled lobbying, and lobbying has a pejorative connotation in the public's perception, they [were] forced to curtail their activities," which the district court noted fell "largely into the category of self-censorship." 534 F.Supp. at 498. The district court rejected that argument, though, because there was "no factual record of economic reprisals, loss of employment, threats, or other manifestations of hostility . . . as in NAACP v. Alabama." <u>Id.</u> In <u>Taylor</u>, again in the lobbying context, the Federal Circuit found as follows:

> This, then, is a case like *Buckley*, not *NAACP*. As in *Buckley*, the plaintiff has tendered no "record evidence of the sort proffered in *NAACP v. Alabama*." 424 U.S. at 71, 96 S.Ct. 612. *Instead, it primarily relies on "clearly articulated fears" and a few examples of harassment unconnected to lobbying disclosures by [the plaintiff] or any other entity.* Moreover, the risks that [the plaintiff] claims its members would suffer if their participation in controversial lobbying were revealed are no different from those suffered by any organization that employs or hires lobbyists itself, and little different from those suffered by any individual who contributes to a candidate or political party. If that kind of risk rendered [the challenged

D.     There Is No Constitutional Violation Due to Vagueness

"[A] vague regulation of speech infringes on First Amendment rights." Voters Education Committee, 161 Wn.2d at 484 (citing Reno v. Am. Civil Liberties Union, 521 U.S. 844, 871-72 (1997) ("The vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech."). A statute "is unconstitutionally vague if it fails to provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." Human Life, 624 F.3d at 1019 (citation omitted); see also Canyon Ferry, 556 F.3d at 1028, 1030 (vagueness found where statute "'fails to provide people of ordinary intelligence a reasonable opportunity to understand' whether their activities require disclosure under the statute"; law unconstitutionally vague where entity "had *no way* of knowing *ex ante*" its conduct would be covered thereby) (quoting Hill v. Colorado, 530 U.S. 703, 732 (2000)) (emphasis added); Zwickler v. Koota, 389 U.S. 241, 249 (1967) (law void for vagueness when it "either forbids or requires the doing of an act in terms so vague [persons] of common intelligence must necessarily guess at its meaning and differ as to its application") (citation omitted).

"[P]erfect clarity," though, "is not required even when a law regulates protected speech." Human Life, 624 F.3d at 1019 (quoting California Teachers Ass'n v. State Bd. Of Educ., 271 F.3d 1141, 1150 (9th Cir. 2001)); see also Taylor, 582 F.3d at 23 (noting "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity") (quoting United States v. Williams, 128 S.Ct. 1830, 1845 (2008)). As the Ninth Circuit has

statute] unconstitutional, it would invalidate most compelled lobbying disclosures in contravention of *Harriss*, and most compelled campaign finance disclosures in contravention of *Buckley*. Accordingly, we reject both [the plaintiff's] facial and as-applied First Amendment challenges.

582 F.3d at 22 (internal footnote omitted) (emphasis added).

ORDER - 102

noted, "we can never expect mathematical certainty from our language." Id. (quoting Grayned v. City of Rockford, 408 U.S. 104, 110 (1972)); see also CICU, 534 F.Supp. at 502 (noting "some weighing" of whether particular activities may come within purview of disclosure statute "is true of all types of disclosure laws," given that such statutes need not "cover every conceivable set of circumstances that may arise under" them); Kimbell, 164 Vt. at 89 ("[A] statute need not detail every circumstance that would amount to a violation.") (citing CICU, 534 F.Supp. at 502, and quoting State v. Hoebel, 41 N.W.2d 865, 867 (1950) ("It is not required that a statue be so elaborate in its detailed specifications as to meet every possible state of circumstances that may arise under it.")). Thus, "[e]ven when a law implicates First Amendment rights, the constitution must tolerate a certain amount of vagueness." California Teachers Ass'n, 271 F.3d at 1151.

But "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." Human Life, 624 F.3d at 1020 (quoting NAACP v. Button, 371 U.S. 415, 433 (1963)). "A statute's vagueness exceeds constitutional limits if its deterrent effect on legitimate expression is both real and substantial, and if the statute is not readily subject to a narrowing construction by the state courts." Human Life, 624 F.3d at 1020 n.9 (quoting California Teachers Ass'n, 271 F.3d at 1151); see also Buckley, 4224 U.S. at 77 ("Where First Amendment rights are involved, an even "greater degree of specificity' is required") (citation omitted). "On the other hand, if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague even though marginal cases could be put where doubts might arise." Harriss, 347 U.S. at 618.

In addition, "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid 'in the vast majority of its intended applications.'" Human Life, 624 F.3d at 1021 (quoting Hill v. Colorado, 530 U.S.

703, 733 (2000)).  Thus, "'the belief that the mere fact that close cases can be envisioned renders a statute vague' is a 'basic mistake.'" <u>Taylor</u>, 583 F.3d at 23 (quoting <u>Williams</u>, 128 S.Ct. at 1845 (2008)) (noting further that while "the statute [in <u>Taylor</u>] may not be a paragon of clarity, it is not so vague as to violate the Constitution, even applying the heightened standard applicable to regulation of speech"); <u>see also</u> <u>CICU</u>, 534 F.Supp. at 502 (declining to accept argument made by plaintiffs concerning vagueness, because it was based on too "expansive" reading of statute); <u>Kimbell</u>, 164 Vt. at 88-89 ("[F]ears of prosecution must be based on reasonable interpretations of the statute in question.") (citing <u>CICU</u>, 534 F.Supp. at 502).

"Where the constitutional requirement of definiteness is at stake," furthermore, the Court must "construe the statue, if that can be done consistent with the legislature's purpose, to avoid the shoals of vagueness." <u>Buckley</u>, 424 U.S. at 77-78; <u>see also</u> <u>Harriss</u>, 347 U.S. at 618 (stating that if "general class of offenses" addressed by statute "can be made constitutionally definite by a reasonable construction" thereof, courts have duty to give it that construction).  "Moreover, 'otherwise imprecise terms may avoid vagueness problems when used in combination with terms that provide sufficient clarity.'" <u>Human Life</u>, 624 F.3d at 1021 ("[V]agueness challenges will be rejected when it is 'clear what the ordinance as a whole prohibits.'") (citing <u>Grayned</u>, 408 U.S. at 110).

Plaintiffs argue "Washington's law" is unconstitutionally vague, because "[e]ven after a review of the *relevant statutory language and agency materials* posted on the PDC website," they "were unable to determine whether *the law or its exemptions* applied to their activities." ECF #22, p. 13 (emphasis added).  "As a result," plaintiffs assert, "they were forced to seek official guidance in the form of a petition for a declaratory order." <u>Id.</u>  Plaintiffs go on to argue that their position here is bolstered by the fact that only "[a]fter *three months* of correspondence,

information gathering, analysis, and internal deliberation, the PDC finally ruled that . . . the grassroots lobbying law would apply to their activities if they exceeded the applicable financial thresholds." <u>Id.</u> (emphasis in original).

The Court agrees with defendants, however, that plaintiffs fail to specifically identify any term contained in RCW 42.17.200 or RCW 42.17.160 they allege to be unconstitutionally vague. Indeed, they point to no particular language in either statutory provision – or elsewhere in RCW Chapter 42.17 for that matter – the lack of specificity of which implicates their First Amendment rights. Rather, as indicated above, they merely refer to the "relevant" statutory language, agency materials or the law or its exemptions in general. Without more, the Court is unable to determine with any precision what constitutional infirmity they are claiming, nor will it speculate for them. In addition, the Court finds nothing in the statutory language contained in RCW 42.17.200 or in RCW 42.17.160 fails to provide "a reasonable opportunity" to those who may come within its purview "to know what conduct is prohibited." <u>Human Life</u>, 624 F.3d at 1019.

Indeed, that language is quite clear as to the persons, entities and activities covered and to the threshold levels at which such coverage comes into play, as discussed previously herein. As such, this is not the type of case where plaintiffs "had *no way* of knowing *ex ante*" that what they may have wanted to do would be covered by Washington's grassroots lobbying disclosure laws. <u>California Teachers Ass'n</u>, 556 F.3d at 1030 (emphasis added). As recognized by many courts, a statute need not "cover every conceivable set of circumstances that may arise under it" to pass constitutional muster, and mere "speculation" or "belief" about "possible vagueness . . . will not support a facial attack . . . when" – as in this case – "it surely is valid 'in the vast majority of its intended applications." <u>Human Life</u>, 624 F.3d at 1021 (quoting <u>Hill</u>, 530 U.S. at 733); <u>Taylor</u>, 583 F.3d at 23 (quoting <u>Williams</u>, 128 S.Ct. at 1845); <u>CICU</u>, 534 F.Supp. at 503.

ORDER - 105

More precisely, plaintiffs have not shown either through their own experience or that of any other similar group that either RCW 42.17.200 or RCW 42.17.160 "'fails to provide people of ordinary intelligence a reasonable opportunity to understand' whether their activities require disclosure." Canyon Ferry, 556 F.3d at 1028 (quoting Hill, 530 U.S. at 732). While it is true that one representative of CE did state in his declaration that at least with respect to events in which CE spends money, "it gets foggy as to exactly who you're going to include" in terms of reporting who participated in those events (ECF #22, Exhibit 6, p. 42), again "perfect clarity" in a statute's language is not required (see Taylor, 582 F.3d at 23 (quoting Williams, 128 S.Ct. at 1845). Nor is it even clear that plaintiffs have made a real, let alone reasonable, effort to comply with the disclosure requirements contained in RCW 42.17.200. See ECF #22, Exhibit 5, p. 48 ("Honestly, I don't know the extent to which reporting is required."); see also ECF #22, Exhibit 11, ¶¶ 14, 21; ECF #25, ¶¶ 24-26, 35, 49-50, 68-69.

Indeed, while plaintiffs assert they were "forced" to seek official guidance in the form of a declaratory order, the record shows they did not take advantage of the many other avenues for seeking such guidance that are available to the public short of petitioning for a declaratory order. See ECF #24, Exhibit 11, ¶¶ 14, 21; ECF #25, ¶¶ 24-26, 35, 49-50, 68-69. In addition, although as noted above, plaintiffs make much of the fact that it took three months for the PDC to rule on their petition – which was submitted on December 3, 2009 – this was because consideration of the petition took place at the PDC's next regularly scheduled hearing, which did not occur until January 28, 2010. See ECF #1, ¶¶ 75-76; ECF #25, ¶¶ 80, 83, 88; ECF #25-3, Exhibit 22. Consideration of the draft declaratory order took place on February 26, 2010, the very next scheduled hearing. ECF #25, ¶¶ 89-91 As such, there is no indication the PDC did not act in a reasonably timely manner here, or was delayed in the action it took due to any difficulty or

confusion in applying the relevant law. To the contrary, the declaratory order is quite clear as to the applicability thereof. <u>See</u> ECF #25-3, Exhibit 23.

E.    <u>There Has Been No Prior Restraint on Free Speech or Association Rights</u>

"Prior restraints on speech are disfavored and carry a 'heavy presumption' of invalidity." <u>Long Beach Area Peace Network v. City of Long Beach</u> ("<u>Long Beach</u>"), 574 F.3d 1011, 1023 (9th Cir. 2009) (quoting <u>Forsyth County v. Nationalist Movement</u>, 505 U.S. 123, 130 (1992)). This is because such restraints "are the most serious and the least tolerable infringement on First Amendment rights." <u>Id.</u> (citation omitted). Those that have been "found invalid" have all given "public officials the power to deny use of a forum in advance of actual expression." <u>Id.</u> (quoting <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 795 n.5 (1989)).

While "[a] prior restraint need not actually result in suppression of speech in order to be constitutionally invalid," the "relevant question [in determining whether something is a prior restraint] is whether the challenged regulation *authorizes* suppression of speech in advance of its expression." <u>Id.</u> (quoting <u>Ward</u>, 491 U.S. at 795 n.5) (emphasis in original). "'Reasonable time, place, [and] manner restrictions' on speech are permissible." <u>Id.</u> (quoting <u>Clark v. Cmty. For Creative Non-Violence</u>, 468 U.S. 288, 293 (1984)). As the Ninth Circuit has noted:

> . . . "[R]estrictions of this kind are valid provided [1] that they are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information."

<u>Id.</u> (quoting <u>Clark</u>, 468 U.S. at 293).

Plaintiffs allege in their complaint that RCW 42.17.200 and the regulations promulgated by the PDC require them "and others to register . . . and file monthly reports *in order to engage* in constitutionally protected speech and association," and therefore that they "constitute a prior restraint." ECF #1, ¶¶ 142-43 (emphasis added). However, plaintiffs provide absolutely no

ORDER - 107

argument, or point to any evidence, in support of these allegations. As such, the Court finds

plaintiffs have not properly presented them for summary judgment purposes. See Carmicle v.

Commissioner of Social Sec. Admin., 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (issue not argued

with specificity in briefing will not be addressed); Paladin Associates., Inc. v. Montana Power

Co., 328 F.3d 1145, 1164 (9th Cir. 2003) (by failing to make argument in opening brief,

objection to grant of summary judgment was waived); Kim v. Kang, 154 F.3d 996, 1000 (9th

Cir.1998) (matters not specifically and distinctly argued in opening brief ordinarily will not be

considered).

In addition, the Court notes that even if plaintiffs had properly presented this claim for

consideration, they would not succeed in establishing the existence of a constitutionally invalid

prior restraint here. First, as discussed previously, the reporting and disclosure requirements in

RCW 42.17.200 do not "authorize" the suppression of speech or association, and therefore it

does not *require* plaintiffs to register and file monthly reports *in order to engage* in free speech

or to exercise their right of association. Accordingly, because Washington's grassroots lobbying

disclosure laws do not actually restrict speech, they also are not content-based, and thus do not

constitute a prior restraint on plaintiffs' asserted rights. It also should be noted here as discussed

above, that those laws are sufficiently tailored to an important governmental interest, namely the

state's interest in informing the public.

F.      There Is No Violation of the Right to Petition the Government

Plaintiffs allege as well in their complaint as follows: (1) that the ability to exercise the

First Amendment to petition the government for redress of grievances "depends on their freedom

from unreasonable regulations that would substantially burden their activities," (2) that RCW

42.17.200 "is not sufficiently tailored to serve any compelling, important, substantial or even

ORDER - 108

legitimate state interest"; and (3) that the application of RCW 42.17.200 and the regulations the PDC has promulgated, on their face and as applied, "severely burden" the right to petition the government for redress of grievances. ECF #1, ¶¶ 130-32.

As with their prior restraint argument, though, plaintiffs here too have failed to provide any argument – or point to any evidence – in support of the above claims, and thus the Court declines to give them any credence. <u>See</u> <u>Carmicle</u>, 533 F.3d at 1161 n.2; <u>Paladin Associates., Inc.</u>, 328 F.3d at 1164; <u>Kim</u>, 154 F.3d at 1000.  In addition, as discussed elsewhere herein, RCW 42.17.200 does not substantially burden the First Amendment right to engage in free speech or right of association and is sufficiently tailored to an important governmental interest.  Given that plaintiffs' argument regarding the right to petition the government is based on these other claims, even if plaintiffs had properly presented this issue for the Court's consideration, they would not have succeeded in summary judgment.

G.    <u>There Has Been No Violation of the Equal Protection Clause</u>

Plaintiffs' last claim is that RCW 42.17.200, RCW 42.17.160 and the PDC's regulations "place an arbitrary burden" on their First Amendment rights and those of others, but do "not impose similar burdens on the First Amendment rights of the media and certain public officials." ECF #1, ¶ 136.  Although not alleged in their complaint, plaintiffs also argue RCW 42.17.160(5) impermissibly exempts from the reporting and disclosure requirements in RCW 42.17.200, those "who restrict their lobbying activities to no more than four days or parts thereof during any three-month period." ECF #22, p. 22.  The existence of these exemptions, plaintiffs claim, deprive both them and others of the equal protection of the law. ECF #1, ¶ 139.  Because "the challenged exemptions are triggered based on the identity of the speaker *and* their subject," plaintiffs further assert, they are "content-based and must be subject to strict scrutiny," a standard which cannot be

met here. ECF #1, ¶ 138; ECF #22, p. 23 (emphasis in original).

Pursuant to the Equal Protection Clause "all persons similarly circumstanced" are to be "treated alike." Gillbrook v. City of Westminster, 177 F.3d 839, 871 (9th Cir. 1999) (quoting Plyler v. Doe, 457 U.S. 202, 216 (1982).  The issue, therefore, is whether others "similarly situated" to plaintiffs are treated differently. Id. (quoting Milikotin v. City of Los Angeles, 643 F.2d 652, 654 (9th Cir. 1981) (allegation of "unequal treatment of persons similarly situated . . . [is] the gravamen of a complaint for denial of equal protection").  However, none of the entities or individuals in the above exemptions is similarly situated to plaintiffs.  Indeed, plaintiffs make no argument that they should be included in the same category as the media, government officials or those who come briefly to directly lobby the legislature, nor would they be able to mount any serious argument in that direction.

"Like other classifications, regulatory distinctions among different kinds of speech may fall afoul of the Equal Protection Clause." City of Ladue v. Gilleo, 512 U.S. 43, 51 n.9 (1994).[45] But while the exemptions plaintiffs challenge here may be directed at specific types of speakers, as discussed above they do not regulate speech *per se*, given that they are only exemptions from the reporting and disclosure requirements contained in RCW Chapter 42.17.  Accordingly, since

---

[45] As the Supreme Court explained:

> . . . [A]n exemption from an otherwise permissible *regulation of speech* may represent a governmental "attempt to give one side of a debatable public question an advantage in expressing its views to the people." . . . Alternatively, through the combined operation of *a general speech restriction* and *its* exemptions, the government might seek to select the "permissible subjects for public debate' and thereby to "control . . . the search for political truth."

Id. at 51 (emphasis added) (citations omitted).  Plaintiffs reliance on Citizens United here, therefore, is misplaced, given that, as discussed previously, that case dealt with a *direct* regulation of speech with respect to corporate media entities. See 130 S.Ct. at 898-99 ("Prohibited . . . are restrictions distinguishing among different speakers, allowing *speech* by some but not others. . . . *Speech restrictions* based on the identity of the speaker are all too often simply a means to control content.").  Indeed, as further discussed previously, Citizens United itself distinguished such direct regulation of speech from the type of reporting and disclosure requirements here, which constitute "a less restrictive *alternative* to more comprehensive regulations of speech." Id. at 915 (emphasis added).

ORDER - 110

those who do not come within the above exemptions are not thereby subject to a direct regulation of their free speech rights by such requirements – than those who do come within the exemptions avoid – the statutory framework creates no distinction among different kinds of speech. As such, no constitutional violation has been shown here.

<u>CONCLUSION</u>

Defendants have met their burden of demonstrating that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law. Plaintiffs have failed in all instances to allege facts sufficient to form a constitutional violation. As such, plaintiffs' motion for summary judgment (<u>see</u> ECF #22) hereby is DENIED, and summary judgment for defendants hereby is GRANTED. Plaintiffs' civil rights complaint therefore hereby is DISMISSED.

DATED this 8th day of November, 2011.

Karen L. Strombom
United States Magistrate Judge